**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION | MDL No. 2445 |
| | Master File No. 2:13-md-02445-MSG |
| This Document Relates To: | |
| *United Food and Commercial Workers Health and Welfare Fund of Northeastern Pennsylvania v. Reckitt Benckiser, Inc., et al.*, No. 2:13-cv-03229-MSG (E.D. Pa.) | |
| *Meridian Health Plan Of Michigan, Inc., v. Reckitt Benckiser Group Plc, et al.*, No. 2:13-cv-01594-MSG (E.D. Pa.) | |
| *Painters District Council No. 30 Health and Welfare Fund v. Reckitt Benckiser, Inc., et al.,* No. 2:13-cv-03450-MSG (E.D. Pa.) | |
| *A.F. of L. - A.G.C. Building Trades Welfare Plan v. Reckitt Benckiser, Inc., et al*., No. 2:13-cv-03545-MSG (E.D. Pa.) | |
| *Michigan Regional Council of Carpenters Employee Benefits Fund, v. Reckitt Benckiser Group Inc., et al.*, No. 2:13-cv-01808-MSG (E.D. Pa.) | |
| *I.B.E.W. 292 Health Care Plan v. Reckitt Benckiser, Inc., et al.*, No. 2:13-cv-02454-MSG (E.D. Pa.) | |
| *Teamsters Health Services and Insurance Plan Local 404 v. Reckitt Benckiser, Inc., et al.*, No. 2:13-cv-03451-MSG (E.D. Pa.) | |
| *Construction & General Laborers' Local 190 Welfare Fund v. Reckitt Benckiser, Inc., et al.*, No. 2:13-cv-04430-MSG (E.D. Pa.) | |

*New York Hotel Trades Council & Hotel Assoc. of New York City, Inc. Health Benefits Fund v. Reckitt Benckiser, Inc., et al.*, No. 2:13-cv-03381-MSG (E.D. Pa.)

**END PAYOR CLASS PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ IV

INTRODUCTION ................................................................................. 1

ARGUMENT ....................................................................................... 1

  I.   END PAYOR PLAINTIFFS STATE A CLAIM WITH RESPECT
      TO RECKITT'S EXCLUSIONARY PRODUCT SWITCH
      SCHEME. ................................................................................ 1

     A.  The Price Disconnect Prevents Consumers From Making the
         Relevant Price/Quality Choice. ......................................... 2

     B.  *Tricor* Held that the Price Disconnect Requires Courts to Apply
         the Rule of Reason. ......................................................... 7

     C.  The Leading Court of Appeals Decision Applies the Rule of
         Reason. ...................................................................... 10

     D.  The *Walgreens* Opinion Is Distinguishable and Wrongly Decided. ................. 12

     E.  Plaintiffs Have Sufficiently Alleged Exclusionary Conduct Under
         the Profit Sacrifice Test. .................................................. 15

  II.  END PAYORS HAVE STANDING TO PURSUE THEIR
      CLAIMS. ................................................................................ 18

     A.  End Payors Have Article III Standing. ................................ 18

     B.  Rule 23 Determines Whether Named Plaintiffs May Pursue
         Claims of Absent Class Members in Other States. .................. 18

     C.  Plaintiffs' Claims Arise Under The Laws Of The States In Which
         They Incurred The Overcharge. ......................................... 22

     D.  End Payors Have Standing Under *AGC*. .............................. 26

       1.  *AGC* Does Not Apply to State Antitrust Claims. ............. 26

       2.  Even If *AGC* Applied to State Law, Defendants Fail to Support
           its Application to Plaintiffs' Claims. .............................. 27

          a.  Minnesota and North Carolina Explicitly Rejected *AGC*
             Factors. ............................................................... 28

i

b. *AGC* Does Not Apply in Kansas and Mississippi......................................... 28

c. *Visa* Cases Do Not Warrant Application of *AGC* in the District of Columbia, Iowa, Maine, Michigan, Nebraska, New Mexico, New York, North Dakota, South Dakota, Vermont and Wisconsin.............................................................................. 29

d. Harmonization Provisions Do Not Justify Application of *AGC* in Arizona, New Hampshire, New Mexico, Nevada, Oregon, Utah or West Virginia.................................................... 30

3. Plaintiffs Satisfy *AGC*............................................................................... 31

a. Plaintiffs Are Consumers of Suboxone. .................................................. 31

b. Reckitt's Conduct Caused Plaintiffs' Injuries. ........................................ 32

c. The Existence of Direct Purchasers Is Immaterial.................................... 32

d. Plaintiffs' Damages Claims Are Not Speculative..................................... 33

III. END PAYORS STATE A CLAIM UNDER STATE ANTITRUST, CONSUMER PROTECTION, AND UNJUST ENRICHMENT LAWS. .......................................................................................................... 33

A. Antitrust Claims .................................................................................................. 33

1. Florida, Massachusetts, Puerto Rico and Rhode Island Do Not Bar Recovery By Indirect Purchasers. .............................................................. 33

2. End Payors Allege a Sufficient Nexus to Intrastate Commerce. ................... 34

3. End Payors State Monopolization Claims Under California and New York Law........................................................................................... 36

B. Consumer Protection Statutes .............................................................................. 36

1. *Illinois Brick* Does Not Bar Recovery Under State Consumer Protection Statutes. ........................................................................................ 36

2. There is a Sufficient Nexus between the Alleged Consumer Protection Violations and Intrastate Commerce. .............................................. 38

3. Monopolization Claims are Redressable Under the Consumer Protection Laws. ........................................................................................... 40

a.  The Consumer Protection Laws of Arizona, Idado, Illinois, Maine, Michigan, Minnesota, and West Virginia Are Applied Consistently with the Federal Trade Commission Act, Which Prohibits Monopolization. ....................................... 40

b.  Monopolization is Redressable Under the Remaining States' Consumer Protection Laws. ........................................................ 41

4.  End Payors Have Sufficiently Alleged Deceptive Conduct, To the Extent It Is Required. .............................................................. 42

5.  End Payors Adequately Alleged Unconscionable Conduct. ........................... 45

6.  Reckitt's Other Arguments Regarding Kansas, Massachusetts, and Rhode Island Law Are Meritless. ............................................... 46

C.  The Unjust Enrichment Claims Are Valid ........................................................ 47

1.  The Unjust Enrichment Claims Are Adequately Pled. ................................... 47

2.  Unjust Enrichment is Not Dependent on Other Claims. ................................ 48

3.  End Payors Sufficiently Allege That They Conferred a Benefit on Reckitt That It Would Be Unjust for Reckitt to Retain. ........................... 49

4.  Reckitt's Other Attacks On Unjust Enrichment Are Futile. ......................... 50

IV. END PAYORS HAVE SUFFICIENTLY ALLEGED MONOPOLY POWER AND A RELEVANT MARKET. ............................................................... 52

A.  Relevant Market Analysis is Not Required. ...................................................... 52

B.  Defining a Relevant Market Is a Question of Fact for the Jury. ......................... 53

C.  End Payors Have Alleged a Plausible Relevant Market. .................................... 54

V.  END PAYORS STATE A CLAIM FOR INJUNCTIVE RELIEF ........................ 57

VI. THE RECKITT ENTITIES SHOULD NOT BE DISMISSED. ............................. 58

VII.   END PAYORS HAVE TIMELY SERVED DEFENDANTS. ......................... 58

CONCLUSION ....................................................................................... 60

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Teva Pharms. USA, Inc.*, 432
 F. Supp. 2d 408 (D. Del. 2006).................................................................. passim

*Advanced Health-Care Servs., Inc. v.
 Radford Cmty. Hosp.*, 910 F.2d 139 (4th
 Cir. 1990) ....................................................................................................... 15

*AIG Managed Mkt. Neutral Fund v. Askin
 Capital Mgmt., L.P.,* 197 F.R.D. 104
 (S.D.N.Y. 2000) ............................................................................................. 59

*Allied Orthopedic Appliances Inc. v. Tyco
 Health Care Group LP*, 592 F.3d 991 (9th
 Cir. 2010) ....................................................................................................... 14

*Andrx Pharms. Inc. v. Elan Corp.*, 421 F.3d
 1227 (11th Cir. 2005)...................................................................................... 55

*Apple iPod iTunes Antitrust Litigation*, 2010
 WL 2629907 (N.D. Cal. June 29, 2010).................................................. 12

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir.
 2008) ............................................................................................................... 19

*Asahi Glass Co., Ltd. v. Pentech Pharma.,
 Inc.*, 289 F. Supp. 2d 986 (N.D. Ill. 2003).................................................. 56

*Aspen Skiing Co. v. Highlands Skiing Co.*,
 472 U.S. 585 (1985)........................................................................................ 15

*Assoc. Gen. Contractors of California, Inc.
 v. California State Council of Carpenters*,
 459 U.S. 519 (1983) …………………………………………………….......passim

*AstraZeneca AB v. Mylan Labs., Inc.*, 2010
 WL 2079722 (S.D.N.Y. Aug. 31, 2011).................................................... 14

*Auto Parts Antitrust Litigation,* 12-md-
 02311, 2013 WL 2456612 (E.D. Mich.
 Jun. 6, 2013).......................................................................................... 46, 48

*Babyage.com, Inc. v. Toys R' Us, Inc.*, 2008 U.S. Dist. LEXIS 40476 (E.D. Pa. May 19, 2008) ...................................................... 54

*Baggett v. Hewlett-Packard Co.*, 582 F.Supp.2d 1261 (C.D. Cal. 2007) ....................... 51

*Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F.Supp.2d 569 (S.D.N.Y. 2011) ............... 56

*Beckler v. Visa U.S.A. Inc.*, No. 09-04-C-00030, 2004 WL 2475100 (N.D. Dist. Ct. Sept. 21, 2004) ....................................... 30

*Behrend v. Comcast Corp.*, No. 03-6604, 2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) ................................................. 17

*Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653 (D. Vt. 2012) .................... 40

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) ....................... 14

*Blake v. Abbott Labs.*, No. 03A01-9509-CV-00307, 1996 WL 134947 (Tenn. Ct. App. Mar. 27, 1996) ...................................... 41

*Blue Shield of Va. v. McCready,* 457 U.S. 465 (1982) ......................................... 22

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ................................. 19

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3rd Cir. 2007) .................... 52, 53

*Brookings v. Int'l Motor Contest Ass'n*, 219 F.3d 849 (8th Cir. 2000) ........................ 56

*C. R. Bard v. M3 Sys.*, 157 F.3d 1340 (Fed. Cir. 1998) ......................................... 11

*Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295 (D. Utah 1999) ................. 12

v

*California v. ARC Am. Corp.*, 490 U.S. 93 (1989) ........................................................................................................ 27

*Ciardi v. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303 (Mass. 2002) ........................................................................................ 37

*City of Sunland Park v. Macias*, 75 P.3d 816 (N.M. Ct. App. 2003) ..................................................................................... 30

*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 696 F. Supp. 97 (D. Del. 1988) .................................................................................................. 54

*Columbia Metal Culvert Co., Inc. v. Kaiser Alum. & Chem. Corp.*, 579 F.2d 20 (3d Cir. 1978) ................................................................................................... 55

*Comes v. Microsoft*, 646 N.W.2d, 440 (Iowa 2002) ........................................................................................................ 30

*Concepcion v. VEB Backereimaschenbau Halle*, 120 F.R.D., 482 (D.N.J. 1988) ........................................................ 58

*Cornelison v. Visa U.S.A. Inc.*, Hearing Transcript, No. CIV 03-1350 (S.D. Cir. Ct. 2004) ...................................................................................................... 30

*Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40, 778 N.Y.S.2d 147 (1st Dep't 2004) ............................................................... 36

*D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006) .......................................... passim

*Davis v. Four Seasons Hotel, Ltd.*, 228 P.3d 303 (Hawaii 2010) ....................................................................................... 30

*Dix v. American Bankers Life Assurance Co.*, 429 Mich. 410, 415 N.W.2d 206 (Mich. 1987) .................................................................................................. 44

*Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451 (1992) .......................................................................... 53

*Eon Labs Mfg., Inc. v. Watson Pharms., Inc.*, 164 F. Supp. 2d 350 (S.D.N.Y. 2001) ............................................................................................. 14

*Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 514 (1988) ............................................................ 42

*Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223 (3d Cir. 2013 .................................................... 31

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998) ................................................ 19

*Ferrell v. Wyeth-Ayerst Labs., Inc.*, No. C-1-01-447, 2004 U.S. Dist. LEXIS 15127 (S.D. Ohio, June 30, 2004) .................................................. 20, 24

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992) ............................................ 53

*Four B Corp. v. Daicel Chemical Industries Ltd.*, 253 F. Supp. 2d 1147 (D. Kan. 2003) ........................................................................... 28

*Franklin v. Franklin ex rel. Phillips*, 858 So.2d 110 (Miss. 2003) ................................................ 51

*Fredericks v. Rosenblatt*, 667 N.E.2d 287 (Mass. App. Ct. 1996) ................................................ 47

*FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) ................................................ 2, 52

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ................................................................. 52

*FTC v. Motion Picture Adver. Serv. Co, Inc.* 344 U.S. 392 (1953) ..................................................... 40

*FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1 (D.D.C. 1999) ........................................................... 41

*FTC v. Mylan Labs., Inc.* 62 F. Supp. 2d 25 (D.D.C. 1999) ........................................................... 41

*FTC v. Schering-Plough Corp.*, 2003 FTC LEXIS 187 (F.T.C. 2003) ........................................... 55

*Fucile v. Visa U.S.A., Inc.*, No. 51560-03, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ........................................................ 30

vii

*Geico v. Indem. Ins. Co. v. Kannaday*,  2007
   WL 2990552 (D. Kan. 2007) ............................................................ 46

*Geneva Pharms. Tech. Corp. v. Barr Labs.,
   Inc.*, 386 F.3d 485 (2d Cir. 2004) ................................................ 55

*Gibbons  v.  J.  Nuckolls,  Inc.*,  216  S.W.3d
   667 (Mo. 2007) ......................................................................... 37

*Gladstone, Realtors v. Village of Bellwood*,
   441 U.S. 91 (1979) .................................................................... 18

*Goodman v. Lukens Steel Co.*, 777 F.2d 113
   (3d Cir. 1985) .......................................................................... 19

*Goshen v. Mut. Life Ins. Co. of N.Y.*, 774
   N.E.2d 1190 (N.Y. 2002) ............................................................ 39

*Gratz v. Bollinger*, 539 U.S. 244 (2003) .......................................... 21

*Griffin v. Dugger*, 823 F.2d 1476 (11th Cir.
   1987) ...................................................................................... 21

*Hassine  v.  Jeffes*,  846  F.2d  169  (3d  Cir.
   1988) ...................................................................................... 22

*Hawaii  v.  Standard  Oil  Co.  of  Cal.*,  405
   U.S. 251 (1972) ........................................................................ 23

*Hayden  Pub.  Co.  v.  Cox  Broadcasting
   Corp.*, 730 F.2d 64 (2d Cir. 1984) .............................................. 56

*Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364
   (D.N.J. 2004) ........................................................................... 32

*Ho v. Visa U.S.A. Inc.*, No. 112316/00, 2004
   WL  1118534  (N.Y.  Sup.  Ct.  Apr.  21,
   2004) ...................................................................................... 30

*Hoffmann-LaRoche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ................................................................... 23

*Holeman  v.  Neils,*  803  F.  Supp.  237  (D.
   Ariz. 1992) .............................................................................. 41

viii

*Hoving v. Transnation Title Ins. Co.*, 545 F.
Supp. 2d 662 (E.D. Mich. 2008).................................................... 20

*IBM Peripheral EDP Devices Antitrust
Litig.*, 481 F. Supp. 965 (N.D. Cal. 1979) .................................... 12

*Illinois Brick Co. v. Illinois*, 431 U.S. 720
(1977).............................................................................................. 26

*Illinois ex rel. Burris v. Panhandle E. Pipe
Line Co.*, 935 F.2d 1469 (7th Cir. 1991)...................................... 36

*In re Aftermarket Filters Antitrust Litig.*, No.
08-4883 (RWG), 2009 U.S. Dist. LEXIS
104114 (N.D. Ill. Nov. 5, 2009)............................................. 27, 29

*In re Auto. Parts Antitrust Litig.*, 12-MD-
02311, 2013 WL 2456612 (E.D. Mich.
June 6, 2013)................................................................................. 42

*In re Auto. Parts Antitrust Litig.*, No. 12-
md-02311, 2013 WL 2456612 (E.D.
Mich. June 6, 2013) ...................................................................... 35

*In re Brand Name Prescription Drug
Antitrust Litig.*, 123 F.3d 599 (7th Cir.
1997) .............................................................................................. 35

*In re Cardizem CD Antitrust Litig.*, 105 F.
Supp. 2d 618 (E.D. Mich. 2000)........................... 35, 38, 49, 55

*In re Chocolate Confectionary Antitrust
Litig.*, 602 F. Supp. 2d 538 (M.D. Pa.
2009) ......................................................................................... 35, 37

*In re Ciprofloxacin Hydrochloride Antitrust
Litig.*, 363 F. Supp. 2d 514 (E.D.N.Y.
2005) .............................................................................................. 55

*In re DDAVP Indirect Purchaser Antitrust
Litig.*, 903 F. Supp. 2d 198 (S.D.N.Y.
2012) ......................................................................................... 36, 41

*In re DDAVP Indirect Purchaser Antitrust
Litig.*, No. 05-cv-2237, 2012 WL
4932158 (S.D.N.Y. Oct. 17, 2012) .............................................. 35

*In re Digital Music Antitrust Litig.*, 812 F.
   Supp. 2d 390 (S.D.N.Y. 2011)................................................................. 35, 58

*In re Ditropan XL Antitrust Litig.,* 529 F.
   Supp. 2d 1098 (N.D. Cal. 2007) ............................................................. 43

*In re Dynamic Random Access Memory
   (DRAM) Antitrust Litig.*, 536 F. Supp. 2d
   1129 (N.D. Cal. 2008) ................................................... 34, 37, 38, 41

*In re Flash Memory Antitrust Litig.*, 643 F.
   Supp. 2d 1133 (N.D. Cal. 2009) ............................................................. 30

*In re Flonase Antitrust Litig.*, 692 F. Supp.
   2d 524 (E.D. Pa. 2010) .............................................................. 31, 32, 40

*In re Grand Theft Auto Video Game
   Consumer Litig. (No. II)*, No. 06 MD
   1739(SWK)(MHD), 2006 WL 3039993
   (S.D.N.Y. Oct. 25, 2006) ....................................................................... 20

*In re Graphics Processing Units Antitrust
   Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal.
   2007)...................................................................................................... 30

*In re Hypodermic Prods. Antitrust Litig.*,
   MDL No. 1730, No. 05 Civ 1602, 2007
   U.S. Dist. LEXIS 47438 (D.N.J. June 29,
   2007)...................................................................................................... 20

*In re Imperial Home Décor Group, Inc.*, 294
   B.R. 607 (D. Del. 2003)......................................................................... 60

*In re Intel Corp. Microprocessor Antitrust
   Litig.*, 496 F. Supp. 2d 404 (D. Del. 2007) ......................................... 35

*In re K-Dur Antitrust Litig.,* 2008 WL
   2660783 (D.N.J. Mar. 19, 2008)............................................................ 25

*In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d
   517 (D.N.J. 2004) ......................................................... 31, 33, 48, 49

*In re Lorazepam & Clorazepate Antitrust
   Litig.*, 202 F.R.D. 12 (D.D.C. 2001) ..................................................... 22

*In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30 (D.D.C. 2003) ................................................ 22, 25, 48, 55

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. Pa. 1993) ................................................ 33

*In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090 (D.N.J. 2011) ................................................................................ 28, 38

*In re Mercedes-Benz TeleAid Litig.*, 257 F.R.D. 46 (D.N.J. 2009) ................................................ 47

*In re Meridian Project Sys. Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214 (E.D. Cal. 2005) ................................................................ 38

*In re Neurontin Antitrust Litig.*, MDL No. 1479, Master Docket No. 02-1390(FSH), 2013 U.S. Dist. LEXIS 111587 (D.N.J. Aug. 8, 2013) ................................................ 55

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp.2d 160 (D. Me. 2004) ........................................ 41, 42, 44

*In re Nexium (Esomeprazole) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 129696 (D. Mass. Sept. 11, 2013) ............................ 20, 25, 55

*In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642 (E.D. Mich. 2011) ................ 38

*In re Pharm. Indus. Average Wholesale Price Litig.*, 738 F. Supp. 2d 227 (D. Mass. 2010) ........................................ 46

*In re Pharm. Industry Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) ................................................ 47

*In re Photochromic Lens Antitrust Litig.*, 2011 WL 4914997 (M.D. Fla. 2011) ................ 46

*In re Pool Products Distribution Mkt. Antitrust Litig.*, MDL 2328, 2013 WL 2297213 (E.D. La. May 24, 2013) ............................................ 37

*In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907 (N.D. Ill. 2009) ................................................ 27, 30

*In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867 (E.D. Pa. 2012) ........................ passim

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) ......................................................... 19

*In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756 (E.D. Mich. 2013) ......................................................... 37

*In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004) ................................. 22, 24

*In re Reliance Secs. Litig.*, 91 F. Supp. 2d 706 (D. Del. 2000) ...................................... 59

*In re Rezulin Products Liability Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005) ........................ 25

*In re S.D. Microsoft Antitrust Litig.*, 707 N.W.2d 85 (S.D. 2005) ................................. 30

*In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279 (S.D. Fla. 2005) ......................................................... 55

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) .................... 27, 30, 37

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ...................... 34

*In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F.Supp.2d 1107 (D. Kan. 2003) ................................................. 42

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. Del. 2000) ........................ 31, 57

*In re Wellbutrin XL Antitrust Litig.*, 260
   F.R.D. 143 (E.D. Pa. 2009)................................................................. passim

*Ireland v. Microsoft*, 00-cv-201515, 2001
   WL 1868946 (Cir. Ct. Mo Jan. 24, 2001).................................................. 37

*Jefferson Parish Hosp. Dist. No.2 v. Hyde*,
   466 U.S. 2 (1984)............................................................................... 52

*Kaiser Found.v. Abbott Labs*, No. CV 02-
   2443, 2009 U.S. Dist. Lexis 107512 (C.D.
   Cal. Oct. 8, 2009)............................................................................... 56

*Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293
   (Neb. 2006) ....................................................................................... 29

*Kaufman v. Sirius XM Radio, Inc.*, 474 Fed.
   App'x 5 (2nd Cir. 2012) ....................................................................... 39

*King Drug Co. of Florence, Inc. v.
   Cephalon, Inc.*, 702 F. Supp. 2d 514 (E.D.
   Pa. 2010) ...................................................................................... passim

*Knoll Pharms. Co., Inc. v. Teva Pharms.
   USA, Inc.*, No. 01-C-1646, 2001 WL
   1001117 (N.D. Ill. Aug. 24, 2001)........................................................... 55

*Knowles v. Visa U.S.A. Inc.*, No. CV-03-
   707, 2004 WL 2475284 (Me. Super. Ct.
   Oct. 20, 2004) ................................................................................... 29

*Kuhl v. Guitar Ctr. Stores, Inc.*, No. 07-C-
   214, 2008 WL 656049 (N.D. Ill. Mar. 5,
   2008) ............................................................................................... 20

*La. Wholesale Drug Co., Inc. v. Sanofi-
   Aventis*, No. 07 Civ 7343(HB), 2008 WL
   169362 (S.D.N.Y. Jan. 18, 2008)............................................................. 55

*LaChance v. U.S. Smokeless Tobacco Co.*,
   931 A.2d 571 (N.H. 2007) ..................................................................... 39

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir.
   2003) (en banc) .................................................................................. 10

xiii

*Lewis v. Asbestos Corp.*, MDL 875, 2011
    WL 5881180 (E.D. Pa. Aug. 2, 2010) ........................................................ 60

*Long v. Dell, Inc.*, 984 A.2d 1074 (R.I.
    2009) ........................................................................................................... 47

*Lorix v. Crompton Corp.*, 736 N.W.2d 619
    (Minn. 2007) .................................................................................... 27, 28, 30

*Macquarie Grp. Ltd. v. Pac. Corporate
    Grp., LLC*, No. 08–CV–2113, 2009 WL
    539928 (S.D. Cal. Mar. 2, 2009) ................................................................ 45

*Martis v. Grinell Mut. Reinsurance Co.*, 388
    Ill. App. 3d 1017 (2009) ............................................................................. 51

*Matador Holdings, Inc. v. HoPo Realty
    Invs.*, 77 So. 3d 139 (Ala. 2011) ................................................................ 51

*McCarthy v. Recordex Serv.*, 80 F.3d 842
    (3d Cir. 1996) .............................................................................................. 57

*Miller v. Hygrade Food Prods. Corp.*, 89 F.
    Supp. 2d 643 (E.D. Pa. 2000) ................................................................ 21, 22

*Multistate Legal Studies, Inc. v. Harcourt
    Brace Jovanovich Legal & Prof'l Pub.,
    Inc.*, 63 F.3d 1540 (10th Cir. 1995) ........................................................... 11

*Muniz v. Horizon Lines Inc.*, 737 F. Supp.
    2d 57 (D.P.R. 2010) .................................................................................... 34

*Mutual Pharm. Co., Inc. v. Hoechst Marion
    Roussel, Inc.*, No. Civ. A. 96–1409, 1997
    WL 805261 (E.D. Pa. Dec. 17, 1997) ......................................................... 56

*Nass-Romero v. Visa U.S.A.*, 279 P.3d 772
    (N.M. Ct. App. 2012) .................................................................................. 29

*NECA-IBEW Health & Welfare Fund v.
    Goldman Sachs & Co.*, 693 F.3d 145 (2d
    Cir. 2012) .................................................................................................... 19

*New York v. Feldman,* 210 F. Supp. 2d 294
    (S.D.N.Y. 2002) ..................................................................................... 39, 44

xiv

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ............ 22

*Northeastern Tel. Co. v. AT&T*, 651 F.2d 76 (2d Cir. 1981) ............ 11

*Novell, Inc. v. Microsoft Corp.*, 2013 WL 5303259, ___ F.3d ___ (10th Cir. Sept. 23, 2013) ............ 15

*Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331 (Miss. 2004) ............ 28

*Peck v. Gen. Motors Corp.*, 894 F.2d 844 (6th Cir. 1990) ............ 31

*Peerless Heater Co. v. Mestek, Inc.*, No. Civ. A. 98-6532, 1999 WL 624481 (E.D. Pa. Aug. 6, 1999) ............ 53

*People ex rel. Spitzer v. Applied Card Systems, Inc.*, 805 N.Y.S.2d 175 (N.Y. App. Div. 3rd Dept. 2005) ............ 43

*Persky v. Turley*, 1991 WL 327434 (D. Ariz. 1991) ............ 44

*Piazza v. Ebsco Indus.*, 273 F.3d 1341 (11th Cir. 2001) ............ 19

*Pressure Vessels of Puerto Rico v. Empire Gas de Puerto Rico*, 137 D.P.R. 497 (1994) ............ 34

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F3d 430 (3d Cir. 1997) ............ 53, 54

*Ramson v. Lavne*, 668 F. Supp. 1162 (N.D. Ill. 1987) ............ 41

*Response of Carolina Inc. v. Leasco Response Inc.*, 537 F.2d 1307 (5th Cir. 1976) ............ 14

*Robinson v. Colorado State Lottery Div.*, 179 P.3d 998 (Colo. 2008) ............ 49

*Romero v. Philip Morris Inc.*, 242 P.3d 280 (N.M. 2010) .................................................................. 30

*Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010) ..................................................................... 20

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995) ...................................... 44

*Sergeants Benev. Ass'n Health & Welf. Fund v. Sanofi-Aventis U.S. LLP*, No. 08-0179, 2012 WL 4336218 (E.D.N.Y. Sept. 17, 2012) .................................................................... 25

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205 (E.D. Pa. 2009) .......................... 24

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380 (E.D. Pa. 2010) .................... 39

*Sheet Metal Workers National Health Fund v. Amgen Inc.*, No. 07 Civ 5295, 2008 U.S. Dist. LEXIS 62181 (D.N.J. Aug. 13, 2008) ............................................... 20, 35, 38, 40

*Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034 (N.D. Ill. 2007) ....................................................... 36

*Singer v. AT&T Corp.*, 185 F.R.D. 681 (S.D. Fla. 1998) ............................................................. 47

*Smithkline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686 (E.D. Pa. 2004) .................... 14

*SmithKline Beecham Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) ................ 15, 54, 55, 56

*Sosna v. Iowa*, 419 U.S. 393 (1975) .......................... 18

*Southard v. Visa U.S.A., Inc.*, 734 N.W. 2d 193 (Iowa 2007) ....................................................... 29

xvi

*Stark v. Visa U.S.A. Inc.*, No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004) ............................................................ 29

*State v. Piedmont Funding Corp.*, 382 A.2d 819 (R.I. 1978) ....................................................... 47

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ....................................................... 18

*Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005) ..................................................... 30

*Sunbelt Television, Inc. v. Jones Intercable, Inc.*, 795 F. Supp. 333 (C.D. Cal. 1992) ............. 36

*Teague v. Bayer AG*, 195 N.C. App. 18 (N.C. Ct. App. 2009)..................................... 28, 29

*The Knit With v. Knitting Fever, Inc.*, 2010 WL 2788203 (E.D. Pa. July 13, 2010)............... 60

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ................................................................ 53

*Tops Mkts, Inc. v. Quality Mkts, Inc.*, 142 F.3d 90 (2d Cir. 1998) .................................... 52

*Toys R Us Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ....................................................... 52

*Tungate v. Maclean-Stevens Studios, Inc.*, 714 A.2d 792 (Me. 1998)................................. 44

*U.S. Anchor Mgf., Inc. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir. 1993) ............................... 56

*United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) ............................. 23

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ............................... 10, 57

*United States v. E I du Pont de Nemours & Co.*, 351 U.S. 377 (1956)................................. 52

xvii

*United States v. Microsoft Corp.*, 253 F.3d
    34 (D.C. Cir. 2001) ............................................................. passim

*United States v. Microsoft*, 84 F. Supp. 2d 9,
    21, 26–27 (D.D.C. 1999) .................................................... 13

*Verizon Commc'ns Inc. v. Law Offices of
    Curtis V. Trinko*, 540 U.S. 398 (2004) ............................... 15

*W. Penn Allegheny Health Sys., Inc. v.
    UPMC*, 627 F.3d 85 (3d Cir. 2010) ................................... 31

*Walgreen Co. v. AstraZeneca Pharm. L.P.*,
    534 F. Supp. 2d 146 (D.D.C. 2008)........................... 12, 13, 14

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.
    2541 (2011) ......................................................................... 21

*Warma Witter Kreisler, Inc. v. Samsung
    Electronics Am., Inc.*, No. 08 Civ 5380,
    2009 U.S. Dist. LEXIS 112773 (D.N.J.
    Dec. 3. 2009)....................................................................... 20

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir.
    1984) ................................................................................... 53

*Xerox Corp. v. Media Sciences Int'l, Inc.*,
    511 F. Supp. 2d 372, 388 (S.D.N.Y.
    2007) ................................................................................... 12

*Xerox Corp. v. Media Sciences Int'l, Inc.*,
    No. 06-4872, 2007 WL 2685063
    (S.D.N.Y. Sept. 14, 2007)................................................... 56

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d
    254 (3d Cir. 2012)............................................................... 17

**Statutes**

10 P.R. Laws Ann. § 268 (2012) ............................................ 34

740 Ill. Comp. Stat. 10/2 (2012) ............................................ 24

740 Ill. Comp. Stat. Ann. 10/7(2) .......................................... 36

815 Ill. Comp. Stat. § 505/2 ................................................... 41

Ariz. Rev. Stat. § 44-1408(B) (2013) ........................................................... 26

Ariz. Rev. Stat. Ann. § 44-1522, *et seq.* ................................................. 41, 43

Ark. Stat. Ann. § 4–88–107 (2013) ................................................................ 45

Cal. Bus. & Prof. Code §§17200 *et seq.* ...................................................... 36

D.C. Code § 28-3904 (2013) ........................................................................... 45

Federal Trade Commission Act, 15 U.S.C. §
    45 ............................................................................................................ 41

Fla. Stat. §§ 501.201, *et seq.* ....................................................................... 33

Fla. Stat. Ann. § 501.204 ............................................................................... 43

Idaho Code Ann. § 48-603 (2013) ................................................................. 45

Kan. Stat. Ann. § 50-624 ............................................................................... 46

Kan. Stat. Ann. § 50-626 (2012) ................................................................... 45

Kan. Stat. Ann. § 50-627 ............................................................................... 43

Mass. Gen. Laws. ch. 93A § 1 (2013) ........................................................... 33

Mass. Gen. Laws. ch. 93A, § 9(1) (2013) ..................................................... 26

Me. Rev. Stat. Ann. tit. 5 § 207 ..................................................................... 43

Mich. Comp. Laws § 445.903 ........................................................................ 43

Mich. Comp. Laws Ann. § 445.911 ............................................................... 41

Minn. Stat. Ann. § 325D.09 ........................................................................... 43

Minn. Stat. Ann. § 8.31 .................................................................................. 41

N.C. Gen. Stat. Ann. § 75-1.1 (2013) ........................................................... 45

N.H. Rev. Stat. § 358–A:2 ............................................................................. 39

N.M. Stat. Ann. §57-12-3 (2013) .................................................................. 45

N.Y. Gen. Bus. Law § 340 (2013), *et seq.* .................................................. 36

xix

N.Y. Gen. Bus. Law § 349 ............................................................................ 36, 39, 43

Neb. Rev. Stat. § 59-1601 (2013) ............................................................................ 39

Nev. Rev. Stat. Ann. § 598A.030 (2011) ................................................................. 24

Pa. Stat. Ann. tit. 73, § 201-2 ................................................................................. 43

Pa. Stat. Ann. tit. 73, § 201-3 ................................................................................. 43

R.I. Gen. Laws §§ 6-13.1-1, *et* seq. ..................................................................... 34

R.I. Gen. Laws §§ 6-36-5 *et seq.* ...................................................................... 34, 37

S.D. Codified Laws Ann. § 37-24-6 ......................................................................... 43

Tenn. Code Ann. § 47-25-101 (2013), *et seq.* ...................................................................................................... 36

Utah Code Ann. § 13-11-4 (2013) ............................................................................ 45

Vt. Stat. Ann. tit. 9, § 2461 ..................................................................................... 40

W. Va. Code § 46A-6-103 ........................................................................................ 41

Wis. Stat. § 133.01 (2013) ....................................................................................... 24

Wis. Stat. Ann. § 133.18 (2013) .............................................................................. 26

**Other Authorities**

1 William B. Rubinstein et al., Newberg on Class Actions §2:6 (5th ed. 2011) ............................................................. 19

66 Am. Jur. 2d Restitution and Implied Contracts § 7 (August 2013) ................................................................. 49

7AA The Late Charles Alan Wright, et al., Federal Practice and Procedure §1785.1 (3d ed. 2010) ......................................................................................... 19

Allison Masson & Robert L. Steiner, FTC, *Generic Substitution And Prescription Drug Prices: Economic Effects Of State Drug Product Selection Laws* (1985) ..................................................... 3, 4

Cong. Globe, 39th Cong., 1st Sess. 1090,
    1292 (1866) ..................................................................................................... 25

Drug Product Selection, Staff Report to the
    FTC, Bureau of Consumer Protection
    (Jan. 1979) .................................................................................................. 3, 4

Eric L. Cramer & Daniel Berger, *The
    Superiority of Direct Proof of Monopoly
    Power and Anticompetitive Effects in
    Antitrust Cases Involving Delayed Entry
    of Generic Drugs*, 39 U.S.F. L. Rev. 81
    (2004) ............................................................................................................ 52

Herbert Hovenkamp, *et al.*, IP and Antitrust:
    An Analysis of Antitrust Principles
    Applied to Intellectual Property Law §
    15.3, 2012 WL 5831540 (2012) ......................................................... 2, 8, 12

Herbert Hovenkamp, et al., IP and Antitrust:
    An Analysis of Antitrust Principles
    Applied to Intellectual Property Law, §
    12.3, 2012 WL 5831501 (2012) ................................................................. 15

IIIB Areeda & Hovenkamp, Antitrust Law
    ¶776c (3d ed. 2006) ..................................................................................... 11

IIIB Areeda & Hovenkamp, Antitrust Law
    ¶776a (3d ed. 2008) ..................................................................................... 12

John Stuart Mill, Principles of Political
    Economy  (1848) (Oxford Univ. Press
    1998) ............................................................................................................... 3

Jonathan Jacobson, et al., *Predatory
    Innovation: An Analysis of Allied
    Orthopedic v. Tyco in the Context of
    Section 2 Jurisprudence*, Loyola
    Consumer L. Rev. 1 (2010) ......................................................................... 11

Kenneth J. Arrow, *Uncertainty and the
    Welfare Economics of Medical Care*, 53
    Am. Econ. Rev. 959 (1963) ........................................................................... 3

xxi

Louis Kaplow, *Why (Ever) Define Markets?*,
124 Harv. L. Rev. 438 (2010) ...................................................................................... 52

Mark A. Hurwitz & Richard E. Caves,
*Persuasion or Information? Promotion
and the Shares of Brand Name and
Generic Pharmaceuticals*, 31 J. L. &
Econ. 299 (1988).......................................................................................................... 4

Michael A. Carrier, *A Real-World Analysis
of Pharmaceutical Settlements: The
Missing Dimension of Product Hopping*,
62 Fla. L. Rev. 1009 (2010) ................................................................. 3, 4, 5, 7

Restatement (Second) of Conflict of Laws §
145 ............................................................................................................................ 23

Restatement (Second) of Conflict of Laws §
6 ........................................................................................................................ 23, 24

Restatement (Third) of Restitution and
Unjust Enrichment § 1 .............................................................................................. 49

Restatement of Restitution § 1 (1937) .......................................................................... 48

**Rules**

Fed. R. Civ. P. 4.......................................................................................................... 59

# INTRODUCTION

The Court should deny every aspect of Reckitt's[1] motion to dismiss[2] the End Payor Plaintiffs' Consolidated Amended Complaint ("Complaint" or "CAC").

# ARGUMENT

## I.   END PAYOR PLAINTIFFS STATE A CLAIM WITH RESPECT TO RECKITT'S EXCLUSIONARY PRODUCT SWITCH SCHEME.

Reckitt argues that a monopolist pharmaceutical manufacturer is entirely immune from antitrust scrutiny when it alters its product with the purpose and effect of impairing generic competition.  MTD at 12, 14–15.  That is not the law.

End Payors adopt the Direct Purchasers' arguments with respect to the basic antitrust issues; we address in greater detail the proper legal standard for evaluating the product switch scheme under Section 2 because it is a central question in this case.  The proper standard is the Rule of Reason, but Plaintiffs' Complaint also passes muster under the more demanding Profit Sacrifice standard.

As a reward for developing Suboxone, Reckitt enjoyed seven years of government-granted monopoly profits.  That reward, for which End Payors paid, resulted in an installed base of prescriptions written for Suboxone tablets.  At the end of the seven-year monopoly, that installed base of prescriptions for Suboxone tablets should have been open to generic

---

[1] "Reckitt" refers to Defendants Reckitt Benckiser, Inc., Reckitt Benckiser LLC, Reckitt Benckiser Pharmaceuticals, Inc., Reckitt Benckiser Healthcare (UK) Ltd., and Reckitt Benckiser Group plc.

[2] End Payor Plaintiffs ("End Payors" or "Plaintiffs") are nine union health and welfare funds that represent a putative class of consumers and third-party payors ("TPPs") that purchase or reimburse their members' purchases for Suboxone. Reckitt has incorporated by reference against the End Payors the arguments that it asserts against the Direct Purchaser Plaintiffs. Def. Mem. at 1.  End Payors hereby incorporate by reference the Direct Purchaser Plaintiffs' factual discussion and responsive arguments on all issues. Our references to "MTD" are to Reckitt's brief in support of their motion against the Direct Purchasers; references to "Def. Mem." are to Reckitt's brief in support of their motion against the End Payors.

competition, so that End Payors could finally enjoy the benefits of Suboxone at competitive prices.

Instead, Reckitt parlayed End Payors' prior investments in Suboxone tablets—the installed base of prescriptions—into a continuing monopoly for Suboxone film.  Leading commentators on the interplay between intellectual property and antitrust law have concluded that such "product hopping [by brand-name drug manufacturers] to ward off generic competition is precisely the sort of behavior the Sherman Act condemns.  While monopolists have no general duty to help their competitors, they do have an obligation to refrain from acts that have no purpose or effect except to exclude competition."  Herbert Hovenkamp, *et al.*, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law ("IP and Antitrust") § 15.3, 2012 WL 5831540 (2012).  These experts are right.

      **A.**     **The Price Disconnect Prevents Consumers From Making the Relevant Price/Quality Choice.**

The Supreme Court very recently rejected a brand manufacturer's contention that its conduct enjoyed "near-automatic antitrust immunity," and instead subjected that conduct to traditional Rule of Reason analysis.  *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013).  Although that case involved Section 1 of the Sherman Act rather than Section 2, the Court's analysis is notable for its careful attention to the specific economic and regulatory characteristics of prescription pharmaceutical markets.  In particular, the Court highlighted the "general procompetitive thrust of the [Hatch-Waxman Act]" and brand manufacturers' ability to undermine that procompetitive thrust by manipulating the "unique regulatory framework."  *Id*. at 2234, 2235.  The statute "unintentionally . . . created special incentives" for anticompetitive conduct.  *Id*. at 2235 (citation omitted).  This case perfectly illustrates the concerns that prompted the Court to reject antitrust immunity in favor of Rule of Reason inquiry.

Market forces are usually sufficient to ensure that manufacturers make only those product design changes that are likely to lead to increased consumer welfare.   A consumer who both selects and pays for the new product weighs its qualities against its price and decides whether the extra cost is "worth it."   With the price/quality trade-off in consumers' hands, manufacturers will generally make only those design changes that consumers are likely to value enough to pay for.

These market forces break down, however, when the person who must pay for the product does not select it, and the person who selects it does not pay.[3]   Prescription pharmaceutical markets, in which doctors choose which product the patient will buy, are characterized by just such a "price disconnect."   CAC ¶¶129–132; Michael A. Carrier, *A Real-World Analysis of Pharmaceutical Settlements: The Missing Dimension of Product Hopping*, 62 Fla. L. Rev. 1009, 1011 (2010) (hereafter "Carrier, *Real World*"); Drug Product Selection, Staff Report to the FTC, Bureau of Consumer Protection at 2–3 (Jan. 1979) (hereinafter "FTC Staff Report").   Thus, "the institutions of the prescription drug market are markedly different from those in most other product markets.   For prescription drugs, it has not been the consumer who has made the choice among brands; it has been the physician."   Allison Masson & Robert L. Steiner, FTC, *Generic Substitution And Prescription Drug Prices: Economic Effects Of State Drug Product Selection Laws* 5 (1985) (hereinafter "FTC Generic Substitution Report").   The "consumer price/quality choice" that usually disciplines markets, and that Reckitt relies on here, simply does not exist in this market.   The consumer needs a prescription—a permission slip— from her doctor, and her doctor does not take price into account (or take it fully into account)

---

[3] In these circumstances "the foundation of the *laisser-faire* principle breaks down entirely" and "the supply called forth by the demand of the market will be anything but what is really required." John Stuart Mill, Principles of Political Economy 342 (1848) (Oxford Univ. Press 1998). This insight is one of the foundations of the modern economic understanding of markets in which doctors choose the product but patients pay for it.  *See, e.g.*, Kenneth J. Arrow, *Uncertainty and the Welfare Economics of Medical Care*, 53 Am. Econ. Rev. 959, 967 (1963).

when choosing the product.  CAC ¶129.  *See, e.g.,* Carrier, *Real World*, at 1011; Mark A. Hurwitz & Richard E. Caves, *Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals*, 31 J. L. & Econ. 299, 300 (1988).  Brand manufacturers like Reckitt exploit this market defect by promoting their brand products to doctors through armies of sales force "detailers" on bases other than price.  CAC ¶130; Carrier, *Real World*, at 1020.

The Hatch-Waxman Act and state generic-substitution laws were specifically designed to ameliorate this price disconnect and help restore consumer choice.  CAC ¶133; Carrier, *Real World*, at 1013, 1017–18; FTC Generic Substitution Report at 7; FTC Staff Report at 273.  But FDA regulations, which are concerned with safety and not with effects on competition, prevent generic substitution unless the generic is in the same dosage form as the brand.  This puts a premium on the generic obtaining an "AB-rating" to the brand drug—the generic's only feasible means of competing is obtaining this rating, which permits automatic substitution at the pharmacy counter.  CAC ¶133; Carrier, *Real World*, at 1018.

Brand manufacturers like Reckitt can prevent generic substitution—they can game the system—by changing the dosage form before the generic enters the market.  Tweaking the dosage form prevents generic substitutability and thereby substantially impairs the generic's only commercially viable means of competing.  And it simultaneously erects a new set of regulatory barriers to entry—a years-long process of getting FDA approval for the new formulation and possibly also an additional 30-month stay and new patent litigation. Carrier, *Real World*, at 1018–19.

Reckitt's insistence that its tablet-to-film switch preserved "consumer choice" ignores these well-known facts of the prescription pharmaceutical marketplace, all of which are

specifically pleaded in Plaintiffs' Complaint.   And Reckitt aggravated the welfare-reducing effect of its product reformulation through four additional anticompetitive techniques: (1) "cannibalizing" the prescription base before the generics entered; (2) falsely disparaging the Suboxone tablets; (3) announcing that Reckitt was withdrawing the tablets from the market; and (4) deliberately weakening the tablet product.

Reckitt began cannibalizing the tablet prescription base—urging doctors to prescribe the film rather than the tablets—two and a half years before the generics entered the market.  CAC ¶ 16.  Doctors thus received an entirely one-sided presentation as to the comparative qualities of the tablets and the film.  Manufacturers of other brand products had no incentive to counter Reckitt's message that its film is superior to its tablets.   Carrier, *Real World*, at 1019.  And, of course, the generic tablets were not yet available.  Reckitt compounded its one-sided sales pitch as to the products' relative qualities with a fundamentally false message as to their relative prices.  The generics, with their low prices, were not yet available (and doctors did not know that they shortly would become available), and Reckitt offered the film at a slightly lower price than the tablets.  CAC ¶42.  Thus, in deciding whether to switch the patient from the tablets to the film, doctors had false or incomplete information as to the products' relative qualities and prices.

Reckitt further exacerbated doctors' information deficit by falsely telling them that the tablets were unsafe.  Plaintiffs' Complaint alleges in detail that Reckitt's detailers promoted the message that the tablets were unsafe for households with children. CAC ¶¶43, 44.  This message was false—it was the same false message that the FDA rejected.  CAC ¶¶78–80.   No other manufacturer with a product on the market had the incentive or ability to counter Reckitt's false message, so Reckitt succeeded in scaring doctors into prescribing the film.  CAC ¶¶3, 46; *see also* CAC ¶86 (in another product hop perpetrated at about the same time, Reckitt's internal

5

document said: "If we were to change the formulation of our current Gaviscon liquid . . . with the rationale that we were doing so for health and safety reasons . . . we could withdraw Gaviscon liquid from sale. . . and replace it with the new formulation.").

Reckitt also accelerated and deepened the product switch by telling doctors that Reckitt was withdrawing the tablets from the market.  CAC ¶¶3, 45.  This facilitated the switch by reinforcing Reckitt's false message that the tablets were unsafe.  And it essentially forced doctors to switch to the film for new prescriptions.  Doctors starting new patients on Suboxone prescribed the film so that they would not have to switch dosage forms in the midst of the treatment.

Central to Reckitt's scheme was its assertion that the tablets were less safe than the film because only the film was available in unit-dose packaging.   But Reckitt deliberately refrained from selling the tablets in unit-dose packaging as part of its anticompetitive scheme.  CAC ¶¶ 26–28.  Reckitt had the technical ability to sell the tablets in unit-dose packaging, and in fact does so in most of the rest of the developed world.  *Id*. ¶28.  Because the film itself is not any improvement over the tablets, Reckitt intentionally withheld the unit-dose packaging from the tablets in the United States in order to be able to tell doctors that the unit-dose-packed film was superior to the bottled tablets.  *Id*. ¶¶23–24.  Indeed, the United States is the only market in the world in which Reckitt sells film, rather than tablets, in unit-dosed packages.  *Id*. ¶21.

Reckitt's anticompetitive tactics were enormously effective.  By the time the generics finally entered in late February 2013, Reckitt had succeeded in converting 85% of the prescription base from tablets to film.  CAC ¶46.

It is true, of course, that *after* generics entered the market they could try to win back some of those prescriptions.   But the Complaint specifically alleges that, due to the price

6

disconnect and other characteristics of the pharmaceutical marketplace, generics have no viable means of regaining those prescriptions.  CAC ¶¶48–49.  Doctors whom Reckitt had recently convinced to switch from tablets to film are very reluctant to switch patients back to the tablets. *Id.* ¶49.  And generic manufacturers do not (and cannot economically) use sales force detailers to visit doctors and encourage them to switch back.  *Id.* ¶131–32; Carrier, *Real World*, at 1019. These are the economic realities that made it essential to Reckitt's anticompetitive scheme to convert the prescription base before the generics entered.  It succeeded.

We show next that Reckitt's scheme is properly judged under the Rule of Reason.

**B.      *Tricor* Held that the Price Disconnect Requires Courts to Apply the Rule of Reason.**

In a case directly on point, Judge Jordan held that the product-hopping scheme should be evaluated under the traditional Rule of Reason.  *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 420–23 (D. Del. 2006) (hereafter *Tricor*").  The brand manufacturer there implemented two switches, one from capsules to tablets and another from one dosage strength to another.  The manufacturer cannibalized the original prescription base before the generics could enter the market and withdrew the original product from the market.  *Id.* at 415–18.  *Compare* CAC ¶¶ 17–35, 41–47.

Defendants there, like Reckitt here, argued that their conduct was virtually *per se* legal in light of the deference owed to the marketplace's role in determining the success of new products. *Tricor*, 432 F. Supp. 2d at 421.  Judge Jordan rejected that argument, noting that courts' usual reluctance to evaluate product redesigns is founded on "the success of those products in an *open market*, and the related conclusion that the harm to [defendant's] competitors was a matter of consumer choice."  *Id.* (emphasis added).  Where, to the contrary, "the introduction of a new product by a monopolist prevents consumer choice, greater scrutiny is appropriate."  *Id*.

Applying that analytical framework, the court denied defendants' motion to dismiss the complaint based on plaintiffs' detailed allegations regarding the price disconnect—the same allegations plaintiffs make here.   The price disconnect prevents consumers from making the relevant price/quality choice, so the product switch is subject to inquiry under the Rule of Reason:

> The nature of the pharmaceutical market, as described in Plaintiffs' allegations, persuades me that the rule of reason approach should apply here as well.  The per se standard proposed by Defendants presupposes an open market where the merits of any new product can be tested by unfettered consumer choice.  But here, according to Plaintiffs, consumers were not presented with a choice between [drug] formulations.

*Id*.  *See also* IP and Antitrust § 15.3 (the *Tricor* court "concluded that rule of reason treatment was appropriate in this instance without any deference to the defendant's product changes, since the allegations were that those product changes wouldn't face market competition because of regulatory barriers"); Carrier, *Real World*, at 1019–20.

The court's conclusion based on the price disconnect was reinforced by the manufacturer's withdrawal of the original product from the market.  *Tricor*, 432 F. Supp. 2d at 422.[4]   The defendant "prevented [consumer] choice by removing the old formulations from the market while introducing new formulations."   *Id*.   This conduct reinforced the need for "an inquiry into the effect of Defendants' formulation changes, following the rule of reason approach." *Id*.

---

[4] Reckitt argues that *Tricor* is inapplicable because the defendant in *Tricor* took additional steps not taken by Reckitt here that made no economic sense but for the effect on the generic. MTD at 19.  This argument is unavailing in light of the plain language noted above.   Moreover, as discussed in Section I(E) below, End Payors have clearly alleged that Reckitt's product switch scheme made no economic sense but for its impairing generic competition.

The court made clear that the product withdrawal merely reinforced the conclusion based on the product switch and price disconnect:  "the allegations of product removal . . . like the allegations related to the product changes themselves, support Plaintiffs' antitrust claims."  *Id*. at 424.   Indeed, the court held that, in light of the "nature of the pharmaceutical market, as described in Plaintiffs' allegations," the product reformulation alone was "sufficient to support an antitrust claim" and the product withdrawals were merely "[a]ctions [t]aken to [s]upport the [f]ormulation [c]hanges."  *Id*. at 423.

This Court should reach the same conclusion.  Plaintiffs here include the same allegations regarding the price disconnect and consequent absence of the relevant consumer price/quality choice.  And Reckitt announced the imminent withdrawal of the tablets in September 2012, five months before the generics entered, and then withdrew the tablets after the generics entered. CAC ¶¶3, 70.  As noted above, this announcement and withdrawal had the same anticompetitive effect as in *Tricor*—coercing doctors to write new prescriptions for the film.  Indeed, Reckitt's announcement and withdrawal was substantially more anticompetitive than the withdrawal in *Tricor* because Reckitt falsely associated it with a serious safety issue.

Lastly, Judge Jordan also rejected another argument that Reckitt repeatedly sprinkles throughout its brief—that its conduct did not prevent the FDA from *approving* the generics.  *See, e.g.*, MTD at 21–23, 27, 33.  The court held that, despite not altogether preventing the generics from reaching the market, the brand manufacturer unlawfully impaired the generics' most efficient means of distribution—AB-rated substitutability:

> Here, while [the generics] may be able to market their own
> branded versions of the old TriCor formulations, they cannot
> provide generic substitutes for the current TriCor formulation,
> which is alleged to be their cost-efficient means of competing in
> the pharmaceutical drug market. That opportunity has allegedly
> been prevented entirely by Defendants' allegedly manipulative and
> unjustifiable formulation changes.

*Tricor*, 423 F. Supp. 2d at 423.  It is emphatically the law of this Circuit that plaintiff need only

show that the monopolist impaired rivals' cost-efficient distribution means. *See, e.g.*, *United*

*States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005); *LePage's Inc. v. 3M*, 324 F.3d

141, 160-62 (3d Cir. 2003) (en banc).

      **C.**     **The Leading Court of Appeals Decision Applies the Rule of Reason.**

The *en banc* Court of Appeals in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir.

2001), also applied the Rule of Reason to product redesigns.  Although "courts are properly very

skeptical" of claims that design changes have harmed competition, "[j]udicial deference to

product innovation … does not mean that a monopolist's product design decisions are per se

lawful." *Id*. at 65.

In *Microsoft*, the monopolist redesigned its operating system so that Netscape's rival

internet browser would not be compatible with the system.  The economic circumstances in

*Microsoft* that led the Court to apply the Rule of Reason are analogous to, if not identical to,

those at play here.  The strong "network effects"[5] in *Microsoft* impaired free consumer choice

and thereby increased the importance of compatibility between Microsoft's operating system and

rivals' internet browsers.  This "premium on compatibility" allowed "a dominant firm . . . [to]

exclude rivals anticompetitively by engineering incompatibilities between the dominant product

and the product offered by rivals." IIIB Areeda & Hovenkamp, Antitrust Law ¶776c, at 297 (3d

---

[5] In essence, "network effects" exist to the extent that one person's utility from using a
product depends in substantial part on how many other people also use it.  For example, my
telephone is more useful to me if many other people also use telephones.

ed. 2006). In markets with significant network externalities, compatibility may be "a key to market success." *Id*. Consequently, the premium on compatibility "increas[ed] both the incentive and the opportunities" for anticompetitive product redesigns. *Id*. These economic realities supported subjecting Microsoft's product redesigns to the Rule of Reason. *Microsoft Corp.*, 253 F.3d at 95.

Just so here. Like the network effects in *Microsoft*, the price disconnect prevents consumers from making the relevant price/quality choice and thus heightens the importance of compatibility—AB substitutability—of generic drugs. For generic pharmaceuticals, compatibility with the branded product is *the* key to market success, and brand manufacturers' incentives and opportunities for welfare-reducing reformulations are consequently even greater than those in *Microsoft*. Indeed, the product redesign here not only destroyed generic substitutability but also called forth a whole new set of regulatory barriers to entry. Just as in *Microsoft*, the Rule of Reason applies because the monopolist had the means and incentive to redesign the product with anticompetitive effect. *See* Jonathan Jacobson, et al., *Predatory Innovation: An Analysis of Allied Orthopedic v. Tyco in the Context of Section 2 Jurisprudence*, Loyola Consumer L. Rev. 1, 8 (2010) ("There are two scenarios where an exclusionary redesign may be especially harmful: (a) in the context of network markets . . . and (b) pharmaceutical markets . . . .").

A host of other cases have likewise concluded that a monopolist's product redesign can be unlawfully exclusionary under Section 2. *See, e.g.*, *C. R. Bard v. M3 Sys.*, 157 F.3d 1340, 1382 (Fed. Cir. 1998); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pub., Inc.*, 63 F.3d 1540, 1551 (10th Cir. 1995); *Northeastern Tel. Co. v. AT&T*, 651 F.2d 76 (2d Cir. 1981); *Apple iPod iTunes Antitrust Litigation*, 2010 WL 2629907 (N.D. Cal. June 29,

2010); *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295 (D. Utah 1999); *Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 388 (S.D.N.Y. 2007); *IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1003 (N.D. Cal. 1979), *aff'd on other grounds*, 698 F.2d 1377, 1382 (9th Cir. 1983).

Reckitt cites ¶781 of the Areeda/Hovenkamp treatise for the proposition that redesigning a product usually causes no competitive harm. MTD at 13.  But the relevant section is ¶776, which deals with a monopolist's strategic creation of incompatibility between its product and complementary products.  That section strongly confirms our reading of *Microsoft*, noting that "strategic creation of incompatibility can have serious anticompetitive consequences, particularly in 'network' industries where compatibility itself is often an essential ingredient to product success."  IIIB Areeda & Hovenkamp, Antitrust Law ¶776a, at 286 (3d ed. 2008); *see also id.* ¶776c, at 297 (courts must be more vigilant where economic circumstances "place a premium on compatibility" and thus "increase both the incentive and the opportunities for certain kinds of anticompetitive behavior").  Professor Hovenkamp has subsequently made expressly clear that pharmaceutical reformulations should be judged under the standards governing complementary products. IP and Antitrust § 15.3, at 25 (2012) (pharmaceutical product redesigns should be evaluated "[u]nder the analysis we offer in section 12.3e3," which addresses design changes intended to impair competition from complementary products).

### D.   The *Walgreens* Opinion Is Distinguishable and Wrongly Decided.

Reckitt relies heavily on the district court decision in *Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146 (D.D.C. 2008).  But that court wholly ignored the economic realities of this marketplace, including the decisive price disconnect.  The court simply denied that these markets are any different from ordinary markets where consumers make the price/quality choice, asserting counter-factually that "[n]ew products are not capable of affecting

12

competitors' market share unless consumers prefer the new product." *Id*. at 151. Repeatedly using the term "free consumer choice," the court sometimes identified patients, and sometimes doctors, as the "consumers," *id*. at 151, 152.   Nowhere did the court confront the key marketplace reality—that patients have the payment obligation while doctors make the product selection.

The *Walgreens* court compounded this fundamental error by focusing solely on whether AstraZeneca's conduct altogether prevented FDA approval of the generic, rather than whether that conduct interfered with the effective distribution of the generic, i.e., its substitutability. The court held that plaintiffs failed to state a claim because the brand manufacturer's scheme did not "effectively eliminate[]" consumers' ability to purchase the generic.  *Id*. at 151, 152.  The court erroneously held that *Microsoft* applied the Rule of Reason because Microsoft had "effectively eliminated the customers' choice of internet browsers." *Id*. at 150–51. The *Walgreens* court's assertion is factually wrong—both Microsoft's own pre-design-change, unbundled operating system and its competitors' browsers remained available for sale.  *See United States v. Microsoft*, 84 F. Supp. 2d 9, 21, 26–27 (D.D.C. 1999).  More importantly, *Walgreens*' assertion is *legally* wrong—*Microsoft* famously held that Section 2 liability depends on whether the challenged conduct impairs the rival's efficient distribution, not altogether excludes the rival's product. *Microsoft*, 253 F.3d at 64.  As noted above, our Court of Appeals has repeatedly held the same. Plaintiffs' Complaint here easily meets that standard, alleging that Reckitt's scheme reduced the generics' share from the expected 85% to less than 15%.  CAC ¶46.

In any event, *Walgreens* is clearly distinguishable from the facts Plaintiffs allege here. *Walgreens* itself distinguished *Tricor* on the ground that the conduct there included a product withdrawal.  *Walgreens*, 534 F. Supp. 2d at 151.  Here Reckitt announced an imminent product

withdrawal in September 2012 and then in fact withdrew the tablets, and, as noted in detail above, that announcement and withdrawal had all the attendant anticompetitive effects—and then some—of the product withdrawal in *Tricor*.

Moreover, Reckitt also deliberately weakened the tablets as part of its anticompetitive scheme.  Reckitt insists that the unit-dose packaging made Suboxone safer for households with children.  Reckitt could have included unit-dose packaging for the tablets—as it has done in most of the developed world—but deliberately chose not to do so in order to be able to claim that the unit-dosed film was an improvement.  CAC ¶¶26–28.  A monopolist's deliberately weakening a product is the clearest possible case of an unlawfully exclusionary redesign scheme.  *See, e.g.*, IP and Antitrust, ¶12.3, at 8 (a design "that actually impedes product performance is not entitled to any deference from antitrust courts" and "it is difficult to imagine a plausible procompetitive reason" for such conduct).

*Walgreens* involved neither a product withdrawal nor intentional weakening of the product.  If *Walgreens* were otherwise persuasive, these definitive distinctions would undermine its influence here.[6]

_____

[6] Reckitt's other cases are irrelevant.  *See Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 1002 (9th Cir. 2010) (case decided on summary judgment; no price disconnect; and plaintiffs "presented no evidence to refute that" the redesigned product was superior); *AstraZeneca AB v. Mylan Labs., Inc.*, 2010 WL 2079722, at *6 (S.D.N.Y. Aug. 31, 2011) (perfunctorily citing *Walgreens* without analysis); *Smithkline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686 (E.D. Pa. 2004) (no claim of exclusionary product hop); *Eon Labs Mfg., Inc. v. Watson Pharms., Inc.*, 164 F. Supp. 2d 350 (S.D.N.Y. 2001) (no claim of exclusionary product hop).  Several of Reckitt's cases affirmatively support Plaintiffs' claims here.  *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288–89 (2d Cir. 1979) (case decided after trial; no price disconnect; and Court held that Kodak arguably prevented free consumer choice by restricting the use of the new Kodacolor II film to its own camera for the first eighteen months after the film was available—the same kind of "head start" that Reckitt gave itself here); *Response of Carolina Inc. v. Leasco Response Inc.*, 537 F.2d 1329, 1330 (5th Cir. 1976) (case decided after trial; no price disconnect; plaintiff's contention that its components were not compatible with defendant's new design was "completely without evidentiary support";

**E.      Plaintiffs Have Sufficiently Alleged Exclusionary Conduct Under the Profit Sacrifice Test.**

If the Profit Sacrifice test applies, rather than the Rule of Reason, Plaintiffs' allegations also satisfy that test.

The Profit Sacrifice test asks whether the challenged conduct's benefits to the monopolist are greater than its costs to the monopolist, *absent the conduct's effect on competition*.[7] Essentially, it is an economic test to determine whether the monopolist's sole motive was to impair competition; if the monopolist engages in conduct that would be money-losing absent the impairment of competition, then the fact finder can infer that the monopolist was motivated solely to impair competition.  *See, e.g.*, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004); *Aspen Skiing Co. v. Highlands Skiing Co.*, 472 U.S. 585, 610–11 (1985); *SmithKline Beecham Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978); *Novell, Inc. v. Microsoft Corp.*, 2013 WL 5303259, at *10, ___ F.3d ___ (10th Cir. Sept. 23, 2013); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990).   "If a design change makes no economic sense unless the exclusion of rivals is taken into account, it is reasonable to infer both that the purpose behind the design change was anticompetitive and, more importantly, that the anticompetitive effects of the design change predominated over any technological benefits."  IP and Antitrust, § 12.3, 2012 WL 5831501.

---

and court concluded that claim would be viable "where the technological factor tying the hardware to the software has been designed for the purpose of tying the products, rather than to achieve some technologically beneficial result").

[7] *See* A. Douglas Melamed, *Exclusionary Conduct Under the Antitrust Laws: Balancing, Sacrifice, and Refusals to Deal*, 20 Berkeley Tech. L.J. 1247, 1255 (2005) ("the sacrifice test asks whether the allegedly anticompetitive conduct would be profitable for the defendant and would make good business sense even if it did not exclude rivals and thereby create or preserve market power for the defendant . . . If not--if the conduct would be unprofitable but for the exclusion of rivals and the resulting market power--it is anticompetitive").

Plaintiffs' allegations here regarding the Profit Sacrifice test are straightforward and airtight.  Reckitt did not expect that switching from tablets to film would garner any additional sales or profits.  CAC ¶36–40.   The film's qualities would not entice any new patients into the market or cause any doctors to prescribe Suboxone rather than some other product.  Nor would the film deliver to Reckitt any cost-savings through manufacturing or distribution efficiencies. *Id*. ¶38.   The *sole* benefit that Reckitt expected to gain from the switch from tablets to film came *exclusively* from destroying generic substitutability.  *Id*. ¶39.   And the switch was enormously costly to Reckitt.  *Id*. ¶38.   Absent the impairment of competition—the elimination of generic substitutability—Reckitt's switch would have been a money-losing venture. *Id*. ¶40.   Reckitt's investment in the switch was purely and only an investment in impairing competition.

Thus, despite Reckitt's repeated misstatements to the contrary (MTD at 12, 16–17), Plaintiffs clearly alleged that the product-switch flunks the Profit Sacrifice test.   Indeed, Plaintiffs even quoted Reckitt's own statement to its shareholders, which is as succinct a confession to an unlawful profit sacrifice as a monopolist is ever likely to make:

> As [Reckitt] is rapidly converting Suboxone tablets to the sublingual film, there is a short-term dilutive impact on net revenue and operating profit: however, this conversion much better protects the medium and long-term earnings stream from the Suboxone franchise in the US.   Hence, in the event of generic competition to the tablet, [Reckitt] expects that the Suboxone sublingual film will help to mitigate the impact thereof.

CAC ¶40.  Indeed, the UK Office of Fair Trading specifically found that Reckitt's other unlawful product hop, perpetrated at nearly the same time, also flunked the Profit Sacrifice test.[8]

---

[8] *See Abuse of a dominant position by Reckitt Benckiser Healthcare (UK) Limited and Reckitt Benckiser Group plc*, Decision No. CA98/02/2011, at 268, 273; Case CE/8931/08 (OFT April 12, 2011) (concluding that the product hop would "result in a decrease in RB's profitability that would render the strategy commercially irrational in the absence of benefits derived from hindering the development of full generic competition").

16

Unable to counter these allegations, Reckitt tries to re-define the Profit Sacrifice test, arguing that it requires that Reckitt's conduct have been "actually unprofitable." MTD at 3, 17, 17 n.10.  In other words, Reckitt tries to change the test from whether the conduct would have been profitable *absent its effect of impairing competition*, to simply whether the conduct was profitable.

In short, Reckitt asserts that Plaintiffs can prevail only by showing that the conduct was actually unprofitable in the short term—that it constituted predatory pricing.   The Court of Appeals has already rejected that contention.   Antitrust plaintiffs must prove that the monopolist's sales were in fact unprofitable—that it sold below cost—only when the alleged anticompetitive conduct took the form of too-low prices, *i.e.*, when "the defendant's pricing itself operated as the exclusionary tool."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 279 (3d Cir. 2012).   The Court rejected Reckitt's argument that antitrust plaintiffs must always prove predatory pricing, because "to impose such an unduly simplistic and mechanical rule . . . would place a significant portion of anticompetitive conduct outside the reach of the antitrust laws without adequate justification."  *Id.* at 278.[9]  Reckitt's means of exclusion here was the product switch and the attendant anticompetitive techniques, not below-cost pricing.

---

[9] Reckitt absurdly suggests that Plaintiffs must first allege that the challenged conduct is exclusionary, and then also that it flunks the Profit Sacrifice test.  MTD at 16–17; 21–22.  But the Profit Sacrifice test is a standard for determining whether conduct is exclusionary.  Reckitt's citation to *Behrend v. Comcast Corp.*, No. 03-6604, 2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) (MTD at 3, 12, 16) is misleading.  The full quote from *Behrend* makes clear that the court was discussing what constitutes unlawful monopoly power after full-blown rule of reason analysis. *See Behrend*, 2012 WL 1231794, at *19.  It does not require plaintiffs to establish that the challenged conduct lacked a legitimate business purpose (the second step in rule of reason analysis) in order to demonstrate exclusionary conduct (the first step in rule of reason analysis).

II.     **END PAYORS HAVE STANDING TO PURSUE THEIR CLAIMS.**

A.     **End Payors Have Article III Standing.**

Reckitt argues that the named plaintiffs do not have Article III standing to assert claims on behalf of absent class members in those states in which named plaintiffs do not reside, or made no Suboxone purchases.  Def. Mem. at 6–8.  But Reckitt's argument confuses two separate legal concepts—Article III standing and Rule 23's class certification requirements—and defies binding authority.

To demonstrate Article III standing, a plaintiff need only show that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979).  Here, the named plaintiffs plainly have Article III standing to pursue their own individual claims.   The CAC alleges that, as a result of Reckitt's unlawful conduct, each of them paid more than they otherwise would have.  *See* CAC ¶¶102–110.  This is all that is required to establish the named plaintiffs' Article III standing.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03 (1998).[10]

B.     **Rule 23 Determines Whether Named Plaintiffs May Pursue Claims of Absent Class Members in Other States.**

Once a class representative establishes Article III standing to assert her own claim, whether she also may advance claims of absent class members is determined solely under Rule 23's requirements, not on the pleadings.  *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (once the named plaintiff establishes that he has suffered an injury that is "real and immediate," not "conjectural" or "hypothetical," it "shift[s] the focus of examination from the elements of

---

[10]     Contrary to Reckitt's suggestion (Def. Mem. at 1), *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) is not a standing case.  The Supreme Court explicitly said so.  *Id.* at 728 n.7.

justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class'").  The governing principle is straightforward: "[W]hen a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may serve in a representative capacity on behalf of the class." 1 William B. Rubinstein et al., Newberg on Class Actions §2:6 (5th ed. 2011); *see also* 7AA The Late Charles Alan Wright, et al., Federal Practice and Procedure §1785.1 (3d ed. 2010) (once named plaintiff establishes his own standing, "whether he will be able to represent the putative class . . . depends solely on whether he is able to meet the additional criteria encompassed in Rule 23").  Thus, named plaintiffs need only establish standing to assert their own claims, which they have done.  No separate standing inquiry exists outside of Rule 23's requirements.  *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 307 (3d Cir. 1998) ("[O]nce the named parties have demonstrated they are properly before the court, 'the issue [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing.'"); *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir. 1985) (same).[11]

---

[11] Numerous other Courts of Appeal have held likewise.  *See, e.g.*, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158–62 (2d Cir. 2012) (whether named plaintiff has "class standing" does not turn on whether she would have "statutory or Article III standing"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009) (plaintiff with Article III standing is not limited to asserting "his own rights or his own redress. To the contrary . . . a plaintiff may be able to assert causes of action which are based on conduct that harmed him, but which sweep more broadly than the injury he personally suffered"); *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) (once plaintiff establishes standing to pursue his own claims "[w]hether he is entitled to relief on any or all of those claims and whether he may serve as an adequate class representative for others asserting such claims are separate questions"); *Piazza v. Ebsco Indus.*, 273 F.3d 1341, 1351 (11th Cir. 2001) (where named plaintiff has standing to assert his own claim, whether he can adequately represent the class is determined solely by Rule 23); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) ("[O]nce an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants."); *accord Shady Grove Orthopedic Assoc. v. Allstate Ins.*, 559 U.S. 393, 398 (2010) (once Rule 23 is satisfied, the court must certify the class).

In light of this authority, the court in a similar pharmaceutical antitrust case recently rejected the same Article III argument Reckitt makes here, on the grounds that it "erroneously conflates the requirements of Article III, for the purposes of assessing constitutional standing of the named plaintiffs, with the procedural requirements of Rule 23, which are designed to determine whether a putative class representative for whom Article III standing has already been established may also raise claims of the class which it purports to represent." *In re Nexium (Esomeprazole) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 129696, *99–103 (D. Mass. Sept. 11, 2013). The court thus refused to dismiss claims asserted under the laws of states where the named plaintiffs did not reside. *Id.* at *99–100. Courts have applied this analysis with regularity, because "it is only through a determination of typicality of claims across the various state statutes that the court will know whether standing is appropriate for all the claims asserted." *Kuhl v. Guitar Ctr. Stores, Inc.*, No. 07-C-214, 2008 WL 656049, at *2–3 (N.D. Ill. Mar. 5, 2008).[12]

As these multiple courts recognized, the "claim by claim" analysis adopted by *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143 (E.D. Pa. 2009), and Reckitt's other non-binding authority (Def. Mem. at 7, n.7) is wrong. Indeed, this Court rejected Reckitt's preferred application of *Wellbutrin XL* in a similar generic suppression case, *King Drug Co. of Florence,*

---

[12] *See also In re DDAVP Indirect Purchaser Litig.*, 903 F. Supp. 2d 198, 213–14 (S.D.N.Y. 2012); *Warma Witter Kreisler, Inc. v. Samsung Electronics Am., Inc.*, No. 08 Civ 5380, 2009 U.S. Dist. LEXIS 112773, at *6 (D.N.J. Dec. 3. 2009); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010); *Sheet Metal Workers National Health Fund v. Amgen Inc.*, No. 07 Civ 5295, 2008 U.S. Dist. LEXIS 62181, at *30 (D.N.J. Aug. 12, 2008); *Hoving v. Transnation Title Ins. Co.*, 545 F. Supp. 2d 662, 667–68 (E.D. Mich. 2008); *In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, No. 05 Civ 1602, 2007 U.S. Dist. LEXIS 47438, at *56 (D.N.J. June 29, 2007); *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06 MD 1739 (SWK) (MHD), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 541 (D.N.J. 2004); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 267-70 (D. Mass. 2004); *Ferrell v. Wyeth-Ayerst Labs., Inc.*, No. C-1-01-447, 2004 U.S. Dist. LEXIS 15127, at *12 (S.D. Ohio, June 30, 2004).

*Inc. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 538 (E.D. Pa. 2010) (Goldberg, J.) ("*Provigil*"), calling defendants' reliance on *Wellbutrin XL* there "misplaced." *Id.*[13]

There simply is no requirement, under Article III or Rule 23, that a named plaintiff must have the exact same claim as absent class members. *See Gratz v. Bollinger*, 539 U.S. 244, 265 (2003). In *Gratz*, a transfer student challenged the University of Michigan's admissions criteria and sought to represent a class of transfer students and first-year students, even though they were subject to different admissions criteria. The Court held that Article III did *not* require the named plaintiff and class members to have the same claim. It was sufficient that "the University's use of race in undergraduate transfer admissions does not implicate *a significantly different set of concerns* than does its use of race in undergraduate freshman admissions." *Id.* at 265 (emphasis added).[14]

The only case *Wellbutrin XL* relied on for the purported "claim by claim" requirement was a non-binding Eleventh Circuit opinion, *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987), that pre-dated *Gratz*, and is contrary to binding authority. As this Court in *Miller v. Hygrade Food Prods. Corp.*, 89 F. Supp. 2d 643, 651 (E.D. Pa. 2000), explained in detail, "the Court of Appeals for the Third Circuit has not analyzed the sufficiency of an injury for purposes of standing at the level of specificity demanded by [*Griffin*]." *See also id.* at 651–54 (analyzing

_____

[13] This Court held that the named plaintiffs could pursue claims in states in which their member constituents resided (as opposed to only those states in which named plaintiffs resided, as defendant urged). *Id.* Since those constituents resided in all of the states whose laws the plaintiffs invoked, the Court did not reach the question that will be presented here in the Rule 23 proceedings—whether named plaintiffs with Article III standing are adequate representatives of absent class members in states where neither the named plaintiffs nor their constituents reside.

[14] Similarly, the Supreme Court has reaffirmed that despite "dissimilarities" in the claims of the named plaintiff and class members, Rule 23's adequacy requirement is met where the "plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 n.5 (2011).

cases); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 268 (D. Mass. 2004) (expressly declining to apply *Griffin* to limit end payor standing in a pharmaceutical antitrust case in light of more persuasive authority).[15]

The "claim by claim" analysis Reckitt urges this Court to adopt also defies the very language of Rule 23.  Rule 23(a)(3) provides that a named plaintiff may represent the class if her claims are "typical" of the claims of the class.  Third Circuit law is clear that claims can be "typical" without being identical.  *See, e.g.*, *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001); *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988); *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001) ("[T]here is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members.") (internal citation omitted).

Absent class members throughout the United States have been injured by Reckitt's anticompetitive conduct.  CAC ¶¶102–10, 152.  Whether the named plaintiffs may assert claims on behalf of absent class members must await this Court's analysis under Rule 23.

### C.  Plaintiffs' Claims Arise Under The Laws Of The States In Which They Incurred The Overcharge.

Reckitt relatedly argues that Plaintiffs' claims arise only under the laws of Virginia or the states in which they reside (Def. Mem. at 8–11).  That argument defies long-established antitrust jurisprudence and the plain language of the relevant state statutes.

The two-fold purposes of the antitrust laws are to "deter violators and deprive them of the fruits of their illegal actions and . . . [to] provide ample compensation to the victims of antitrust violations."  *Blue Shield of Va. v. McCready,* 457 U.S. 465, 472 (1982).  Antitrust laws provide

---

[15] *Griffin* is also inapplicable because it was decided on a full evidentiary record.  *Miller*, 89 F. Supp. 2d at 654.  Although standing is a threshold issue, as long as the named plaintiff has Article III standing "as to some claims" and has alleged a nexus to widespread misconduct, it is inappropriate to dismiss the claims for lack of standing at the pleading phase.  *Id.*

private rights of action so that "private attorneys general" will vindicate both of these public interests. *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 262 (1972). The state where the overcharge was incurred and the state where the plaintiff resides both have an interest in compensating the victims of overcharges.[16] But the state where the overcharge was incurred has an additional and overriding interest in deterring overcharges in its jurisdiction. This additional interest is crucial in the choice-of-law analysis. Restatement (Second) of Conflict of Laws § 6(2)(c) (factors include "the relevant policies of other states and the relative interests of those states in the determination of the particular issue").

Overcharges harm a state's economy, causing a misallocation of scarce resources (in economics lingo, causing "deadweight loss"). Richard A. Posner, Antitrust Law 12 (2d ed. 2001). Thus, it has long been the rule under the Sherman Act that choice of law is determined by where the anticompetitive effect—the overcharge—occurs. Judge Learned Hand held in the *Alcoa* case that, regardless of a plaintiffs' or defendants' residence, whether the Sherman Act or foreign law applies is determined by whether "conduct outside its borders . . . has consequences within its borders which the state reprehends." *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (2d Cir. 1945). The determinative "consequence" is the overcharge—"some effect upon prices." *Id.* at 445. Since 1982 this antitrust choice-of-law rule has been embodied in federal legislation. *See Hoffmann-LaRoche Ltd. v. Empagran S.A.,* 542 U.S. 155, 160–61 (2004) (under the Foreign Trade Antitrust Improvements Act, whether foreign conduct is actionable in the U.S. depends on whether "those activities adversely affect domestic commerce," and the relevant effect is "higher domestic . . . prices"). Where the plaintiff resides is irrelevant: if the

---

[16] Thus, Reckitt's reliance on Restatement (Second) of Conflict of Laws § 145, cmt. e, which discusses choice of law where the state in which the injury occurred has no interest in the matter, is entirely misplaced.

plaintiff lives abroad but pays an overcharge in the United States, the Sherman Act applies; if the plaintiff lives in the United States and has a bank account here, but paid an overcharge abroad, the Sherman Act does not apply.  *Id.*  Where the anticompetitive effect occurs—where the overcharge is incurred—is dispositive.

These same antitrust policies drive the application of state antitrust law.  One goal of state antitrust statutes is to "promote the unhampered growth of commerce and industry throughout the State . . . ."  740 Ill. Comp. Stat. 10/2 (2012); *see also, e.g.*, Nev. Rev. Stat. Ann. § 598A.030 (1)(a) (2011); Wis. Stat. § 133.01 (2013).  Courts recognize that, "[s]tates have a strong interest in protecting consumers *with respect to sales within their borders*."  *Relafen,* 221 F.R.D. at 278 (emphasis added); *see also id.* ("[t]he location of consumers' purchases . . . assumes special significance").  This state policy weighs heavily in the choice-of-law analysis, Restatement (Second) of Conflict of Laws § 6(2)(e), and points strongly to the law of "the location of the injury—that is, the location of the sales to the end payor plaintiffs."  *Relafen,* 221 F.R.D. at 277.

This is the near-unanimous view of the courts that have addressed the issue specifically with respect to end payors' purchases, including this Court.  *See, e.g.*, *Provigil*, 702 F. Supp. 2d at 538 (end payors' "injuries would be redressed by a favorable determination under the laws of the states where their members purchased Provigil"); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 213 (E.D. Pa. 2009) ("a [TPP]'s claim arises where the overcharge occurs" and "each [TPP] may have a cause of action in multiple states"); *Ferrell v. Wyeth-Ayerst, Labs., Inc.*, No. C-1-01-447, 2004 U.S. Dist. LEXIS 15127, at *13 (S.D. Ohio June 30, 2004) ("The Court rejects Wyeth's argument that [TPPs] lack standing to prosecute claims anywhere but in their 'home' states, because the **purchase** of Premarin - the

critical event causing the alleged antitrust injury - did not take place only in Illinois or Minnesota.") (emphasis in original).

Other courts have flatly rejected the notion that they must engage in such a choice-of-law analysis prior to the taking of discovery in a class action where the class definition includes members who suffered harm in more states than the named plaintiffs reside.  For example, the *Nexium* court recently stated:

> Although the Defendants contend that this Court must engage in a choice-of-law analysis in order to determine what they characterize as the standing of the named class representatives, it would be premature for the Court to commence this analysis at this stage before the parties are able to engage in discovery . . .To hold that the class representatives may only pursue claims in their principal place of business would be improvident because it would risk jeopardizing the interests of other members of the putative class who purchased Nexium in a range of states.

*In re Nexium*, 2013 WL 4832176, at *24 n.61.  That approach applies equally here.[17]

Moreover, Reckitt's proposed rule would defy the express language of the relevant state statutes, improperly prohibiting non-residents from invoking the antitrust law of the state where they made the purchase.   All of the *Illinois Brick*-repealer statutes expressly extend their protection to all "persons," *not* only all "residents" or all "citizens."[18]  *See, e.g.*, Ariz. Rev. Stat. §

_____

[17] Reckitt's unpersuasive authority (Def. Mem. at 8-9) does nothing to demonstrate that this Court should reverse course from *Provigil*.  *See In re K-Dur Antitrust Litig.*, 2008 WL 2660783 (D.N.J. Mar. 19, 2008) (an un-reviewed decision of a special master whose decision on the merits was later reversed by the Third Circuit); *In re Rezulin Products Liability Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005) (a relative outlier that does not explain its conclusion); *Sergeants Benev. Ass'n Health & Welf. Fund v. Sanofi-Aventis U.S. LLP*, No. 08-0179, 2012 WL 4336218 (E.D.N.Y. Sept. 17, 2012) (cites only to *K-Dur* and *Rezulin* and similarly provides no substantive analysis); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (does not address the choice of law issue); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50 (D.D.C. 2003) (merely accepting as true, at the pleading stage, that plaintiff could bring Illinois claims against an Illinois-headquartered company for transactions that occurred in other states).

[18] This long-established distinction is a significant one.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 1090, 1292 (1866) (Fourteenth Amendment author John A. Bingham borrowed the

44-1408(B) (2013) (claim for damages can be brought by any injured "person"); Mass. Gen. Laws. ch. 93A, § 9(1) (2013) (same); Wis. Stat. Ann. § 133.18(1)(a) (2013) (same).[19]  Reckitt's proposed choice-of-law analysis would deny claims to the very persons to whom these statutes extend their protection.

Under established antitrust jurisprudence and the plain language of the state statutes themselves, the End Payors properly state claims under the laws of the states where they purchased or reimbursed purchases of Suboxone.  CAC  ¶¶102–110.

### D.    End Payors Have Standing Under *AGC*

### 1.    *AGC* Does Not Apply to State Antitrust Claims.

In analyzing Plaintiffs' standing to assert state law claims, this Court must look to state law principles. *See D.R. Ward Constr. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 496 (E.D. Pa. 2006) ("[T]he state rules of antitrust standing determine whether a plaintiff suing under a state antitrust statute enjoys federal prudential standing in a diversity action.").  Each state law at issue here rejects the approach of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which prohibits indirect purchasers from bringing damages claims under federal antitrust law.

The federal antitrust standing principles announced in *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") six years after *Illinois Brick* did nothing to alter states' rights to provide an antitrust cause of action to indirect purchasers.  The Supreme Court has made clear that *AGC* addressed only standing under federal antitrust law and was not intended to preempt or curtail broader state antitrust laws: "*Illinois Brick*, as well as *Associated General Contractors* and *Blue Shield*, all were cases

expansive term "person" from the Fifth Amendment specifically in order to extend equal protection to "all persons, whether citizens or strangers," and the authors of the Fifth Amendment had extended its protections to all "persons" in contrast to Magna Carta's limitation of its rights to only "free men.")

[19] The sole exception is Utah, which limits its damages claims to citizens or residents of Utah.

construing § 4 of the Clayton Act; in none of those cases did the Court identify a federal policy against States imposing liability in addition to that imposed by federal law." *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989). Because the standing formulation articulated in *AGC* is largely designed to determine who has standing under *Illinois Brick—i.e.*, to determine who is a *direct purchaser*—it makes no sense to apply *AGC*'s analysis to claims under state laws that expressly allow recovery by indirect purchasers. *See In re Aftermarket Filters Antitrust Litig.*, No. 08-4883 (RWG), 2009 U.S. Dist. LEXIS 104114, at *34 (N.D. Ill. Nov. 5, 2009) ("*AGC* was obviously never intended to apply to the instant situation involving claims of price fixing down a chain of distribution, because in the federal context such claims were already barred by *Illinois Brick*."). Those states' legislatures did not "repudiate[] *Illinois Brick* and invite[] indirect purchaser suits only for courts to dismiss those suits on the pleadings based on the very concerns that motivated *Illinois Brick*." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007). Accordingly, this Court has squarely held that *AGC* is inapplicable to standing under state antitrust law, unless a particular state has expressly adopted the *AGC* factors as its own law. *D.R. Ward*, 470 F. Supp. 2d at 494–95.[20]

### 2.   Even If *AGC* Applied to State Law, Defendants Fail to Support its Application to Plaintiffs' Claims.

Reckitt implausibly argues that *AGC* governs claims under state laws designed to remedy injuries sustained by indirect purchasers. Reckitt's analysis is wrong. In an improper appendix Reckitt purports to identify authorities supporting their arguments. Yet many of the citations fail to even mention, or only cursorily address, *AGC*; many reference only federal cases rather than state cases; many are from trial courts rather the state appellate courts; many ignore contrary opinions from higher state courts; many citations do not address antitrust issues, let alone

---

[20] *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943–44 (N.D. Ill. 2009).

indirect purchaser standing; and many contain no case law at all.  Individually and collectively, the citations fail to establish that any of the relevant states has issued any "clear directive" from its "legislatures or highest courts" warranting application of *AGC*.

<blockquote>

a.      **Minnesota and North Carolina Explicitly Rejected *AGC* Factors.**
</blockquote>

Reckitt's arguments regarding Minnesota and North Carolina exemplify the inaccuracy of their analysis.  In *Lorix*, cited by Reckitt, the Minnesota Supreme Court expressly rejected application of *AGC* to indirect purchasers' claims.  *Lorix*, 736 N.W.2d at 627, (concluding that "the *AGC* factors do not provide the benchmark for antitrust standing in Minnesota.").  Similarly, in *Teague v. Bayer AG*, 195 N.C. App. 18 (N.C. Ct. App. 2009), cited by Reckitt, the court expressly rejected application of *AGC* to indirect purchaser claims under North Carolina law, concluding "*AGC* is distinguishable from the present case and we hold the *AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes." *Id.* at 26.

<blockquote>

b.      ***AGC* Does Not Apply in Kansas and Mississippi.**
</blockquote>

Reckitt likewise fails to cite a single case demonstrating that Kansas or Mississippi applies *AGC*.  *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090 (D.N.J. 2011), mentions *AGC* only once in describing standing of *direct* purchasers under federal law. *Cf. Four B Corp. v. Daicel Chemical Industries Ltd.*, 253 F. Supp. 2d 1147 (D. Kan. 2003) (indirect purchasers of food products had standing under Kansas's repealer statute without applying *AGC*).  And *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 339 (Miss. 2004), merely references *AGC* for the unremarkable proposition that defendants' alleged wrongful conduct must proximately cause the plaintiff's injury.  Nowhere in the opinion is there

any discussion of *AGC* factors, let alone their application to indirect purchaser claims under Mississippi antitrust law.

> ### c. *Visa* **Cases Do Not Warrant Application of** *AGC* **in the District of Columbia, Iowa, Maine, Michigan, Nebraska, New Mexico, New York, North Dakota, South Dakota, Vermont and Wisconsin.**

For eleven states, Reckitt cites to cases that the *Aftermarket Filters* court distinguished as "the *Visa* cases." 2009 U.S. Dist. LEXIS 104114, at *33. In those cases, customers of stores that accepted the defendants' credit cards alleged that such stores were forced to accept the defendants' debit cards and pay supra-competitive processing costs. *Id.* As a result, the stores raised the prices of their products, and the customers, including those who paid by cash or check, were forced to pay higher prices for those products. *Id.* The *Visa* courts consistently held that the customer plaintiffs lacked antitrust standing because they did not purchase the price-fixed product. *See Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 301 (Neb. 2006); *Aftermarket Filters*, 2009 U.S. Dist. LEXIS 104114, at *33 (collecting cases); *Southard v. Visa U.S.A., Inc.*, 734 N.W. 2d 193, 196-97 (Iowa 2007). The *Visa* cases, and the policy concerns that animate them, have no applicability to cases like this one, where Plaintiffs purchased the product that is the subject of Plaintiffs' monopolization claims. *Aftermarket Filters*, 2009 U.S. Dist. LEXIS 104114, at *34; *see also Teague*, 195 N.C. App. at 26 (distinguishing the *Visa* cases and holding that *AGC* factors do not apply in determining indirect purchaser standing under the North Carolina antitrust statutes).

Eleven of the fourteen cases Reckitt cites in support of its argument are distinguishable *Visa* cases.[21] Of Reckitt's remaining three cases, one simply summaries a *Visa* case,[22] and two

---

[21] *See Peterson v. Visa U.S.A. Inc.*, 2005 D.C. Super. LEXIS 17 at *5–6; *Southard v. Visa U.S.A., Inc.*, 734 N.W. 2d 193 (Iowa 2007); *Knowles v. Visa U.S.A. Inc.*, No. CV-03-707, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004); *Stark v. Visa U.S.A. Inc.*, No. 03-055030-CZ,

contain no mention of *AGC*.[23]  Reckitt has no authority to support its specious argument that any

of the above States' "highest courts" would apply the *AGC* factors to this case.

> **d.   Harmonization Provisions Do Not Justify Application of *AGC* in Arizona, New Hampshire, New Mexico, Nevada, Oregon, Utah or West Virginia.**

Reckitt argues that "harmonization" provisions in Arizona, Nevada, New Hampshire,

New Mexico, Oregon, Utah, and West Virginia require application of the *AGC* factors to

antitrust claims brought under the laws of those States.  Yet, harmonization provisions concern

the scope of *proscribed conduct* at issue, not who may bring suit.  *See, e.g.*, *Lorix*, 736 N.W. 2d

at 626 ("The desire for harmony between federal and state antitrust law relates more to

prohibited conduct than to who may bring suit.").[24]  Federal courts have likewise consistently

held that harmonization provisions are insufficient to demonstrate any intention to apply *AGC*

standards in repealer states.[25]

---

2004 WL 1879003, at *2–4 (Mich. Cir. Ct. July 23, 2004); *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293 (Neb. 2006); *Nass-Romero v. Visa U.S.A.*, 279 P.3d 772 (N.M. Ct. App. 2012); *Ho v. Visa U.S.A. Inc.*, No. 112316/00, 2004 WL 1118534 (N.Y. Sup. Ct. Apr. 21, 2004), *aff'd*, 16 A.D.3d 256 (N.Y. App. Div. 2005); *Beckler v. Visa U.S.A. Inc.*, No. 09-04-C-00030, 2004 WL 2475100 (N.D. Dist. Ct. Sept. 21, 2004); *Cornelison v. Visa U.S.A. Inc.*, Hearing Transcript, No. CIV 03-1350 (S.D. Cir. Ct. 2004); *Fucile v. Visa U.S.A., Inc.*, No. 51560-03, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004); and *Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005).

[22] *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 235 F.R.D. 127 (D. Me. 2006).

[23] *Romero v. Philip Morris Inc.*, 242 P.3d 280 (N.M. 2010); and *In re S.D. Microsoft Antitrust Litig.*, 707 N.W.2d 85 (S.D. 2005).

[24] A*ccord, D.R. Ward*, 470 F. Supp. 2d at 498; *Comes v. Microsoft*, 646 N.W.2d, 440, 446 (Iowa 2002); *Davis v. Four Seasons Hotel, Ltd.*, 228 P.3d 303, 311–12 (Hawaii 2010); *City of Sunland Park v. Macias*, 75 P.3d 816, 823 (N.M. Ct. App. 2003).

[25] *See, e.g., In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) (holding that defendants' citation to "harmonization provisions . . . is not the same thing as showing that *AGC* has been adopted as the law of those states."); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1153 (N.D. Cal. 2009); *In re TFT-LCD,* 586 F. Supp. 2d at 1123; *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943–44 (N.D. Ill. 2009).

3.      **Plaintiffs Satisfy *AGC*.**

In *AGC*, the Supreme Court articulated five factors to be considered in determining antitrust standing: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market; (2) whether the injury alleged is direct; (3) whether more directly injured parties have a motivation to sue; (4) whether damages are speculative; and (5) risks of duplicative recovery.[26]  *AGC*, 459 U.S. at 540-45.  When applying those *AGC* factors, federal courts have consistently held that end payors who purchase drugs at supracompetitive prices have standing.  *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. Del. 2000); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 542 (D.N.J. 2004); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010); and *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 156–57 (E.D. Pa. 2009).  *AGC* similarly supports Plaintiffs' antitrust standing in this case, on each factor.

a.      **Plaintiffs Are Consumers of Suboxone.**

The Third Circuit has repeatedly held that the first *AGC* factor is satisfied when plaintiffs are "consumers or competitors" in the restrained market.  *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 232–33 (3d Cir. 2013); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010).  Plaintiffs clearly satisfy the first *AGC* factor.  As alleged, Plaintiffs are the ultimate consumers of Suboxone and paid inflated prices for the drug as a result of Defendants' unlawful conduct.  CAC ¶¶ 102–110, 147, 179, 181.  Plaintiffs—and their injuries—are exactly *who and what* the states' antitrust laws aim to protect.  Although Reckitt argues that doctors, not Plaintiffs, make the prescribing decisions, courts have consistently held

---

[26] Contrary to Defendants' implication, the Supreme Court has never held that *all* these factors must be satisfied.  *See Peck v. Gen. Motors Corp.*, 894 F.2d 844, 846 (6th Cir. 1990). Indeed, several of them have little or no relevance to state laws permitting indirect purchasers to pursue claims under their antitrust laws.  *See Knowles*, 2004 WL 2475284, *5–6; *Paul*, 496 F. Supp. 2d at 410.

that end payors have standing to pursue antitrust claims even though doctors prescribed the drug at issue. *See, e.g.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 542 (D.N.J. 2004); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 156–57 (E.D. Pa. 2009).[27]

### b.      Reckitt's Conduct Caused Plaintiffs' Injuries.

The "directness" factor has minimal or no weight when evaluating state antitrust standing because repealer states expressly legislate that indirect purchaser injuries are not too remote. *See, e.g.*, *Paul*, 496 F. Supp. 2d at 410. Regardless, Plaintiffs allege facts sufficient to demonstrate the "directness" of their injury. The Complaint alleges that the inflated prices for Suboxone caused by Reckitt's unlawful conduct were passed on to Plaintiffs through a short and unbroken distribution chain. CAC ¶¶144, 146. These allegations, which must be accepted as true, are sufficient to demonstrate "direct," traceable injury. *TFT-LCD*, 586 F. Supp. 2d at 1124. Moreover, if a "directness" issue exists, it should not be resolved on a motion to dismiss. *D.R. Ward*, 470 F. Supp. 2d at 503.

### c.      The Existence of Direct Purchasers Is Immaterial.

The existence of direct purchasers does not bar claims brought under repealer statutes, which authorize *indirect* purchasers to pursue antitrust claims. Indeed, as this Court noted, "the strict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purpose of *Illinois Brick* repealer statutes . . ." *D.R. Ward*, 470 F. Supp. 2d at 503. Thus, "this factor loses relevance when applied to antitrust statutes that permit indirect purchaser claims, which, by definition, necessarily presuppose the existence of more direct purchasers." *Id.* Accordingly, the existence of more

---

[27] Reckitt's case, *Heindel v. Pfizer Inc.,* 381 F. Supp. 2d 364 (D.N.J. 2004), does not concern standing issues or antitrust claims.

direct purchasers has no bearing on Plaintiffs' standing to pursue their state antitrust claims.

**d.    Plaintiffs' Damages Claims Are Not Speculative.**

Courts have consistently refused to dismiss indirect purchaser actions at the motion to dismiss stage because damages are too speculative. *See, e.g.*, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1169 (3d Cir. 1993) ("[W]e do not hold that litigation must be avoided solely because it might be difficult to ascertain damages . . . At the standing stage we look to the initial allegation of damages. . . ."); *D.R. Ward*, 470 F. Supp. 2d at 504. Plaintiffs here allege that they paid higher prices for Co-Formulated Buprenorphine/Naloxone than they would have paid absent Reckitt's illegal conduct. CAC ¶¶144, 147.[28] Overcharge damages like those alleged by End Payors are "readily discernible" and not speculative. *See, e.g.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 542 (D.N.J. 2004).

**III.    END PAYORS STATE A CLAIM UNDER STATE ANTITRUST, CONSUMER PROTECTION, AND UNJUST ENRICHMENT LAWS.**

**A.    Antitrust Claims**

**1.    Florida, Massachusetts, Puerto Rico and Rhode Island Do Not Bar Recovery By Indirect Purchasers.**

Regarding the Florida and Massachussetts antitrust laws, Reckitt's challenge (Def. Mem. at 16) is misplaced, as End Payors brought their monopolization claims under those states' consumer protection statutes. *See* CAC ¶170(d) (claim under the Florida Deceptive and Unfair Trade Act, Fla. Stat. §§ 501.201, *et seq.*; CAC ¶170(h) (claim under Massachusetts' Consumer Protection Statute, Mass. Gen. Laws. ch. 93A § 1 (2013)). As discussed *infra* at 37, 42, these states permit consumer fraud claims based on anticompetitive conduct.

---

[28] Reckitt argues that "conspicuously absent from plaintiffs' allegations is the distinct possibility that the market would have preferred the film version of Suboxone *regardless* of the availability of generic tablets." Def. Mem. at 15. However, at the motion to dismiss stage, Reckitt has no basis to argue for inferences from facts that are not pled.

Regarding Puerto Rico, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1187-88 (N.D. Cal. 2009) was wrongly decided.  The Supreme Court of Puerto Rico has emphasized that under Puerto Rico's antitrust statute, 10 P.R. Laws Ann. § 268 (2012), plaintiffs "need not establish anything beyond a factual causal relation between the injury and the violation" to have standing under the law.  *Pressure Vessels of Puerto Rico v. Empire Gas de Puerto Rico*, 137 D.P.R. 497, 520 (1994).  Because of that liberal standing requirement, indirect purchasers may sue under the LP.R.A.  *See Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57 (D.P.R. 2010).

End Payors clearly may recover in Rhode Island.  That state has recently enacted an *Illinois Brick* repealer that explicitly permits indirect purchaser suits like End Payors' under R.I. Gen. Laws §§ 6-36-5 *et seq.  See also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1144-1145 (N.D. Cal. 2008) (holding that indirect purchaser plaintiffs may pursue competition-based claims under the Rhode Island Unfair Trade Practices and Consumer Protection Act. R.I. Gen. Laws §§ 6-13.1-1, *et* seq.).[29]

### 2.    End Payors Allege a Sufficient Nexus to Intrastate Commerce.

Reckitt contends that Plaintiffs fail to satisfy the intrastate pleading requirements of several states. End Payors, however, have explicitly alleged that: (a) Reckitt's conduct "had substantial intrastate effects in that, *inter alia*, retailers within each state were foreclosed from offering cheaper generic Suboxone to End Payors inside each respective state" (CAC ¶ 152); and (b) "the foreclosure of generic Suboxone directly impacted and disrupted commerce for [End Payors] within each state, who were forced to pay supracompetitive prices" (*id.*).

---

[29] End Payors voluntarily withdraw their claims under the antitrust laws of Illinois, Missouri, New York and Tennessee.

It is well settled that a complaint alleging a nationwide antitrust violation satisfies "intrastate" pleading requirements. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 408 (S.D.N.Y. 2011) (collecting cases).  The logic behind this is straightforward—a nationwide antitrust violation decreases competition in each state, thereby increasing or artificially stabilizing the price of goods paid by consumers in each state. *See In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 655–70 (E.D. Mich. 2000); *In re Brand Name Prescription Drug Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997).  By alleging that Reckitt's nationwide anticompetitive scheme directly impacted commerce within each state, End Payors have demonstrated a sufficient nexus to intrastate commerce. *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2013 WL 2456612, at *20–21 (E.D. Mich. June 6, 2013) (similar allegations sufficient to satisfy the intrastate requirements of the antitrust laws of the District of Columbia, Mississippi, South Dakota, Nevada, New York, North Carolina and West Virginia).  Accordingly, End Payors have satisfied "intrastate" pleading requirements for the District of Columbia,[30] Mississippi,[31] Nevada,[32] New York,[33] North Carolina,[34] South Dakota,[35] and West Virginia.[36]

---

[30] *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 411–14 (D. Del. 2007).

[31] *In re DDAVP Indirect Purchaser Antitrust Litig.*, No. 05-cv-2237, 2012 WL 4932158, at *24–25 (S.D.N.Y. Oct. 17, 2012); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 887- 91 (E.D. Pa. 2012).

[32] *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 163–64 (E.D. Pa. 2009).

[33] *Sheet Metal Workers*, 737 F. Supp. 2d at 399 n.7; *In re Packaged Ice Antitrust Litig.,* 779 F. Supp. 2d 642, 664 (E.D. Mich. 2011).

[34] *In re Auto. Parts Antitrust Litig.*, 12-MD-02311, 2013 WL 2456612, at *21 (E.D. Mich. June 6, 2013).

[35] *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 408 (S.D.N.Y. 2011); *In re NMV*, 350 F. Supp. 2d 160, 171–75 (D. Me. 2004); *In re Processed Egg*, 851 F. Supp. 2d at 887–91.

[36] *See In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 582 (M.D. Pa. 2009) ("*Chocolate*"); *Intel*, 496 F. Supp. 2d at 414. Moreover, this Court has rejected the

3.      **End Payors State Monopolization Claims Under California and New York Law.**

End Payors voluntarily dismiss their claims under the New York and Tennessee antitrust laws, N.Y. Gen. Bus. Law § 340 (2013), *et seq.* (the "*Donnelly Act*") and Tenn. Code Ann. § 47-25-101 (2013), *et seq.*, respectively; however End Payor Plaintiffs are entitled to pursue their New York state law monopolization claims under N.Y. Gen. Bus. Law § 349. *See, e.g.*, *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 228 (S.D.N.Y. 2012); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40, 778 N.Y.S.2d 147, 148 (1st Dep't 2004). Moreover, contrary to Reckitt's suggestion (Def. Mem. at 17), End Payors do not assert a California Cartwright Act claim; rather, End Payors assert a claim for monopolization under California Unfair Competition Law, Cal. Bus. & Prof. Code §§17200 *et seq.* California law permits unfair competition claims based on monopolization. *See, e.g.*, *Sunbelt Television, Inc. v. Jones Intercable, Inc.*, 795 F. Supp. 333, 338 (C.D. Cal. 1992).

B.      **Consumer Protection Statutes**

1.      ***Illinois Brick* Does Not Bar Recovery Under State Consumer Protection Statutes.**

Reckitt erroneously maintains that End Payors' Illinois, Massachusetts, Missouri and Rhode Island consumer protection claims fail because courts in those states have purportedly barred indirect purchaser suits under those states' antitrust laws.  Def. Mem. at 18.

**Illinois:** Illinois is an *Illinois Brick* repealer state. 740 Ill. Comp. Stat. Ann. 10/7(2); *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1480 (7th Cir. 1991). Indeed, *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1047 (N.D. Ill. 2007) held that indirect purchaser antitrust claims could be pursued under the Illinois consumer protection statute.

---

argument that West Virginia's antitrust law requires a defendant's conduct to be "primarily intrastate."  *Provigil*, 702 F. Supp. 2d at 539.

**Missouri:** End Payors' claims under the Missouri Merchandising Practices Act ("MMPA") are not barred by *Illinois Brick*. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 670 (Mo. 2007). After noting that the "broad language" of the MMPA "contemplates that other parties, besides the direct purchaser … who suffer damages resulting from the violator's prohibited conduct under the Act are included among those eligible to receive restitution," the Missouri Supreme Court held that private plaintiffs were not limited to suing only the direct seller, stating that the court would not impose such a "significant limitation on Missouri consumers." *Gibbons*, 216 S.W.3d at 669–70 (citations omitted). *See also In re Pool Products Distribution Mkt. Antitrust Litig.*, MDL 2328, 2013 WL 2297213, at *12 (E.D. La. May 24, 2013) (indirect purchasers were not barred from filing suit under the MMPA if such purchasers otherwise made out an MMPA claim).[37]

**Massachusetts:** The Massachusetts Supreme Court has ruled that indirect purchasers have standing to challenge anticompetitive conduct under its consumer protection act. *See Ciardi v. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 311–12 (Mass. 2002).

**Rhode Island:** The court in *DRAM*, 536 F. Supp. 2d at 1144–45, like many others, found that indirect purchasers can pursue competition-based claims under the Rhode Island Unfair Trade Practices and Consumer Protection Act.[38] Rhode Island has also enacted an *Illinois Brick* repealer that codifies that indirect purchasers possess standing to sue. R.I. Gen. Laws §§ 6-36-5 *et seq.*

---

[37] Defendants' reliance on *Ireland v. Microsoft Corp.* and *NMV* is misplaced. In *Ireland*, the plaintiff's claims were dismissed because the plaintiff purchased a license, not "goods or services as defined under the Act. *Ireland*, 00-cv-201515, 2001 WL 1868946, at *1 (Cir. Ct. Mo Jan. 24, 2001). And *NMV*, 350 F. Supp. 2d at 192 pre-dates *Gibbons* and *Pool Products*.

[38] *See also In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *16 (E.D. Mich. 2013); *In re Chocolate*, 602 F. Supp. 2d at 586–87; *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 587 F. Supp. 2d 1109, 1129 (N.D. Cal. 2008).

2.      **There is a Sufficient Nexus between the Alleged Consumer Protection Violations and Intrastate Commerce.**

As discussed above, End Payors have expressly alleged that Reckitt's nationwide anticompetitive scheme had substantial effects in each state, including California, Nebraska, New York, New Hampshire, North Carolina and Vermont. *See supra* at 34-35, CAC ¶152. Just as allegations of anticompetitive conduct causing nationwide injury have been found sufficient to allege intrastate effects under state antitrust laws, so too are such allegations sufficient to satisfy intrastate effects under state consumer protection laws.   *See, e.g., Auto. Parts,* 2013 WL 2456612, at *28–29 (citing *Packaged Ice,* 779 F. Supp. 2d at 664); *In re Dynamic Random Access Memory Antitrust Litig.,* 516 F. Supp. 2d 1072 (N.D. Cal. 2007).[39]  Reckitt's reliance on *In re Magnesium Oxide Antitrust Litig.,* 2011 WL 5008090 (D.N.J. 2011) is misplaced, as that court dismissed the claims because plaintiffs failed to specify which products they purchased contained the price-fixed compound.  2011 WL 5008090, at *7.  This case does not involve an incorporated product like *Magnesium Oxide*; rather End Payors specifically allege that Reckitt's conduct caused Suboxone purchasers nationwide to pay overcharges.  End Payors also respond to Reckitt's challenge to each of the states listed above as follows.

**California:**  Reckitt's case is inapposite.  *In re Meridian Project Sys. Inc. v. Hardin Constr. Co.,* 404 F. Supp. 2d 1214, 1225  (E.D. Cal. 2005) dismissed an unfair competition claim where none of the alleged misconduct or *injuries* occurred in California.  As noted in detail above, Plaintiffs here allege that Reckitt's conduct injured purchasers in California.  Courts have repeatedly allowed claims under California's Unfair Competition Law based on purchases at supracompetitive prices in California.  *See In re Processed Egg Products Antitrust Litig.,* 851 F.

---

[39] *See also Sheet Metal Workers*, 737 F. Supp. 2d 380, 395–402; *Intel*, 496 F. Supp. 2d 404, 412–15; *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 665–68 (E.D. Mich. 2000); *NMV*, 350 F. Supp. 2d at 193; *Chocolate*, 602 F. Supp. 2d at 581-82.

Supp. 2d 867, 896–97 (E.D. Pa. 2012);  *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 406 (E.D. Pa. 2010).

Regarding **Nebraska** and **New Hampshire**, Plaintiffs have pled a sufficient nexus between the consumer protection violations and the intrastate commerce of these respective territories under the broad sweep of those statutes. The Nebraska statute defines "trade and commerce" as "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."  Neb. Rev. Stat. § 59-1601(2) (2013).  Reckitt offers no authority on point to support its assertion that End Payors fail to establish an intrastate nexus in Nebraska.  Similarly, in *LaChance v. U.S. Smokeless Tobacco Co*, the New Hampshire Supreme Court emphasized that the New Hampshire statute is broad in sweep, explaining that a pleading sufficiently states a claim if the "allegations encompass conduct which was part of trade or commerce that had direct or indirect effects on the people of [New Hampshire]." 931 A.2d 571, 578 (N.H. 2007).  Under this broad standard, End Payors have sufficiently stated a claim for relief under N.H. Rev. Stat. § 358–A:2.[40]

**New York:** GBL § 349 is intentionally broad, applying to "virtually all economic activity."  *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002).  End Payors' allegations that Reckitt engaged in anticompetitive conduct that caused consumers in New York to pay overcharges satisfies the intrastate pleading requirement.  *New York v. Feldman,* 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002); *DDAVP*, 903 F. Supp. 2d at 228.[41]

_____

[40] Although certain federal courts have interpreted the New Hampshire statute to require that the unlawful act itself, as opposed to the trade or commerce, must occur within New Hampshire, New Hampshire state courts have not addressed the issue.  *See NMV*, 350 F. Supp. 2d at 193.  In any event, here, a crucial part of the unlawful act is the overcharge at pharmacy counters in New Hampshire.

[41] *Kaufman v. Sirius XM Radio, Inc.*, 474 Fed. App'x 5 (2nd Cir. 2012) is inapplicable.  The New York claim was dismissed in that case because the non-New York plaintiffs merely alleged

**North Carolina:** Under that State's statute, allegations that Reckitt sold Suboxone and unlawfully maintained its Suboxone monopoly nationwide, including in North Carolina, are sufficient to state a claim. *See Sheet Metal Workers*, 737 F. Supp. 2d at 400; *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at 534–35.

**Vermont:** "The Vermont Supreme Court has repeatedly held that the VCFA is remedial in nature and therefore must be construed liberally so as to furnish all the remedy and all the purposes intended." *Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653, 671 (D. Vt. 2012). Moreover, "[t]he VCFA affords 'any consumer' who has been harmed by unfair methods of competition in commerce or unfair or deceptive acts or practices in commerce a right to sue for damages or equitable relief." *Id.* (quoting Vt. Stat. Ann. tit. 9, § 2461(b)). End Payors here allege that Reckitt directly caused consumers in Vermont to pay supracompetitive prices for Suboxone, thus satisfying the VCFA's standing requirements under an appropriately liberal construction.

> **3.** **Monopolization Claims are Redressable Under the Consumer Protection Laws.**
>
> **a.** **The Consumer Protection Laws of Arizona, Idado, Illinois, Maine, Michigan, Minnesota, and West Virginia Are Applied Consistently with the Federal Trade Commission Act, Which Prohibits Monopolization.**

Reckitt's assertion that the state consumer protection laws of Arizona, Idaho, Illinois, Maine, Michigan, Minnesota, and West Virginia do not "redress" conduct that is describable as "antitrust" ignores the key role that the Federal Trade Commission Act ("FTCA"), which prohibits unfair methods of competition including monopolistic conduct,[42] plays in the

---

that defendant's deceptive conduct emanated from New York; no plaintiff was deceived in New York. *Id*. at *8–9. Here by contrast, End Payors, including named plaintiffs residing in New York, have alleged that plaintiffs suffered their injury in New York.

[42] *FTC v. Motion Picture Adver. Serv. Co, Inc.* 344 U.S. 392 (1953).

application of consumer protection laws in those states.[43]   Monopolization is thus redressable

under each of these states' laws.

> **b.**     **Monopolization is Redressable Under the Remaining States'**
> **Consumer Protection Laws.**

Reckitt's challenge to End Payors' consumer protection claims under the laws of

Arkansas, Kansas, Nevada, New Mexico, Pennsylvania, Rhode Island, South Dakota, Tennessee,

and Virginia similarly fails.  Courts have held that the consumer protection laws in those States

apply to antitrust-type conduct like End Payors' monopolization claims here. *See, e.g.*, *In re New*

*Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp.2d 160, 178-79 (D. Me. 2004)

(Arkansas and New Mexico); *(DRAM) Antitrust Litig.*, 536 F.Supp.2d at 1144-1145 (Rhode

Island); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 221, 226

(S.D.N.Y. 2012) (Nevada and South Dakota); *Blake v. Abbott Labs.*, No. 03A01-9509-CV-

00307, 1996 WL 134947, at *5–7 (Tenn. Ct. App. Mar. 27, 1996) (Tennessee).  Moreover, with

---

[43] *See, e.g.*, *Holeman v. Neils,* 803 F. Supp. 237, 242 (D. Ariz. 1992) (noting that the Arizona Consumer Fraud Act ("ACFA"), Ariz. Rev. Stat. Ann. § 44-1522, *et seq.*, "provides that it be construed consistent with the Federal Trade Commission Act"); *FTC v. Mylan Labs.*, *Inc.* 62 F. Supp. 2d 25, 46 (D.D.C. 1999) (allowing indirect purchaser claims under Idaho's consumer protection act, and holding that "great weight is given to the FTC's interpretation of the FTC Act in the construction of [Idaho's consumer protection act]"); 815 Ill. Comp. Stat. § 505/2 (Section 2 of the Illinois Consumer Fraud and Deceptive Practices Act specifically provides that "consideration **shall** be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act" in interpreting what constitutes unlawful conduct under the act) (emphasis added); *Ramson v. Lavne*, 668 F. Supp. 1162, 1165 (N.D. Ill. 1987) (describing the Illinois Act as a "little FTC Act"); *FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 7 (D.D.C. 1999) (the Maine consumer protection statute "is modeled on the FTC Act, and is explicitly required to be construed consistent with its federal counterpart.");[43] Mich. Comp. Laws Ann. § 445.911(3)(c) (providing a cause of action for any "method, act, or practice in trade or commerce declared by a Circuit Court of Appeals or the Supreme Court of the United States to be an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)"); Minn. Stat. Ann. § 8.31 (non-exclusive list of conduct that may be pursued under Minnesota's consumer fraud statute includes violations of Minnesota's antitrust statute); W. Va. Code § 46A-6-103 (application of West Virginia's Consumer Credit and Protection Act ("WVCCPA") is guided by the FTC Act); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 231 (D. Mass. 2006).

respect to Pennsylvania, Tennessee and Virginia, Reckitt's reliance on *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 206–207 is misplaced.  The court there dismissed plaintiff's consumer protection claims because it found that the complaint did not sufficiently allege fraud or deception under the facts of that case.  Plaintiffs here have sufficiently alleged Reckitt's deceptive conduct.  *See infra* at 42-45.[44]

Regarding Kansas, the Supreme Court of Kansas court has stated that the "[Kansas Consumer Protection Act ("KCPA")] is to be construed liberally to promote the objective, among others, of protecting consumers from suppliers who commit deceptive and unconscionable acts. K.S.A. 50-626(b) provides a non-exclusive list of examples of prohibited deceptive act . . . " *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 514 (1988).  Indeed, claims under both the antitrust act and the KCPA are regularly brought simultaneously. *See e.g.*, *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F.Supp.2d 1107, 1154 (D. Kan. 2003).

### 4.    End Payors Have Sufficiently Alleged Deceptive Conduct, To the Extent It Is Required.

Reckitt incorrectly asserts that End Payors' consumer protection claims fail under the laws of Arizona, Florida, Kansas, Maine, Michigan, Minnesota, New York, Pennsylvania, and South Dakota because End Payors have purportedly failed to sufficiently allege fraud or deceit, which Reckitt maintains is a required element of these states' claims.  Def. Mem. at 20-21.

Courts, however, have routinely held that state consumer protection statutes do not enumerate one cause of action, but rather grant broad remedies flowing from *either* unfair competition generally or another, more particular claim such as fraud.  *See, e.g.*, *In re Auto. Parts Antitrust Litig.*, 12-MD-02311, 2013 WL 2456612, at *23 (E.D. Mich. June 6, 2013) (the Florida statute "was enacted to provide remedies for conduct outside the reach of traditional

---

[44] End Payors are voluntarily withdrawing their claims under the Oregon Unlawful Trade Practices Act.

common law torts such as fraud, and therefore, the plaintiff need not prove the elements of fraud

to sustain an action under the statute") (internal citation omitted); *see also In re Processed Egg*

*Prods.,* 851 F. Supp. 2d at 894*; Wellbutrin SR,* 737 F. Supp. 2d at 406.[45]   Indeed, for all but two

of these states, the plain language of the statutes indicates that neither fraud nor deceit is a

*necessary* element of the claims.[46]   *See, e.g.*, *In re Ditropan XL Antitrust Litig.,* 529 F. Supp. 2d

1098, 1005 (N.D. Cal. 2007) (fraud or reliance is not "required for claims which fall under the

unfair or unlawful prongs.").

Moreover, as discussed above, many of the consumer protection statutes, including the

Arizona, Florida, Maine, Michigan, Minnesota and New York statutes, are modeled after the

FTC Act or otherwise incorporate general antitrust concepts, which do not require fraud or deceit

as an element. *See infra* at 40-41; *see also People ex rel. Spitzer v. Applied Card Systems, Inc.*,

805 N.Y.S.2d 175 (N.Y. App. Div. 3rd Dept. 2005) (the FTC Act informs whether conduct is

deceptive under New York's G.B.L. § 349).  Because antitrust violations constitute an FTC Act

violation, *supra* at n. 42, and these state laws are modeled after the FTC Act, End Payors have

plainly satisfied their pleading requirements under these States' laws—no allegations of fraud or

---

[45] Because of the breadth of these statutes, End Payors allege that Reckitt "engaged in unfair competition *or* unfair, unconscionable, deceptive *or* fraudulent acts or practices" in violation of the state consumer protection laws. CAC ¶178 (emphasis added).

[46] *See* Ariz. Rev. Stat. Ann. § 44-1522 ("deceptive or unfair act or practice"); Fla. Stat. Ann. § 501.204 ("[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices"); Kan. Stat. Ann. § 50-627 ("any unconscionable act or practice"); Me. Rev. Stat. Ann. tit. 5 § 207 ("[u]nfair methods of competition and unfair or deceptive acts or practices"); Mich. Comp. Laws § 445.903 ("[u]nfair, unconscionable, or deceptive methods, acts, or practices"); Minn. Stat. Ann. § 325D.09 ("unfair and fraudulent competition and unsound and uneconomic methods of distribution"); and Pa. Stat. Ann. tit. 73, §§ 201-2, 201-3 ("[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade"). Only the New York and South Dakota statutes arguably require a deceptive act or practice (but not fraud). *See* N.Y. Gen. Bus. Law § 349 ("[d]eceptive acts or practices in the conduct of any business"); S.D. Codified Laws Ann. § 37-24-6(1) (defining a deceptive trade practice).  As discussed below, End Payors have sufficiently alleged that Reckitt's conduct was deceptive under these (and other) states' laws.

deceit are required.  *See NMV*, 350 F. Supp. 2d 160, 186-87 (D. Me. 2004).  Further, as End

Payors can state a claim by alleging unfair competition or other unlawful conduct, End Payors

need not allege fraud or deceit with particularity[47] or allege reliance on a particular deception.[48]

But even if deception is required, End Payors' allegations are sufficient.  End Payors

allege, in specific detail, that Reckitt fabricated a safety issue with Suboxone tablets solely to

impair generic competition.  CAC ¶¶3, 24–35, 70–82 (describing, *inter alia*, ten reasons why

Reckitt's safety justification was false and deceptive).   Reckitt then broadcast this concocted

"safety" issue, and falsely disparaged the tablets to the FDA, doctors, other industry participants,

and the public[49] in a successful move to destroy demand for Suboxone tablets and switch the

market to its patented Suboxone film product, which did not face imminent generic competition.

CC ¶¶ 43-45.  Reckitt ignores all of these well-pled allegations (*see* Def. Mem. at 21, citing only

¶178), which are sufficient under applicable authorities.  *See*, *e.g.*, *In re DDAVP Indirect*

*Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 228 (S.D.N.Y. 2012) (alleged anticompetitive

---

[47] Kansas and Minnesota are the only states for which Reckitt supports its proposition that heightened pleading is required. Even if Kansas and/or Minnesota require heightened pleading, as discussed below, the Complaint alleges Reckitt's deception with particularity.

[48] Even if reliance were required for Arizona, Maine and Michigan, as Reckitt maintains, End Payors state a claim. *See, e.g., Persky v. Turley*, 1991 WL 327434, at *9 (D. Ariz. 1991) (individual reliance not required in Arizona); *Dix v. American Bankers Life Assurance Co.*, 429 Mich. 410, 415 N.W.2d 206, 418 (Mich. 1987) (same in Michigan).  With respect to Maine, *Tungate v. Maclean-Stevens Studios, Inc.*, 714 A.2d 792 (Me. 1998), upon which Reckitt's authority relied, is inapposite.  That case involved an advertised price that was alleged to have been deceptive.  *Tungate*, 714 A.2d at 797.  Plaintiffs here do not allege that Reckitt deceived them through an "unfair price." Plaintiffs allege that Reckitt's deceptive, anticompetitive scheme caused them to pay supracompetive prices, which is unfair and deceptive under the Maine statute.

[49] To the extent New York requires a deceptive act or practice directed to consumers, End Payors have satisfied that requirement. A "consumer-oriented act" is simply one that causes "any 'consumer injury or harm to the public interest.'" *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  Moreover, Reckitt's public announcement that it would be withdrawing Suboxone tablets for false safety reasons was directed to consumers, among others.

scheme to delay generic entry was deceptive under multiple state consumer protection laws, including Arizona, Michigan, New York and South Dakota); *Macquarie Grp. Ltd. v. Pac. Corporate Grp., LLC*, No. 08–CV–2113, 2009 WL 539928, at *9 (S.D. Cal. Mar. 2, 2009). Reckitt's disregard for End Payors' allegations, and the actual requirements of these states' laws, should not be countenanced.

### 5.   End Payors Adequately Alleged Unconscionable Conduct.

Reckitt also challenges the sufficiency of End Payors' Arkansas, District of Columbia, Idaho, Kansas, New Mexico, North Carolina and Utah claims (Def. Mem. at 22), but End Payors are not required to plead unconscionable conduct under any of these states' laws.  Each of these states' consumer protection statues also prohibit "unfair," "deceptive" and/or other non-exclusive misconduct that constitutes a violation.[50]

Whether or not End Payors are required to plead it, End Payors have sufficiently alleged that Reckitt's anticompetitive conduct is unconscionable. End Payors allege that Reckitt instituted a multi-faceted scheme to rob consumers of a less expensive, but superior opioid dependence drug—solely for Reckitt's own gain.  CAC ¶3.  A major component of this scheme was to concoct a safety story about harm to children, when Reckitt could have acted to prevent pediatric exposures, but did not.  CAC¶¶ 25, 30–35, 70–82.  As a result of Reckitt's conduct, "[t]here was and is a gross disparity between the price that Plaintiffs and the Class members paid

---

[50] *See* Ark. Stat. Ann. § 4–88–107(a)(10) (2013) (prohibiting "unconscionable, false, *or* deceptive act or practice in business, commerce, or trade")*;* D.C. Code § 28-3904(a)-(hh) (2013) (listing thirty-five non-exclusive violations, only one of which requires a showing of unconscionability); Idaho Code Ann. § 48-603 (2013) (prohibiting "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"); Kan. Stat. Ann. § 50-626 (2012) (prohibiting deceptive acts and practices); N.M. Stat. Ann. §57-12-3 (2013) ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."); N.C. Gen. Stat. Ann. § 75-1.1 (2013) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."); Utah Code Ann. § 13-11-4 (2013) (prohibiting deceptive acts and practices).

for the brand Suboxone product and the value received, given that a much cheaper substitute generic product should have been available sooner and in greater quantity, and prices for brand Suboxone should have been much lower, but for Reckitt's unlawful conduct."  CAC ¶179.  These detailed allegations, which Reckitt simply ignores, are sufficient to demonstrate unconscionability under all applicable state laws.[51]

### 6.    Reckitt's Other Arguments Regarding Kansas, Massachusetts, and Rhode Island Law Are Meritless.

**Kansas:** Reckitt asserts that the named plaintiffs cannot maintain a consumer protection claim because health and welfare funds are not "consumers."  Def. Mem. at 22.  Reckitt is wrong.  *See Geico v. Indem. Ins. Co. v. Kannaday*, 2007 WL 2990552, at * 3 (D. Kan. 2007) (referring to "third-party payors" as "consumers" under the Kansas Unfair Trade and Consumer Protection Act "KCPA").  Under the KCPA, a consumer is defined as "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes."  Kan. Stat. Ann. § 50-624. Named plaintiffs fit within this definition because they purchase Suboxone for the personal use of their consumer insureds.  *See, e.g.*, CAC ¶¶147, 179, 181.

**Massachusetts:** Reckitt contends that End Payors have failed to serve a pre-suit demand letter in accordance with Mass. Gen Laws ch. 93A, 9(3).  Reckitt is wrong for three reasons. *First*, the pre-suit demand letter applies only if a defendant maintains a principal place of business or assets in Massachusetts, *id*., which Reckitt does not. *Second*, the pre-suit demand

---

[51] *See, e.g.*, *In re Photochromic Lens Antitrust Litig.*, 2011 WL 4914997, at *4 (M.D.  Fla. 2011) (Arkansas); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1125–26 (District of Columbia); *In re In re DDAVP Indirect Purchaser Litig.*, 903 F. Supp. 2d 198, 224– 225 (S.D.N.Y. 2012) (Idaho); *Auto. Parts Antitrust Litig.*, 12-MD-02311, 2013 WL 2456612, at *25 (E.D. Mich. June 6, 2013) (New Mexico and North Carolina); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 204 (D. Me. 2004) (Utah);  *In re Pharm. Indus. Average Wholesale Price Litig.*, 738 F. Supp. 2d 227, 239 (D. Mass. 2010) (Kansas).

requirement does not apply to claims brought by businesses like Plaintiffs in this case. *In re Pharm. Industry Average Wholesale Price Litig.*, 230 F.R.D. 61, 86 (D. Mass. 2005). *Third*, the notice requirement is designed to promote settlement. Reckitt has been on notice of the facts and claims in this litigation for quite sometime and demonstrated no desire to resolve this matter absent judicial intervention. *See Fredericks v. Rosenblatt*, 667 N.E.2d 287, 289 (Mass. App. Ct. 1996). Accordingly, the pre-suit demand requirement does not apply.

**Rhode Island:** *State v. Piedmont Funding Corp.*, 382 A.2d 819, 822 (R.I. 1978) is inapposite. There, the court dismissed a deceptive trade practice act claim concerning the defendant's sale of insurance and investment programs to plaintiff, because such a sale is regulated by federal and state government agencies. *Id.* Here, by contrast, End Payors do not challenge conduct directly regulated by the FDA, such as the approval of Suboxone film. Instead, End Payors challenge Reckitt's unilateral, bad faith gaming of the system that the FDA in no way monitors. *Cf. Long v. Dell, Inc.*, 984 A.2d 1074, 1081 (R.I. 2009) (holding that the "regulated conduct" exemption does not exempt the fraudulent collection of taxes).

### C.    The Unjust Enrichment Claims Are Valid

Reckitt makes various attacks on Plaintiffs' unjust enrichment claims, which improperly assume the underlying antitrust claims will be dismissed and ignore significant case law— including this Court's *Provigil* decision—upholding unjust enrichment claims in essentially identical circumstances.

### 1.    The Unjust Enrichment Claims Are Adequately Pled.

State law claims of unjust enrichment are "universally recognized causes of action that are materially the same throughout the United States." *Singer v. AT&T Corp.,* 185 F.R.D. 681, 692 (S.D. Fla. 1998); *see also In re Mercedes-Benz TeleAid Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009). Generally speaking, in order to state a claim for unjust enrichment, a plaintiff must

allege: (1) at plaintiff's expense (2) defendant received benefit and (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it.  Restatement of Restitution § 1 (1937); *see also In re K-Dur*, 338 F. Supp. 2d at 544; *In re Lorazepam*, 295 F. Supp. 2d at 50.  End Payors have sufficiently pled each of these elements: Reckitt received a benefit in the "nature of profits resulting from unlawful overcharges and monopoly profits" (CAC ¶190); the financial benefits received by Reckitt rightfully belong to Plaintiffs and the Class (CAC ¶194); and it would be inequitable to allow Reckitt to retain its ill-gotten gains (CAC ¶195).[52]

## 2.    Unjust Enrichment is Not Dependent on Other Claims.

Reckitt makes a Catch-22 challenge to Plaintiffs' unjust enrichment claims, first arguing that Plaintiffs can assert unjust enrichment only in states that allow indirect purchaser antitrust claims,[53] and then claiming that Plaintiffs can assert unjust enrichment only in states where they have no other legal remedies.  Both of these arguments are wrong.

This Court in *Provigil* expressly rejected Reckitt's first argument.  *See Provigil*, 702 F. Supp. 2d at 539–40.  Denying defendants' arguments that unjust enrichment claims by end payors constituted an impermissible "end run" around statutory limitations on antitrust claims, this Court cited several cases that "have found just the opposite."  *Id.* at 539–40 (citing cases).  Reckitt offers no reason, much less a persuasive reason, why the Court should not follow its prior decision on this issue.

---

[52] Reckitt's reliance on *Auto Parts* and *Wellbutrin* is misguided.  In those cases, plaintiffs specified *no* source of law on which they were basing their unjust enrichment claims. *See Wellbutrin*, 260 F.R.D. at 167 and *Auto Parts*, 2013 WL 2456612, at *31 (E.D. Mich. Jun. 6, 2013). Those cases merely ruled that there was no unjust enrichment claim under federal common law, a decision End Payors do not dispute.

[53] Reckitt's challenge to "autonomous" unjust enrichment claims, meaning those not based on a statutory violation (Def. Mem. at 24), is a variation on the argument that a statutory violation is required to bring an antitrust claim.  *Cardizem*, 105 F. Supp.2d at 668-69.

Moreover, End Payors' unjust enrichment claims may proceed even if some (or all) of their statutory claims are dismissed. *Cardizem* warned of confusing "[p]laintiffs' right to recover an equitable remedy under a common law claim based upon principles of unjust enrichment with [their] right to recover a remedy at law for an alleged violation of a state's antitrust laws." 105 F. Supp. 2d at 669. Rejecting the very argument Reckitt makes here, *Cardizem* noted that common law claims may be successfully brought even where statutory or contract claims are unsuccessful. *Id.* (citing illustrative cases from Wisconsin, Minnesota, and Tennessee).

Reckitt's alternative argument, no lack of legal remedy, also fails because unjust enrichment is a separate cause of action which plaintiffs are allowed to plead in the alternative under Federal Rule of Civil Procedure 8—regardless of consistency and whether based on legal or equitable grounds. *See, e.g.*, *In re Processed Egg*, 851 F. Supp. 2d at 917–18; *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1, Comment (a). Accordingly, even if a legal remedy would bar End Payors' unjust enrichment claims, it is premature to dismiss such claims before Plaintiffs' remedies are determined. *See, e.g.*, *In re K-Dur*, 338 F. Supp. 2d at 544.

### 3. End Payors Sufficiently Allege That They Conferred a Benefit on Reckitt That It Would Be Unjust for Reckitt to Retain.

Contrary to Reckitt's argument (Def. Mem. at 27), there is no "direct benefit" requirement. Unjust enrichment does not require any promise or privity between the parties. *See* 66 Am. Jur. 2d Restitution and Implied Contracts § 7 (August 2013) (citing *Robinson v. Colorado State Lottery Div.*, 179 P.3d 998 (Colo. 2008)). "[R]ecovery based on unjust enrichment depends upon showing that the parties have money, or its equivalent, in their hands that, in equity and good conscience, they ought not be allowed to retain and that ex aequo et bono belongs to another." *Id.* § 12.

This Court recently conducted a detailed analysis of the supposed "direct benefit" requirement in several states and concluded that no such requirement was supported by the caselaw.  *See In re Processed Egg Prods.*, 851 F. Supp. 2d at 918–19 (upholding unjust enrichment claims under the laws of the District of Columbia, Florida, Kansas, Minnesota, New York, North Carolina, Utah and West Virginia, among others). Moreover, courts in analogous cases have held the relationship between end payors, like Plaintiffs, and the pharmaceutical manufacturer defendant to be sufficiently connected to allow claims for unjust enrichment.  *See, e.g.*, *DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 234 (S.D.N.Y. 2012) (plaintiffs "plausibly conferred some benefit on Defendants, albeit indirectly by purchasing DDAVP at elevated prices and Defendants profited from the individual demand of the DDAVP consumers, the ultimate victims of Defendants' unlawful conduct."); *Cardizem*, 105 F. Supp. 2d at 670 (plaintiffs conferred a benefit "in the form of overpayments and increased profits" and "it would be unjust under the alleged circumstances for Defendants to retain that benefit").

As *DDAVP* and *Cardizem* demonstrate, simply because End Payors bought Suboxone does not mean that End Payors received the benefit of their bargain or that Reckitt's monopolistic profits were equitable. To the contrary, as a result of Reckitt's anticompetitive scheme, End Payors unwittingly paid artificially inflated prices for Suboxone that "it would be unjust under the alleged circumstances" for Reckitt to retain.  Reckitt cannot "profit[] from the individual demand" of End Payors and shield its conduct from liability on the grounds that End Payors got what they had coming to them.

### 4.    Reckitt's Other Attacks On Unjust Enrichment Are Futile.

Reckitt claims incorrectly that there is no cause of action for unjust enrichment in California and Mississippi.  Under California law, the elements of unjust enrichment are: "(1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another." *Baggett v.*

*Hewlett-Packard Co.,* 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007).  Likewise, Mississippi law allows recovery under an unjust enrichment theory.  *Franklin v. Franklin ex rel. Phillips*, 858 So.2d 110, 121 (Miss. 2003) ("To collect under an unjust enrichment or quasi-contract theory, the claimant must show 'there is no legal contract but…the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another.'").  *See also Processed Egg*, 851 F. Supp. at 913-14, upholding California and Mississippi unjust enrichment claims.

Reckitt's attempt to defeat an unjust enrichment claim under Alabama law by relying on *Matador Holdings, Inc. v. HoPo Realty Invs.,* 77 So. 3d 139 (Ala. 2011) is unavailing.  There, the Alabama Supreme Court expressly stated that retention of a benefit is unjust if the recipient engaged in unconscionable conduct.  *Id*. at 145–46.  Here, End Payors sufficiently allege that Reckitt's anticompetitive scheme was "unconscionable."   CAC ¶¶ 89–92, 96; *infra* at 45-46.  This case involves far more than the mere failure to pay for supplies at issue in *Matador*.

Reckitt's attempts to create a "special duty" requirement under Illinois and South Carolina law are also futile.  *Martis v. Grinell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017 (2009) simply rejected an unjust enrichment claim where the plaintiff tried to sue under an insurance policy it was not a party to, stating that its musings on unjust enrichment were *dicta* and not part of an appeal before it.  *Id*. at 1024.  Moreover, because End Payors allege violations of federal and state antitrust law, their unjust enrichment claim is valid in Illinois even under the *Martis* rationale.  In any event, violation of the antitrust laws would establish the breach of any extra duty required under Illinois or South Carolina law.

## IV.   END PAYORS HAVE SUFFICIENTLY ALLEGED MONOPOLY POWER AND A RELEVANT MARKET.

### A.   Relevant Market Analysis is Not Required.

Reckitt asserts that End Payors have failed to plausibly define a relevant market.  But defining a relevant market is not required.  Plaintiffs can allege (and ultimately prove) that Reckitt has monopoly power with respect to Suboxone in two ways: either (i) directly, through evidence that Reckitt's conduct caused anticompetitive effects; or (ii) indirectly, through evidence of Reckitt's dominant shares in a relevant market.  *See, e.g.*, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3rd Cir. 2007).  The "direct evidence" method does not require proof of a relevant market. *Broadcom Corp.*, 501 F.3d at 307 n.3.  *See also Toys R Us Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000); *Tops Mkts, Inc. v. Quality Mkts, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998).[54]

Here, End Payors have sufficiently alleged that Reckitt possesses monopoly power over Suboxone through direct evidence, including Reckitt's costly efforts to exclude generic competitors.  The Supreme Court has held that such costly efforts make sense only if the defendant has significant market power.  *FTC v. Actavis*, 133 S. Ct. at 2236.[55]  In addition:  (a) Reckitt successfully impaired and excluded generic competition (CAC ¶¶88, 90–91, 134, 143–145), *United States v. E I du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956); (b) Reckitt's conduct resulted in supracompetitive prices (CAC ¶¶ 42, 96, 143, 146, 157–58), *Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2, 27 & n.46 (1984); (c) no firm was able to respond to

---

[54] *See also* Louis Kaplow, *Why (Ever) Define Markets?*, 124 Harv. L. Rev. 438, 517 (2010); Eric L. Cramer & Daniel Berger, *The Superiority of Direct Proof of Monopoly Power and Anticompetitive Effects in Antitrust Cases Involving Delayed Entry of Generic Drugs*, 39 U.S.F. L. Rev. 81, 84 n.10 (2004).

[55] As a Section 1 case, *Actavis* concerned only "market power"—the ability to price above the competitive level—but the "monopoly power" required in a Section 2 case is simply *substantial* market power, i.e., the ability to price substantially above the competitive level.  *Microsoft*, 253 F.3d at 51.

Reckitt's high prices by increasing output of competing goods (CAC ¶¶4, 134, 143–44), *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 464 (1992); and (d) consumer welfare suffered from the lack of competing goods in a high-price environment (CAC ¶¶ 18–20, 144, 147), *Microsoft*, 253 F.3d at 51.  End Payors have satisfied the "direct proof" method of alleging monopoly power, so relevant market allegations are unnecessary.

### B.     Defining a Relevant Market Is a Question of Fact for the Jury.

Even if a relevant product market definition were required, the contour of the relevant market raises disputed issues of fact that cannot be resolved on a motion to dismiss.  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. at 482 ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."). Dismissal at the Rule 12(b)(6) stage is thus disfavored.  *See, e.g.*, *Broadcom*, 501 F.3d at 315; *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992) ("the determination of a relevant product market . . . is a highly factual one best allocated to the trier of fact"); *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984) ("[m]arket definition is a question of fact").

Even Reckitt's cases acknowledge that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F3d 430, 436 (3d Cir. 1997) ("It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.").  Reckitt's challenge to End Payors' market definition is "best resolved on a motion for summary judgment or at trial."  *Peerless Heater Co. v. Mestek, Inc.*, No. Civ. A. 98-6532, 1999 WL 624481, at *1 (E.D. Pa. Aug. 6, 1999).

## C.  End Payors Have Alleged a Plausible Relevant Market.

In any event, End Payors have alleged a plausible relevant market. It is true, as Reckitt states, that the relevant product market is defined by determining products' "reasonable interchangeability." *Queen City Pizza*, 124 F.3d at 436.  But, contrary to Reckitt's argument (MTD at 34), products are not "reasonably interchangeable" for antitrust purposes simply because they have similar uses.  Rather, reasonable interchangeability turns on whether the products are *economic substitutes* for one another, i.e., whether relative changes in the price of one product would cause a substantial shift in the demand for another, a concept commonly referred to as cross-elasticity of demand.  *Queen City Pizza*, 124 F.3d at 437–38; *see also SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978); *Babyage.com, Inc. v. Toys R' Us, Inc.*, 2008 U.S. Dist. LEXIS 40476, *4–6 (E.D. Pa. May 19, 2008); *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 696 F. Supp. 97, 131 (D. Del. 1988)

The relevant product market End Payors allege here clearly meets this test.  End Payors expressly allege that the relevant product market is limited to Suboxone and its AB-rated generic bioequivalents (CAC ¶¶153–62) because, *inter alia*, Suboxone does not exhibit significant, positive cross-elasticity of demand regarding price, with any opioid dependence treatment or other product except AB-rated generic versions of Suboxone (CAC ¶¶5, 22, 156, 157), including similar products approved for the same therapeutic use (CAC ¶¶128–32).[56]

These allegations are more than plausible.  The unique characteristics of the pharmaceutical industry—including especially the price disconnect—give brand manufacturers the ability to raise or maintain prices substantially above competitive levels without losing

---

[56] End Payors also allege that Suboxone and its AB-rated generic equivalents are therapeutically unique.  CAC ¶¶5, 22, 159.

substantial sales, until generic substitutes are available.[57]   Indeed, the Court of Appeals has ruled

that "[m]arket definition must take into account the fact that physicians, who regulate use of

drugs are not cost-conscious."   *Columbia Metal Culvert Co., Inc. v. Kaiser Alum. & Chem.*

*Corp.*, 579 F.2d 20, 28 n.22 (3d Cir. 1978) (citation omitted).

That is why 50 states have enacted generic substitution laws—to foster the price

competition that is otherwise lacking in these markets.   And that is why a litany of decisions, in

other generic suppression cases, have upheld a relevant product market limited to brand and

generic versions of a single drug, despite the existence of other drugs in the same therapeutic

class.   *See, e.g.*, *SmithKline*, 575 F.2d at 1064; *Andrx Pharms. Inc. v. Elan Corp*., 421 F.3d 1227,

1235-36 (11th Cir. 2005); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc*., 386 F.3d 485, 496-99

(2d Cir. 2004); *In re Nexium (Esomeprazole) Antitrust Litig.*, 12-md-02409, 2013 WL 4832176,

at *12, 2013 U.S. Dist. LEXIS 129696, at *46–50 (D. Mass. Sept. 11, 2013); *In re Neurontin*

*Antitrust Litig.*, MDL No. 1479, Master Docket No. 02-1390(FSH), 2013 U.S. Dist. LEXIS

111587, at *10–11 (D.N.J. Aug. 8, 2013); *La. Wholesale Drug Co., Inc. v. Sanofi-Aventis*, No. 07

Civ. 7343(HB), 2008 WL 169362, at *7 (S.D.N.Y. Jan. 18, 2008); *In re Lorazepam &*

*Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81-82 (D.D.C. 2006); *In re Ciprofloxacin*

*Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 522-23 (E.D.N.Y. 2005); *In re Terazosin*

*Hydrochloride Antitrust Litig*., 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla. 2005); *FTC v.*

*Schering-Plough Corp*., 2003 FTC LEXIS 187, *58–59 (F.T.C. 2003); *Knoll Pharms. Co., Inc. v.*

*Teva Pharms. USA, Inc.*, No. 01-C-1646, 2001 WL 1001117, at *3–4 (N.D. Ill. Aug. 24, 2001);

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d at 680–81; *Mutual Pharm. Co., Inc. v.*

---

[57] Reckitt's conclusory assertion that "in the pharmaceutical industry, interchangeability turns on therapeutic use" (MTD at 34) is not just wrong, it is also contrary to End Payors' allegations, which must be taken as true on this motion to dismiss.

*Hoechst Marion Roussel, Inc.*, No. Civ. A. 96–1409, 1997 WL 805261, at *2–3 (E.D. Pa. Dec. 17, 1997).[58]

End Payors plausibly allege that neither Subutex nor any other opioid dependence drug exhibits significant, positive cross-price elasticity of demand with Suboxone and thereby constrains prices to competitive levels.  It would be error to include such products in the relevant product market.  *See, e.g.*, *Microsoft*, 253 F.3d at 53; *Brookings v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000); *U.S. Anchor Mgf., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-99 (11th Cir. 1993); *U.S. v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 & n.1 (8th Cir. 1988); *Hayden Pub. Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 70 (2d Cir. 1984).[59]

---

[58] Reckitt's non-binding cases are distinguishable.  *Ashahi Glass* merely noted that it cannot be assumed that a particular drug in a separate market, and also acknowledged that drugs within the same therapeutic category may be in different product markets. *Asahi Glass Co., Ltd. v. Pentech Pharma., Inc.*, 289 F. Supp. 2d 986, 996 (N.D. Ill. 2003), citing *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062-65 (3d Cir. 1978).  *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F.Supp.2d 569 (S.D.N.Y. 2011), involved an amended product market definition that directly contradicted the counterclaim plaintiff's original allegations and is contrary to the weight of authority discussed above. Finally, *Kaiser Found.v. Abbott Labs*, No. CV 02-2443, 2009 U.S. Dist. Lexis 107512 (C.D. Cal. Oct. 8, 2009), was decided on summary judgment based on expert evidence. Reckitt implies that plaintiffs have impermissibly pled a "single brand" as a product market.  Plaintiffs have done no such thing.  The relevant market pled by plaintiffs includes all firms that supply branded and generic co-formulated buprenorphine/naloxone drugs, not just a single firm.  CAC ¶160.  That is not a "single brand" product market.  *See Todd*, 275 F.3d at 200 n.3 ("These [single-brand] cases would be applicable to this case if plaintiff were alleging that Exxon alone constitutes the relevant product market, but plaintiff does not so allege"); *Xerox Corp. v. Media Sciences Int'l., Inc.*, No. 06-4872, 2007 WL 2685063, *6–7 (S.D.N.Y. Sept. 14, 2007) ("the replacement solid ink sticks themselves are not single brand products in that both plaintiff and defendant manufacture and market them").

[59] Thus, Reckitt's request that the Court take judicial notice of certain documents it says indicate purported similarities in patients' use of Subutex and Suboxoe is not just improper, *see In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 13-md-2445, Oct. 4, 2013 Order [ECF No. 66] at ¶¶4–5, but largely irrelevant.

## V.    END PAYORS STATE A CLAIM FOR INJUNCTIVE RELIEF.

Reckitt offers three baseless arguments opposing Plaintiffs' claim for injunctive relief. Each of these arguments should be rejected.

*First*, it is immaterial whether the Directs Purchasers have an identical claim.  Reckitt's thinly-disguised attempt to apply *Illinois Brick* to a claim for injunctive relief in a "duplication of the Directs' claim" argument should not be credited.[60]  *Illinois Brick* applies only to damages. *McCarthy v. Recordex Serv.*, 80 F.3d 842, 856-57 (3d Cir. 1996).

*Second*, Reckitt argues that End Payors have no ongoing or future injury because generic Suboxone tablets entered the market in February 2013.  Reckitt's argument misses (or obscures) the point.  End Payors' theory of harm is that Reckitt introduced Suboxone film and destroyed the market for Suboxone tablets so that by the time generic Suboxone tablets received FDA approval, there would be no market for generic tablets.  End Payors' harm is ongoing because but for Reckitt's anticompetitive scheme, all or nearly all Suboxone sales would be less expensive generic Suboxone tablets. Instead, End Payors are stuck paying artificially inflated brand prices for an inferior film product.  Thus, there is an ongoing competitive effect that can be remedied through an injunction (such as, for example, compulsory licensing of the film patents to generic competitors, or a mandated reduction in Reckitt's price of the branded film, among many other possibilities).

---

[60]    Reckitt's reliance upon *Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237 (3d. Cir. 2010), is misplaced. There, the Court affirmed dismissal on *summary judgment* because the plaintiffs had failed to present *evidence* showing that they had a threat of injury. *Id.* at 250.  On this motion to dismiss, End Payors' allegations are to be accepted as true and analyzed in that context. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 398 (3d Cir. 2000).

*Finally*, as discussed above and in the Direct Purchasers' brief, End Payors have standing under Clayton Act § 16 because End Payors have sufficiently alleged injury flowing from a contemporary antitrust violation.

## VI.   THE RECKITT ENTITIES SHOULD NOT BE DISMISSED.

Reckitt Benckiser Group plc ("RBG") and Reckitt Benckiser Healthcare (UK) Ltd. ("RBH") should not be dismissed.  Parent or sister corporate entities are proper defendants when they are alleged to be directly liable for unlawful conduct—that is, they took part in the alleged misconduct.  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011). Reckitt simply ignores that End Payors allege that these entities are directly responsible for the misconduct alleged in Plaintiffs' complaint.  CAC ¶¶83–87; 114–15.  More specifically, End Payors allege that RBG: (a) was "advised of the generic impairing purpose of the product hop from Suboxone tablets to film, and of the related anticompetitive tactics" (CAC ¶83); (b) "specifically approved" the anticompetitive scheme and its purpose (*id*.); and (c) "directed th[e] anticompetitive scheme over the course of many years" (*id*.).  In addition, End Payors allege that RBG approved a strikingly similar product hop by RBH in England that served as a template when RBG was approving and directing the Suboxone product hop scheme in conjunction with Reckitt Benckiser Pharmaceuticals, Inc. CAC ¶¶84–87.  Because End Payors allege that RBG and RBH took part in the alleged misconduct, RBG and RBH are proper defendants.

## VII.   END PAYORS HAVE TIMELY SERVED DEFENDANTS.

Reckitt's meritless service argument seeks to waste this Court's resources and is wrong under Rule 4.

The purpose of civil plaintiffs effectuating service is to notify the defendants of the claims against them. *Concepcion v. VEB Backereimaschenbau Halle*, 120 F.R.D., 482, 485 (D.N.J. 1988). An individual, corporation, or association that is subject to service under Rule

4(e), (f), or (h) has a duty to avoid unnecessary expenses of serving the summons. Fed. R. Civ. P. 4(d)(1).  No fewer than six End Payor Plaintiffs issued summons to all Reckitt entities;[61] those defendants are properly subject to this Court's jurisdiction by virtue of being sued and timely served in suits that are consolidated in this main action, and by entering appearances to defend these actions.[62]  Under circumstances such as these, any dismissal of certain actions as to only the un-served defendants—which dismissal would be required to be without prejudice—would be a profound waste of judicial resources.  *See AIG Managed Mkt. Neutral Fund v. Askin Capital Mgmt., L.P.,* 197 F.R.D. 104, 109 (S.D.N.Y. 2000) ("DLJ is already a defendant in the Consolidated Actions pending before this court. Presumably the only result of a dismissal would be that the AIG Plaintiffs would refile their complaint, resulting in a waste of judicial resources."); *In re Reliance Secs. Litig.*, 91 F. Supp. 2d 706, 719 (D. Del. 2000).[63]

Moreover, as to the foreign entities, RBG and RBH, the 120-day time period prescribed by Rule 4(m) does not apply. Rule 4(m) clearly states: "This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1)." *Lewis v. Asbestos Corp.*, MDL 875, 2011

---

[61] *See Painters District Council No. 30 Health and Welfare Fund v. Reckitt Benckiser, Inc. et al.*, No. 2:13-cv-01455 (D.N.J.), Docket Nos. 2, 10; *Meridian Plan of Michigan v. Reckitt Benckiser, Inc. et al.*, No. 2:13-cv-01594 (E.D. Pa.), Docket Nos. 3-4; *IBEW 292 Health Care Plan v. Reckitt Benckiser, Inc., et al.*, No. 2:13-cv-02454 (E.D. Pa.), Docket No. 2; *Teamsters Health Services and Insurance Plan Local 404*, No. 2:13-cv-03130 (D.N.J.), Docket No. 3; *Construction & General Laborer's Local 190 Health and Welfare Fund v. Reckitt Benckiser, Inc. et al.*, No. 2:13-cv-03256 (D.N.J.), Docket No. 2; and *New York Hotel Trades Council & Hotel Assoc. of New York City v. Reckitt Benckiser, Inc. et al.*, No. 2:13-cv-03381 (E.D. Pa.), Docket No. 2.

[62] *See Painters District Council No. 30 Health and Welfare Fund v. Reckitt Benckiser, Inc. et al.*, No. 2:13-cv-01455 (D.N.J.), Docket No. 7 (appearance "on behalf of all defendants").

[63] Rule 4(m) contemplates that the court can order service be made within a specified time. Fed. R. Civ. P. 4 (m).  The 1993 amendment comments note that the new subdivision (m) "explicitly provides that the court shall allow additional time if there is good cause for the plaintiff's failure to effect service in the prescribed 120 days, and authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision *even if there is no good cause shown*.  Fed. R. Civ. P. 4 (m), Advisory Comm. Notes, 1993 Amendment.

WL 5881180 n.1 (E.D. Pa. Aug. 2, 2010); *In re Imperial Home Décor Group, Inc.*, 294 B.R. 607 (D. Del. 2003).  Rather, courts allow a "reasonable time" for accomplishing service of process, which has not been surpassed here.  *See, e.g., The Knit With v. Knitting Fever, Inc.*, 2010 WL 2788203, at *12–13 (E.D. Pa. July 13, 2010) (where case had been pending for close to two years, court gave plaintiff 60 days to accomplish proper service upon foreign defendants). Dismissal is not warranted.

## CONCLUSION

For all the foregoing reasons, Reckitt's motion to dismiss should be denied.

Dated:  October 15, 2013

Respectfully submitted:

**HILLIARD & SHADOWEN LLC**

/s/ Steve D. Shadowen

Steve D. Shadowen
Matthew C. Weiner
39 West Main Street
Mechanicsburg, PA 17055
Telephone: (855) 344-3298
steve@hillardshadowenlaw.com
matt@hilliardshadowenlaw.com

Anne Fornecker
919 Congress Ave., Suite 1325
Austin, TX 78701
Telephone: (855) 344-3298
anne@hilliardshadowenlaw.com

*Counsel for Plaintiff United Food and Commercial Workers Health and Welfare Fund of Northeastern Pennsylvania and Interim Co-Lead Counsel for the End Payor Class*

60

**SPECTOR ROSEMAN KODROFF &
WILLIS, P.C.**
Jeffrey L. Kodroff
John Macoretta
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300
jkodroff@srkw-law.com
JMacoretta@srkw-law.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs*

**WEXLER WALLACE LLP**
Kenneth A. Wexler
55 West Monroe, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com

*Counsel for Plaintiff Meridian Plan of
Michigan, Inc. and Interim Co-Lead
Counsel for the End Payor Class*

**MOTLEY RICE LLC**
Michael M. Buchman
275 Seventh Avenue, 2nd Floor
New York, NY 10001
mbuchman@motleyrice.com

*Counsel for Plaintiff A.F. of L – A.G.C.
Building Trades Welfare Plan and Interim
Co-Lead Counsel for the End Payor Class*

**MILLER LAW LLC**
Marvin A. Miller
115 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 332-3400
mmiller@millerlawllc.com

*Counsel for Plaintiff Painters District Council No. 30 Health and Welfare Fund and Interim Co-Lead Counsel for the End Payor Class*

**WILENTZ, GOLDMAN & SPITZER, P.A.**
Kevin P. Roddy
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
Telephone: (732) 636-8000
E-mail: kroddy@wilentz.com

*Counsel for Plaintiff Painters District Council No. 30 Health and Welfare Fund and Interim Executive Committee Member*

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
Natalie Finkelman Bennett
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
nfinkelman@sfmslaw.com

*Counsel for Plaintiff United Food and Commercial Workers Health and Welfare Fund of Northeastern Pennsylvania and Interim Executive Committee Member*

**SCOTT & SCOTT LLP**
Joe Guglielmo
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: (212) 223-6444
jguglielmo@scott-scott.com

*Counsel for Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund and Interim Executive Committee Member*

**HEINS MILLS & OLSON, P.L.C.**
Renae D. Steiner
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 795-9002
rsteiner@heinsmills.com

*Counsel for Plaintiff I.B.E.W. 292 Health Care Plan and Interim Executive Committee Member*

**MILBERG LLP**
Paul Novak
One Kennedy Square
777 Woodward Avenue, Suite 890
Detroit, MI 48226
Telephone: (313) 309-1760
Facsimile:   (313) 447-2038
pnovak@milberg.com

*Counsel for Plaintiff Meridian Health Plan of Michigan, Inc. and Interim Executive Committee Member*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
J. Douglas Richards
88 Pine Street, 14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
drichards@cohenmilstein.com

*Counsel for Plaintiff New Your Hotel Trades Council & Hotel Assoc. of New York City, Inc. and Interim Executive Committee Member*

**DUGAN LAW FIRM, APLC**
James R. Dugan
One Canal Place
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
jdugan@dugan-lawfirm.com

*Counsel for Plaintiff Teamsters Health Services and Insurance Plan Local 404 and Interim Executive Committee Member*

**HACH ROSE SCHIRRIPA & CHEVERIE, LLP**
Frank Schirripa
185 Madison Avenue, 14th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212) 779-0028

*Counsel for Plaintiff Teamsters Health Services and Insurance Plan Local 404 and Interim Executive Committee Member*

**ZIMMERMAN REED, PLLP**
Anne T. Regan
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
Anne.Regan@zimmereed.com

*Counsel for Plaintiff I.B.E.W. 292 Health Care Plan and Interim Executive Committee Member*