UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>All End-Payor Actions | MDL No. 2445<br><br>Master File No. 2:13-md-02445-MSG |

### END-PAYOR CLASS PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO RECONSIDER

Reckitt's[1] motion provides no basis for the Court to reconsider any aspect of its denial of the motion to dismiss Plaintiffs' complaint. The Court did not overlook the issues that Reckitt seeks to revisit; Plaintiffs litigated and won them after the Court took significant "consideration and care"[2] in evaluating established antitrust authority. Reckitt simply seeks another chance to argue that Plaintiffs' product hop claims are purportedly defeated by an inapplicable presumption that Plaintiffs' allegations clearly overcome in any event. Nor can Reckitt successfully reargue whether its parent corporation, Reckitt Benckiser Group, plc ("RBG"), is a proper defendant. Plaintiffs need not have alleged every element of a Section 2 claim against RBG in light of Plaintiffs' sufficient allegations that RBG approved and directed the anticompetitive product hop

---

[1] "Reckitt" is Reckitt Benckiser Pharmaceuticals, Inc.

[2] Memorandum of Law in Support of Defendants' Local Civil Rule 7.1(G) Motion to Reconsider, ECF No. 99-1, ("Def. Mem.") at 1.

scheme.[3]  For the reasons discussed herein,[4] Plaintiffs respectfully request that the Court deny Reckitt's request for a do-over.

## ARGUMENT

### I. MOTIONS FOR RECONSIDERATION ARE RARELY GRANTED.

"[A] motion for reconsideration addresses only factual and legal matters that the Court may have overlooked."[5] "'It is improper on a motion for reconsideration to ask the Court to rethink what it had already thought through—rightly or wrongly.'"[6]

### II. RECKITT HAS OFFERED NO VIABLE GROUNDS FOR RECONSIDERATION.

#### A. The Court Correctly Upheld Plaintiffs' Product Hop Claims.

The Direct Purchaser Class Plaintiffs' brief, which is incorporated by reference herein, establishes that the Court fully considered and addressed Reckitt's argument concerning its statements about Suboxone tablets. Plaintiffs write separately to emphasize that the presumption that competitor statements have a *de minimus* effect on competition is inapplicable here—where Plaintiffs have alleged that Reckitt falsely disparaged Suboxone tablets in conjunction with other coercive activity—and even if that presumption did apply, Plaintiffs' allegations overcome it.

---

[3] Memorandum Opinion, ECF No. 97, ("Op.") at 73-74.

[4] End Payor Class Plaintiffs ("Plaintiffs") hereby incorporate and adopt the arguments made by the Direct Purchaser Class Plaintiffs in their opposition on this motion. Plaintiffs submit this brief to separately address two of Reckitt's arguments (product hop and liability of Reckitt's parent company, RBG).

[5] *Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993) (quotations and alterations omitted).

[6] *Andrews v. Sias*, 12-cv-6515, 2012 WL 6650809, at *1 (E.D. Pa. Dec. 20, 2012) (Goldberg, J.) (quoting *Glendon Energy Co.*, 836 F. Supp. at 1122).

### 1. The Court Properly Analyzed the Combined Effects of Reckitt's Coercive Measures.

Plaintiffs have alleged a multifaceted product-hopping scheme that unlawfully thwarted generic competition in violation of federal and state law. One aspect of this scheme consisted of Reckitt falsely disparaging Suboxone tablets through fabricated safety concerns while falsely claiming that Suboxone film has an improved safety profile. The key question in this case is not, as Reckitt suggests, whether Reckitt's false statements standing alone likely had an anticompetitive effect, but whether the "comprehensive" effect of Reckitt's "combined" unlawful conduct—including the threatened, and later, *actual withdrawal* of Suboxone tablets from the market—likely had an anticompetitive effect.[7] The Court, after "carefully review[ing] Plaintiffs' complaint," properly recognized that:

> [T]he facts presented sufficiently allege that the disparagement of Suboxone tablets took place *alongside* "coercive" measures. The threatened removal of the tablets from the *market in conjunction with* the alleged fabricated safety concerns could plausibly coerce patients and doctors to switch from tablet to film.[8]

Indeed, the Court has already rejected Reckitt's erroneous argument that "false disparagement of a product cannot give rise to antitrust liability," holding instead that such acts can give rise to liability "especially *when … combined* with other anticompetitive acts."[9]

### 2. If the *De Minimus* Presumption Were Applicable, Plaintiffs' Product Hop Claims Would Overcome It.

Reckitt argues that a so-called "*de minimus* presumption" precludes Plaintiffs' product-hop claims. Not so.

---

[7] Op. at 18.

[8] Op. at 19 (emphasis added).

[9] Op. at 18-19 (citing *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3d Cir. 2010) (emphasis added); *see also* Direct Purchaser Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, ECF No. 67, at 24 n.103 (citing numerous cases).

*First*, even if it were applicable (which it is not), the *de minimis* presumption is not properly addressed at the motion to dismiss stage.[10] The presumption's factors "cannot be adequately evaluated until the discovery process has moved forward to a greater extent than it has thus far."[11]

*Second*, the *de minimis* presumption is inapplicable here. The presumption is discussed in Areeda and Hovenkamp's *Antitrust Law* treatise, and applied by certain courts, only in the context of an independent antitrust cause of action for "misrepresentations or false statements."[12] As discussed previously, Plaintiffs do not assert a stand-alone "product disparagement" or "misrepresentation" claim.  The presumption does not apply.[13]

Moreover, as recognized in *TYR Sport Inc. v. Warnaco Swimwear*, "[t]he *de minimis* presumption rests on … reasoning [concerning] 'buyer distrust of a seller's disparaging comments *about a rival seller*."[14] Here, Reckitt did not disparage the product of a rival, but *its*

---

[10] *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).

[11] *Id*. at 917; *see also Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 332 (E.D.N.Y. 2009). Reckitt's case *Tate v Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1080 (N.D. Cal. 2002) is inapposite because it involved stand-alone product disparagement claims, which are not at issue here, and turned on findings that are not applicable to the pharmaceutical marketplace.

[12] IIIB Areeda & Hovenkamp, *Antitrust Law*, ¶ 782b (2d ed. 2002). The courts that have applied the presumption have offered little independent analysis of it. Maurice E. Stucke, *When A Monopolist Deceives*, 76 Antitrust L.J. 823, 826 (2010) ("the Second, Sixth, and Ninth Circuits, besides citing the [Areeda] *Treatise*, offer little, if any, independent analysis for their presumptions and elements"). And the presumption has been criticized by a number of respected scholars. *See, e.g.*, *id*. at 845 ("neither the [Areeda] *Treatise*'s de minimis presumption nor six elements are grounded in the Sherman Act's text, legislative purpose, or legislative history"); *see also Deception As an Antitrust Violation*, 125 Harv. L. Rev. 1235, 1255 (2012).

[13] Even if the claims in this case were the *type* to which the *de minimis* presumption applied (they are not), the Third Circuit had not adopted it *in any* context. Stucke, *supra*, 76 Antitrust L.J. at 826 (the *de minimis* presumption applies only in the Second, Sixth, and Ninth Circuits).

[14] 679 F. Supp. 2d 1120, 1132 (C.D. Cal. 2009) (quoting *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997)) (emphasis added).

*own product*, giving an "appearance of objectivity and lack of bias."[15] Reckitt maintained the "added credibility" that it "otherwise would not have enjoyed" speaking about a rival product, and "[t]his fact alone negates the applicability of the *de minimis* presumption…."[16]

*Third*, even if the *de minimis* presumption applied, Plaintiffs clearly overcome it under the six-factor test that Reckitt invokes.[17]

Plaintiffs identified, and the Court recognized, statements by Reckitt that were "clearly false," including Reckitt's false safety concerns, *i.e.*, "that the lack of unit dose packaging in the tablets raised the risk of pediatric exposure."[18] Reckitt's failure to remove the tablets until March 2013 "demonstrates the falsity of Reckitt's stated safety concerns."[19] Reckitt argues that its fabricated safety concerns "are a classic example of a statement of opinion based on disclosed facts,"[20] ignoring Plaintiffs' well-pleaded allegations to the contrary.[21]

Reckitt's misrepresentations were "clearly material." Reckitt's misrepresentations were successful in converting, by the end of 2012, nearly 70% of Suboxone prescriptions to Suboxone

---

[15] *Id*.

[16] *Id*.

[17] Plaintiffs note, however, that in two of the three circuits that actually apply the *de minimis* presumption, it "can be rebutted even if the plaintiff cannot win on all six factors." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, No. 09-CV-8578 JPO, 2014 WL 4746130, at *27 (S.D.N.Y. Sept. 24, 2014); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 371 (6th Cir. 2003).

[18] Op. at 20 (citing DP Compl. ¶ 89, 95).

[19] *Id*. (citing DP Compl. ¶ 94).

[20] Def. Mem. at 12.

[21] *See, e.g.*, DP Compl. at ¶¶ 83-87, 93-96; EP Compl. at ¶¶ 23-35, 41, 43-45, 47. Erecting a straw man, Reckitt argues that its "statement that it intended to withdraw Suboxone tablets was … demonstrably *true*[.]" Def. Mem. at 12. But Plaintiffs do not dispute that Reckitt intended to withdraw Suboxone tablets. Rather, Plaintiffs contend that Reckitt fabricated its safety concerns and falsely claimed that Suboxone film alleviated these concerns.

film. Moreover, Reckitt would be hard-pressed to point to something more material to doctors and consumers than the safety of its drug products.[22]

Reckitt's statements were also "clearly likely to induce reasonable reliance." Plaintiffs have alleged Reckitt's use of sales representative "detailers" who visit physician's offices to persuade physicians to prescribe its products.[23] When a brand company undermines its own product's safety with armies of sales representatives, it is easy to see how such conduct would likely induce reliance by doctors. With no offsetting or neutralizing statements (as discussed below), Reckitt's statements were clearly likely to induce—and in fact, did induce—reasonable reliance.

The *de minimis* test asks whether the misrepresentations were made to a buyer without knowledge of the subject matter. The idea is that a buyer with such knowledge will have the incentive and ability to overcome the defendant's false representations. Here, the "buyers" of the product consist of the various consumer Plaintiffs in this case. Consumers lack the specialized medical knowledge necessary to overcome Reckitt's misrepresentations. Reckitt does not attempt to dispute this fact.

Relying on *Walgreen*, Reckitt argues that "doctors and medical professionals … are necessary [sic] knowledgeable in the subject matter of medicine."[24] However, *Walgreen* is distinguishable and wrongly decided. *Walgreen* "wholly ignored the economic realities of this marketplace, including the decisive price disconnect," never "confront[ing] the key marketplace

---

[22] Reckitt focuses exclusively on its statements regarding its intention to withdraw Suboxone tablets, ignoring completely the material statements regarding purported safety concerns. In any event, focusing on Reckitt's threatened removal of its tablets, the Court clearly recognized that "[a] patient that preferred the tablets despite the safety concerns might be further persuaded to switch to the film, believing that their favored product would soon be removed from the market." Op. at 19.

[23] DP Compl. at ¶ 47; EP Compl. at ¶¶ 3, 43-44, 130.

[24] Def. Mem. at 14.

reality—that patients have the payment obligation while doctors make the product selection."[25] Doctors are not the buyers of Reckitt's products and thus lack the incentive to overcome Reckitt's misrepresentations. Doctors do not pay for pharmaceuticals, are not price sensitive, and lack the incentive to challenge Reckitt's misrepresentations. *Walgreen*—without recognizing this fundamental reality and without providing any analysis whatsoever—simply got it wrong.[26]

Indeed, Reckitt's massive (and costly) marketing campaign directed at doctors would have been irrational if Reckitt thought that the effect in the marketplace would be *de minimis*. As one court succinctly stated, "This Court agrees with [plaintiff's] inference that if the buyers were knowledgeable, then [defendant] would not make these presentations to them."[27]

Failing to raise the issue, Reckitt concedes that its representations "continued for long periods." Reckitt's fraudulent marketing scheme lasted from the time of Suboxone film approval in 2010 through at least September 2012 when Reckitt issued its tablet discontinuation announcement.

Finally, Reckitt's statements are not susceptible to neutralization or other offset. Reckitt's misrepresentations were designed to switch the market from Suboxone tablets to Suboxone film, thereby impairing generic competition. Reckitt produced both the tablets and the film, so there were no "counter-detailers" to dissuade doctors from switching from tablets to film. And

---

[25] End Payor Class Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, ECF No. 68, ("EP Mem.") at 12-13. This Court likewise acknowledged the "various market forces unique to the pharmaceutical industry." Op. at 21.

[26] EP Mem. at 3-5; *see also People of the State of New York v. Actavis, PLC*, No. 14-cv-7473, 2014 WL 7015198, at *1 (S.D.N.Y. Dec. 11, 2014); Michael A. Carrier, *A Real-World Analysis of Pharmaceutical Settlements: The Missing Dimension of Product Hopping*, 62 Fla. L. Rev. 1009, 1011, 1019-20 (2010) (hereafter "Carrier, *Real World*").

[27] *Avery Dennison Corp. v. Acco Brands, Inc.*, 99-cv-1877, 2000 WL 986995, at *21 (C.D. Cal. Feb. 22, 2000) (issue of fact precluded summary judgment as to whether plaintiff had "overcome the de minimis presumption to establish that [defendant's] sales campaign is anticompetitive conduct").

Reckitt's cannibalization of the tablet prescription base began two-and-a-half years before any generic had FDA approval and entered the market, leaving no one to neutralize Reckitt's detailing against Suboxone tablets.

Contrary to Reckitt's assertion, Plaintiffs do not "concede[] that the generics were capable of such neutralization."[28] Rather, Plaintiffs specifically pointed out that: (1) "[d]octors whom Reckitt had recently convinced to switch from tablets to film are very reluctant to switch patients back to the tablets"; and (2) it is not economically feasible for generic manufacturers to use sales force detailers to visit doctors and encourage them to switch back to tablets.[29]

### B. The Court Correctly Upheld Plaintiffs' Claims Against RBG.

The Court did not overlook the argument that Plaintiffs failed to sufficiently allege RBG's market power. Rather than alleging that RBG itself had market power, Plaintiffs alleged that Reckitt had market power, and that RBG controlled or encouraged Reckitt's anticompetitive conduct. This is plainly sufficient under the law.

"A Section 2 claim brought against a parent corporation based on anticompetitive activity occurring at the subsidiary level is sufficient if there are factual allegations showing … independent conduct on the part of the parent."[30] "When the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent

---

[28] Def. Mem. at 14.

[29] EP Mem. at 7; *see also* Carrier, *Real World*, at 1019; *People of the State of New York v. Actavis, PLC*, No. 14-cv-7473, 2014 WL 7015198, at *10 (recounting expert testimony that "[a] brand manufacturer that has successfully achieved a switch to a follow-on product can expect that most 'switched' patients will not make a second switch back to the original product."); *id*. at 17, 25 (quoting evidence that brand company knew that "it's very difficult for the generics to then reverse-commute back" once patients are switched to the follow-on product); *id*. at *26-27 (discussing anticompetitive effects of product hop strategy in light of evidence that generics do not market drugs); *id*. at *29-31 (listing factors that inhibit switching to the generic once it becomes available).

[30] *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005).

8

conduct to be held directly liable **as a single enterprise with the subsidiary** under the Sherman Act."[31]  In light of Plaintiffs' allegations that RBG "control[led], direct[ed], or encourage[d]" Reckitt's conduct,[32] Reckitt's market power may be attributed to its parent, RBG.[33]

Defendants' cases are distinguishable on the grounds that they do not involve a parent-subsidiary relationship;[34] allegations of independent conduct by the parent;[35] or a Section 2 claim.[36]

The Court ruled that Plaintiffs sufficiently alleged that RBG directed and advanced the anticompetitive product hop scheme.[37]  The Court, therefore, did not need to address—and did not overlook—whether Plaintiffs had sufficiently alleged market power with respect to the parent Reckitt entity.  RBG is liable as a single enterprise with its subsidiary—no separate market power allegations are necessary.

---

[31] *Id.* (emphasis added); *see also In re Pennsylvania Title Ins. Antitrust Litigation*, 648 F. Supp. 2d 663, 688 (E.D. Pa. 2009).

[32] EP Compl. at ¶¶ 83-87; Op. at 73-74.

[33] *Cf. Rolite Inc. v. Wheelabrator Environmental Systems, Inc*., 958 F. Supp. 992, 1000-02 (E.D. Pa. 1997) (denying motion to dismiss section 2 claim for failure to allege parent company was a market competitor where parent controlled subsidiary and benefitted from commerce within relevant market).

[34] *See In re Mushroom Direct Purchaser Antitrust Litig*., 514 F. Supp. 2d 683, 699 (E.D. Pa. 2007) (concerted monopolization claim against association members and association); *Santana Products, Inc. v. Sylvester & Associates*, Ltd., 121 F. Supp. 2d 729, 741 (E.D.N.Y. 1999) (shared monopoly claim against conspiring competitors).

[35] *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 419 (S.D.N.Y. 2011) ("The most the complaint alleges is that the Parent Companies own their respective subsidiaries and have ownership interests in the joint ventures.").

[36] *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752 (1984) concerned only whether a parent and subsidiary are capable of conspiring within the meaning of Sherman Act §1, which does not reach unilateral conduct.

[37] Op. at 73-74.

**CONCLUSION**

For all the foregoing reasons, Reckitt's motion for reconsideration should be denied in its entirety.

Dated: January 16, 2015　　　　　　　　　　　　Respectfully Submitted,

/s/ John Macoretta

**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
Jeffrey L. Kodroff
John Macoretta
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300
jkodroff@srkw-law.com
JMacoretta@srkw-law.com

*Liaison Counsel for the End Payor Class*

**HILLIARD & SHADOWEN LLP**
Steve D. Shadowen
Matthew C. Weiner
39 West Main Street
Mechanicsburg, PA 17055
Telephone: (855) 344-3298
steve@hillardshadowenlaw.com
matt@hilliardshadowenlaw.com

**HILLIARD & SHADOWEN LLP**
Anne K. Fornecker
919 Congress Ave., Suite 1325
Austin, TX 78701
Telephone: (855) 344-3298
anne@hilliardshadowenlaw.com

*Interim Co-Lead Counsel for the End Payor Class*

**WEXLER WALLACE LLP**
Kenneth A. Wexler
Thomas A. Doyle

        55 West Monroe, Suite 3300
        Chicago, IL 60603
        Telephone: (312) 346-2222
        kaw@wexlerwallace.com
        tad@wexlerwallace.com

*Interim Co-Lead Counsel for the End Payor Class*

**MOTLEY RICE LLC**
Michael M. Buchman
275 Seventh Avenue, 2nd Floor
New York, NY 10001
mbuchman@motleyrice.com

*Interim Co-Lead Counsel for the End Payor Class*

**MILLER LAW LLC**
Marvin A. Miller
Lori A. Fanning
115 South LaSalle Street
Chicago, IL 60603
Telephone: (312) 332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

*Interim Co-Lead Counsel for the End Payor Class*

## CERTIFICATE OF SERVICE

I, John Macoretta, hereby certify that I caused a copy of the foregoing End Payor Class Plaintiffs' Memorandum in Opposition to Defendants' Motion to Reconsider to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access this filing through the Court's system, and notice of this filing will be sent to these parties by operation of the Court's electronic filing system.

Dated: January 16, 2015January 16, 15                                      Respectfully Submitted,

                                                                            /s/ John Macoretta