## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) |

**MDL No. 2445**

**Master File No. 2:13-MD-2445-MSG**

**THIS DOCUMENT RELATES TO:**

*End Payor Plaintiff Actions*

## MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF END PAYOR SETTLEMENT AND FOR OTHER RELIEF

### I.        INTRODUCTION

Plaintiffs A.F. of L. – A.C.G. Building Trades Welfare Plan, Construction & General Laborers' Local 190 Welfare Fund, I.B.E.W. 292 Health Care Plan, Michigan Regional Council of Carpenters Employee Benefits Fund, Painters District Council No. 30 Health and Welfare Fund, Teamsters Health Services and Insurance Plan Local 404, and United Food & Commercial Workers Health and Welfare Fund of Northeastern Pennsylvania (collectively, "End Payor Plaintiffs" and, together with Defendant, "Parties"), and on behalf of the End Payor Class (as defined in Section IV.A., below), submit this memorandum in support of their motion for preliminary approval of end payor settlement and other relief under FED. R. CIV. P. 23(e), and for, *inter alia*, approval of their proposed form of notice to the End Payor Class, permission to disseminate the same, the appointment of the Settlement Administrator, appointment of the Escrow Agent, and the appointment of Class Counsel.  The settlement agreement providing the terms of the End Payor Plaintiffs' settlement with Defendant (hereinafter "Settlement" or "Settlement Agreement") is attached to the Declaration of Kenneth A. Wexler in Support of

Plaintiffs' Motion for Preliminary Approval of End Payor Settlement and for Other Relief ("Wexler Decl.") as **Exhibit A**.

End Payor Plaintiffs brought this class action class action individually and on behalf of the End Payor Class whose members purchased, paid, and/or reimbursed for Co-Formulated Buprenorphine/Naloxone (Suboxone and/or its AB-rated generic equivalent) in 48 States plus the District of Columbia and Puerto Rico.   End Payor Plaintiffs alleged, *inter alia*, that they would have paid significantly less for Suboxone but for Defendant's anticompetitive conduct.

End Payor Plaintiffs alleged that Defendant engaged in a fraudulent scheme with respect to Suboxone in violation of state antitrust and consumer protection statutes, causing End Payor Plaintiffs and the End Payor Class to pay higher prices for Suboxone and its generic equivalents than they would have paid in a competitive market, unjustly enriching Defendant in the process. After more than *10 years* of hard-fought litigation, End Payor Plaintiffs and Defendant have reached a Settlement which, if approved, would resolve the litigation between them.

The proposed Settlement will conclude all claims of End Payors in this litigation against Defendant concerning the alleged suppression of generic competition for Suboxone during the period December 22, 2011 to the date of preliminary approval of the Settlement.  The Settlement provides for Defendant to pay $30 million dollars into an escrow fund, to be apportioned to End Payors as follows: $18,453,000 to the End Payors purchasing in the states of Alabama, Alaska, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin (the "[Illinois Brick] Repealer States"), with the balance paid to the End Payors making purchases in in the states of Arkansas, Colorado, Connecticut, Delaware,

Georgia, Idaho, Kentucky, Louisiana, Montana, New Jersey, Oklahoma, Texas, Washington, and Wyoming (the "Non-Repealer States").  This breakdown was reached after arms-length negotiations between attorneys advocating for the Repealer and Non-Repealer States, respectively. *See* Declaration of Kevin Roddy ("Roddy Decl."), **Exhibit C** to the Wexler Decl.; Declaration of Lee Albert ("Albert Decl."), **Exhibit D** to the Wexler Decl.  Those attorneys further considered the analysis conducted by Plaintiffs' economist, Rena Conti, of whatever differential existed between the damages suffered by consumers as opposed to TPPs. Declaration of Rena Conti, **Exhibit E** to the Wexler Decl. The amounts distributed for purchases made in each state will thus be allocated 55% to TPPs and 45% to consumers.

Class Counsel strongly recommends approval of the proposed Settlement.  Given the risks of continued litigation with a limited issues-only class, the prospect of further individual trials on antitrust impact and damages, uncertain results, and potential appeals, Class Counsel believe the proposed Settlement is fair, reasonable, adequate and in the best interests of the End Payor Plaintiffs and the End Payor Class. Indeed, Class Counsel believe the proposed Settlement is an excellent result for their constituency.

## II.   STATEMENT OF FACTS

The proposed End Payor Class consists of consumers and health plans covering millions of lives and are represented by seven health plans that provide prescription drug coverage for their members. End Payors paid for Suboxone for their own use, or that of their members, and since they do not resell Suboxone, End Payors did not pass on any amount of the overcharges they paid.  Absent Defendant's alleged misconduct, End Payor Plaintiffs would have paid far less for Suboxone than they did.

This Court is well-versed in the underlying facts and allegations in the case.  *See, e.g., In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation*, 622 F. Supp. 3d

22 (E.D. Pa. (2022). Suffice it to say, End Payor Plaintiffs alleged that Defendant engaged in an intricate anticompetitive scheme to maintain and extend its monopoly power in the Suboxone market.  The alleged scheme included a product hop, disparagement of the pill to move market share to the film, price manipulation, a sham Citizen Petition, and delay through sabotage of the REMs process, all intended to delay the onset of generic competition for Suboxone and minimize its effect upon ultimate entry into the market. End Payor Plaintiffs alleged that, because of this conduct, they paid higher prices for Suboxone than they should have.

### III.    HISTORY OF END PAYOR LITIGATION

The End Payor cases came to this Court in June 2013 pursuant to an order of the Judicial Panel for Multidistrict Litigation. Dkt. 1. On August 7, 2013, the Court appointed Class Counsel as Interim Co-Lead Counsel, and appointed Liaison Counsel as well.  Dkt. 44.  On August 15, 2013, End Payor Plaintiffs filed a Consolidated Amended Class Action Complaint ("CAC"). Dkt. 48.

The CAC brought antitrust, consumer protection, and unjust enrichment claims under the laws of 48 States, plus Puerto Rico and the District of Columbia, and it named multiple defendants, including Reckitt Benckiser, Inc. and a number of its affiliates. *Id.*  The defendants moved to dismiss the CAC for failure to state a claim and for lack of Article III standing. Dkt. 57.  The Court ultimately dismissed the claims arising under the laws of 37 States and otherwise denied the motion with respect to the other 13 States. The Court also dismissed the Reckitt entities, leaving Indivior as the sole defendant.  Dkt. 98.

Thereafter, the parties engaged in a wide array of discovery, including interrogatories, document productions, depositions, the retention of experts, and motion practice relating to perceived defects in the various responses.  Along with the direct purchasers and State Attorneys General, who had brought separate cases but were coordinated in this Court for pre-trial

proceedings, End Payor Plaintiffs helped craft and had sought to enter orders relating to authenticity and admissibility of documents, ESI, protective orders, and scheduling orders.  On March 17, 2015, the Court entered a scheduling order regarding motions for class certification, expert reports, briefing on class certification, a fact discovery cut-off, motions for summary judgment, and Daubert motions.  Dkt. 143.

On March 6, 2015, End Payor Plaintiffs filed a Second Amended Consolidated Class Action Complaint ("SAC"). Dkt. 152.  Defendant answered on May 15, 2015, Dkt. 161, and the litigation went forward.

On September18, 2018, End Payor Plaintiffs filed their motion for class certification of an 11-state issues-only class pursuant to Rule 23(c)(4).  Dkt. 472. Interim Co-Lead Counsel filed such a motion in large part because the Court had recently refused to certify a Rule 23(b)(3) damages class in the context of a different pharmaceutical antitrust case (*Provigil*). The Court there found that the class of end payors was not ascertainable under Third Circuit law and that individual issues predominated.  Interim Co-Lead Counsel believed an issues class might avoid the deficiencies the Court held existed in *Provigil* and they therefore asked the Court to certify a class on five issues relating to proof of an antitrust violation.  *Id.*  On September 27, 2019, after extensive briefing and argument, the Court certified the issues class End Payor Plaintiffs had requested (the "11-State Class"). Dkt. 588.

Just before then, on July 11, 2019, the U.S. Department of Justice announced a $1.4 billion settlement with Reckitt over Indivior's marketing of Suboxone.  Indivior had been indicted for its conduct as a subsidiary of Reckitt and trial was set to begin on May 11, 2020. The settlement resolved the criminal proceeding and civil governmental claims regarding the marketing of Suboxone.  The settlement included Reckitt's forfeiture over time of proceeds

totaling $647 million received from Indivior, civil settlements with the federal government and the states totaling $700 million, and an administrative resolution with the FTC for $50 million.

Despite the unknown impact of this development on Indivior's finances, End Payor Plaintiffs pressed on in the litigation, responding to summary judgment and Daubert motions Defendant filed in an effort to defeat the case without a trial. Dkt. 671. The Court denied the Daubert and summary judgment motions on February 19, 2021, and August 22, 2022, respectively. Dkt. 686, 813.

After denying summary judgment, the Court held a status conference to address the remainder of the schedule. Dkt. 848. At that status conference, the parties and the Court discussed issues that remained in dispute and Defendant stated its intent to file a motion to dismiss the End Payor Plaintiffs' claims on the grounds of the Supreme Court's decision on Article III standing in *TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021)*. The Court gave Indivior permission to do so, and then went about setting dates leading to trial, which the Court scheduled for September 18, 2023. Dkt. 852. The Court then inquired whether the Parties and Defendant had any interest in discussing settlement.

End Payor Plaintiffs and Indivior subsequently consented to mediation with the Court acting as mediator. Before the first session, however, Indivior moved not only to dismiss the End Payor case for lack of Article III standing, but also – alternatively – to decertify the class on the theory that End Payor Plaintiffs could not go to trial on issues that did not include injury. Dkt. 871. End Payor Plaintiffs responded to this motion on May 29, 2023.

Co-Lead Counsel began mediation on January 25, 2023. Dkt. 851. There ensued six months of adversarial and sometimes contentious negotiations facilitated by the Court and resulting in the proposed $30 million Settlement.

## IV.    SUMMARY OF SETTLEMENT

### A.    The Settlement Fund.

Defendant has agreed to pay $30 million to the End Payor Class ("the End Payor Settlement Amount") to settle all End Payor Class claims against it pending in this action, including, subject to certain exceptions, all claims that were or could have been brought by End Payors, including those with the right of appeal.  *Wexler Decl.*, Ex. A, ¶7.  Defendant will pay the End Payor Settlement Amount into an escrow account no later than ten (15) days after the Court enters an order granting preliminary approval of the Settlement.  *Id.*, ¶ 7.  Subject to Court approval, the End Payor Settlement Amount will be used to pay the costs of notice,  reimburse the expenses incurred by Class Counsel in litigating the case, pay Class Counsel's attorneys' fees; and pay service awards of $15,000.00 to each End Payor Plaintiff representative ("Fund Expenses").  After subtracting Fund Expenses, the remaining balance of the End Payor Settlement Fund ("Net Settlement Fund") shall be distributed to the End Payor Class pursuant to the Plan of Allocation (Attached as **Exhibit G** to the Wexler Decl.).

### B.    The Releases.

End Payor Plaintiffs, on behalf of themselves and the End Payor Class, have agreed to release Defendant and its related entities from all claims that were or could have been brought in this litigation.  *Id.*, ¶ 12(a).  This fact notwithstanding, the release does not apply to the plaintiffs in certain matters specified in Paragraph 12(b) of the Settlement.  *Id.*, ¶ 12(b).  Further, the members of the End Payor Class agree to waive their rights under § 1542 of the California Civil Code respecting unknown claims and similar state or federal laws.  *Id.*, ¶ 12(c).

## V.    THIS CASE SATISFIES THE REQUIREMENTS FOR CERTIFICATION OF AN END PAYOR SETTLEMENT CLASS

As this Court noted in its opinion and order certifying the 11-State Class, the four prerequisites of Fed. R. Civ. P. 23(a) must be met to certify a class.  *In re Suboxone*

*(Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 66-68 (E.D. Pa. 2019).  In addition, when seeking relief, plaintiffs must satisfy one of the requirements of Rule 23(b).  *See also Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011).  Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that common issues predominate over individual ones and that a class action be superior to other available methods of adjudication.  *See* Fed. R. Civ. P. 23(b); *Sullivan,* 667 F.3d at 296.  Class certification is only appropriate if "the trial court is satisfied, after a rigorous analysis, that the prerequisites . . . have been satisfied."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Plaintiffs bear the burden of demonstrating compliance with Rule 23 by a preponderance of the evidence.  *Byrd v. Aaron's Inc*., 784 F.3d 154, 163 (3d Cir. 2015).

"The [United States] Supreme Court has made clear that '[s]ettlement is relevant to a class certification.'"  *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619 (1997)).  Accordingly, a district court may consider the existence of a proposed settlement when evaluating whether class certification is appropriate, *Pet Food*, 529 F.3d at 341 (*citing In re Prudential Ins. Co*., 148 F.3d 283, 308 (3d Cir.1998)), and thus need not inquire, in the context of a request to certify a settlement class, "whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *AmchemProducts v. Windsor*, 521 U.S. 591, 620 (1997).

While the Third Circuit stressed in *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 316 (3d Cir. 2008) that limited consideration of the merits may be relevant in considering a motion for class certification, it also made clear that the reason for this is not to predict which party will win. *Id*. at 317 n. 17. Merits are relevant only if they pertain to the requirements of Rule 23.  *In re Cmty. Bank of N. Va*., 622 F.3d 275, 294 (3d Cir. 2010), as

amended (Oct. 20, 2010) (citations omitted). The touchstone of the class certification inquiry thus remains whether the Rule 23 requirements have been satisfied. *Id*. at 294-95 (citations omitted).

For the reasons set forth below, the proposed settlement class meets all the Rule 23 requirements for certification.

### A.    The Elements of Rule 23(a) are satisfied.

### 1.  Numerosity is present.

The first element of Rule 23(a) requires that the class be of sufficient size that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). A plaintiff need not show that joinder is "impossible."" *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 260 (E.D. Pa. 2012) (Pratter, J.). In determining numerosity, "a court may accept common sense assumptions." *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 205 (E.D. Pa. 2001) (citation omitted). Generally, though, if the "potential number of plaintiffs exceeds 40, the [numerosity] prong of Rule 23(a) has been met." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250 (3d Cir. 2016) (citation omitted).

Courts have routinely determined that classes of end payors for prescription drugs are sufficiently numerous.[1] Further, the exact number of class members need not be known for class certification to be proper. *Osgood v. Harrah's Entertainment, Inc.*, 202 F.R.D. 115 (D.N.J. 2001). A good faith estimate in the thousands is more than enough. *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685 n.21 (S.D. Fla. 2004).

---

[1] *See, e.g., Wellbutrin XL*, 282 F.R.D. at 137 (granting certification and finding numerosity requirement "easily met in this case because the plaintiffs seek to certify a class of hundreds of thousands of consumer class members and thousands of TPP class members"); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012) (certifying a class, and noting numerosity "planning satisfied as Indirect Purchasers seek to certify a class of tens of thousands of consumer class members and hundreds of TPP class members").

This Court previously certified an issues class for purchases made in 11 states, finding the numerosity requirement was amply met. It stands to reason that the injection of 39 more States into the equation exponentially amplifies that conclusion.[2]

### 2. There are questions of law and fact common to all class members under Rule 23(a)(2).

A common question is one that "is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Commonality "does not require that all class members share identical claims, and indeed factual differences among the claims of the putative class members do not defeat certification." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998) (quoting *Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).  A "single common question is sufficient" to establish commonality. *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 137 (E.D. Pa. 2011) (citation omitted).

Where plaintiffs allege anticompetitive activity, the claims ordinarily involve common questions of law and fact because the claims proceed from a single course of conduct. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2003); *Wellbutrin XL*, 282 F.R.D. at 137.  Unjust enrichment likewise focuses on the conduct of the defendant. *See In re Broiler Chicken Antitrust Litig.*, No. 16-C-8637, 2022 WL 1720468, at *20 (N.D. Ill. May 27, 2022) (unjust enrichment where there is proof of antitrust violation.).

Rule 23(a)(2) is satisfied here.  Numerous common issues of law and fact are encompassed by the specific issues sought for certification here, including: (1) the existence of

---

[2] *See* Wexler Decl. **Exhibit F** (Declaration of Elaine Pang ("Pang Decl.") Ex. C at pp. 7, 29, contemplating individual notice being mailed to many thousands of End Payor Settlement Class members).

deceptive and anticompetitive conduct; (2) the presence and willful maintenance of monopoly power; and (3) the absence of cognizable procompetitive justifications.  These common issues will be decided by the fact-finder's analysis of common evidence bearing on questions solely focused on Indivior's conduct. The Court previously found these same common questions satisfied Rule 23(a)(2) for litigation purposes. Nothing has changed that warrants deciding otherwise now.

### 3.   Plaintiffs' claims are typical of the End Payor Class's claims.

Rule 23(a)(3)'s typicality factor examines "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006). The requirement does not mandate that all the putative class members share identical claims. *Baby Neal*, 43 F.3d at 56, 63; *Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988).[3]  As with commonality, "[f]actual differences will not defeat typicality if the named plaintiffs' claims arise from the same event or course of conduct that gives rise to the claims of the class members and are based on the same legal theory." *Flonase*, 284 F.R.D. at 217-18; s*ee also In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, No. 06-cv-3202, 2009 WL 2137224, at *4 (E.D. Pa. July 16, 2009).  Typicality is established where the named plaintiffs allege that they and all putative class members have suffered economic damages arising from the defendant's purported anticompetitive conduct.  *Processed Egg Prods.,* 284 F.R.D. at 261.

---

[3] Courts recognize that this requirement "can be met with surprising ease in most cases, because the majority of class action decisions support the view that when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is met." *Dodge v. Cambrex Corp.*, No. 03-cv-4896, 2007 WL 608365, at *5 (D.N.J. Feb. 23, 2007) (citation omitted).

This is precisely End Payor Plaintiffs allege here, that all their claims arise out of Indivior's anticompetitive conduct. Indivior is alleged to have implemented a plan to inflate brand Suboxone tablet prices and switch consumers to film, delaying generic Suboxone tablets from entering the market.  End Payor Plaintiffs were damaged by paying an inflated price for Suboxone. Further, Defendant reaped huge profits from its conduct and unjustly benefited from the scheme. Despite minor differences among certain state laws, End Payor Plaintiffs assert claims based upon common legal theories and an identical course of conduct.  Typicality, which the Court previously found in respect to the 11-State Class it certified, is satisfied again here.

### 4.  The End Payor Class is Adequately Represented.

The End Payor Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is measured with two objectives: (1) "ensure that the named plaintiff and its counsel have the ability and the incentive to represent the claims of the class vigorously," and (2) "that there is no conflict between the individual's claims and those asserted on behalf of the class."  *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 199 (E.D. Pa. 2017); *Processed Egg Prods.*, 284 F.R.D. at 261.

Both objectives are met here.  First, End Payor Plaintiffs are represented by experienced counsel thoroughly familiar with litigating complex class actions.  Hilliard & Shadowen LLC, Wexler Boley & Elgersma LLP, Miller Law LLC, and Motley Rice LLC (Interim Co-Lead and Class Counsel), and Spector Roseman & Kodroff PC (Liaison Counsel) have served in leadership roles in numerous consumer and antitrust class actions, including similar indirect purchaser pharmaceutical antitrust class actions involving delayed generic competition.[4]  Since the inception of this litigation, these firms have consistently

---

[4] *See* Firm Resumes at **Exhibit B** to Wexler Decl.

demonstrated the willingness and ability to fairly and adequately represent the proposed End Payor Class, devoting whatever time and resources have been required to achieve the best recovery possible on behalf of the End Payor Class. They defeated a motion to dismiss, engaged in discovery, successfully obtained certification of the 11-State Class, defeated Daubert motions, and defeated a motion for summary judgement.  Counsel have more than "demonstrated their dedication and ability, through their handling of the subject litigation." *Processed Egg Prods.*, 284 F.R.D. at 291.

Second, there are no conflicts among class members.  Indeed, the interests of the End Payor Plaintiffs and the putative End Payor Class are aligned; all have the same interest in establishing liability against Defendant for the same anticompetitive conduct and recovering, on behalf of each eligible claimant, relief for damages resulting from that conduct.  By pursuing this litigation, each End Payor Plaintiff necessarily advances the common interests of all other End Payor Class members.  The requirements of Rule 23(a)(4) are met.

### B.     The Requisite Elements of Rule 23(b)(3) are Satisfied.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  "Considerable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484. In antitrust and consumer fraud cases such as this one, courts consistently find that common issues regarding the defendant's conduct and its scope predominate over individual issues, which follows from the central nature of these causes of action. *See In re Suboxone,* 421 F. Supp. 3d at 55  ("Viewing

th[e] evidence as a whole creates a question, common to all class members, of whether Reckitt engaged in an anticompetitive nationwide and market-wide product switch scheme to move prescriptions from tablet to film."); *see also Amchem*, 521 U.S. at 625 ("[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

Plaintiffs must also show that a class action is superior to individual actions. This is evaluated by four considerations: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced  by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of the class action. Fed.R.Civ.P.23(b)(3).

Here, any Class member's interest in individually controlling the prosecution of separate claims is outweighed by the efficiency of the class mechanism.   Thousands, if not millions, of persons and entities paid for all or part of the purchase price of Suboxone during the Class Period; settling these claims in the context of a class action in this Court conserves both judicial and private resources and hastens these class members' recovery.  Finally, while Plaintiffs see no management difficulties in this case, this consideration is irrelevant to certifying the proposed End Payor Class, as there will be no trial to manage. *See Amchem*, 521 U.S. at 620. Plaintiffs thus satisfy Rule 23(b)(3).

## C.    Ascertainability is Satisfied.

For a litigation class, the Third Circuit has a heightened ascertainability requirement. *Byrd*, 784 F.3d at 163-65. In addition to demonstrating the existence of an objective class

definition, the proponent of class certification must submit evidence of an administratively feasible methodology for ascertaining class members before class certification.  *Id*. at 164-65. In its opinion certifying the 11-State Class the Court concluded that Plaintiffs here had satisfied their burden of showing the Class could be ascertained before certification. *Suboxone*, 421 F. Supp. 3d at 72.  It could rely on the same evidence to find it so now as well. Dkt. 472.

The Third Circuit has held, however, ascertainability, like manageability, is not a factor when considering approval of a class action settlement.  In *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litigation*, 656 Fed. Appx. 8 (3d. Cir. 2016), the district court had denied certification of a settlement class on the grounds that there was insufficient evidence of ascertainability.  656 Fed. Appx. at 8. The Third Circuit reversed, stating that the existence of an administratively feasible method for ascertaining a class "is not implicated by this case, because the settlement agreement removes the need for a trial." *Id*. at 9.

Thus, all the prerequisites for class certification have been met, and the Court should certify the End Payor Class.

## VI.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED.

Federal courts favor class action settlements. Indeed, in this Circuit, there is an "especially strong" presumption in favor of class action settlements.  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010).  *See also Austin v. Penn. Dept. of Corrections*, 876 F. Supp 1437, 1455 (E.D. Pa. 1995); and *Eichenholtz v. Brennan*, 52 F.3d 478, 486 (3d Cir. 1995).

Approval of a class action settlement is committed to the sound discretion of the Court. *In re Warfarin*, 391 F.3d at 535 (3d Cir. 2004).  Judicial review under Fed. R. Civ. P. 23(e) is a two-step process.  First, the Court conducts a preliminary analysis of the settlement terms to determine

if it and its related processes (such as notice, the claim form, and the schedule for a final fairness hearing) appear to be sufficiently fair and reasonable to allow for class member input after notice. Second, the Court holds a final hearing pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure on: "(1) the propriety of the proposed settlement class; (2) the fairness, reasonableness, and adequacy of the proposed settlement; and (3) the reasonableness of the requested fees, expenses, and service awards." *Ahrendsen v. Prudent Fiduciary Services, LLC*, 2023 WL 4139151 at *1 (June 22, 2023, E.D. Pa.). *See also Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 438 (E.D. Pa. 2008); *Curiale v. Lenox Group, Inc.*, Civ. A. 07-1432, 2008 WL 4899474, at *4 (E.D. Pa. Nov. 14, 2008). These preliminary and final procedures are summarized in the Manual for Complex Litigation, Fourth (2004) § 21.6 ("Manual"), the Federal Judicial Center publication designed to aid federal judges in the management of complex litigation.

Final approval has a more exacting standard than preliminary approval. Fed. R. Civ. P. 23 (e)(2). At the final approval stage, a multi-factor test (established in the seminal case of *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)) applies to determine whether a class action settlement ultimately should be approved. *See Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 2011 U.S. App. LEXIS 25185, at *112-156 (3d Cir. Dec. 20, 2011); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009). In contrast, at preliminary approval, a court only must make an evaluation of whether the proposed settlement is within the *range* of possible approval and free of obvious deficiencies or reasons to doubt its fairness. *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007); *Curiale*, 2008 WL 4899474, at *4; *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004); *Thomas v. NCO Fin. Sys., Inc.*, Civ. A. 00-5118, 2002 WL 1773035, at *5 (E.D. Pa. July 31, 2002). If a settlement falls within the range of possible approval, preliminary approval should be granted, and notice given to class members to allow them the opportunity to learn

about and comment on the proposed settlement. *Samuel v. Equicredit Corp.*, No. Civ. A. 00-6196, 2002 WL 970396, at *1 n.1 (E.D. Pa. May 6, 2002).

"[T]he the standard for preliminary approval is far less demanding" than for final approval. *Gates*, 248 F.R.D. at 444, n.7. Preliminary approval is not a binding commitment to final approval, but merely a determination that the settlement has no obvious shortcomings and generally appears to be reasonable. *Id.* at 438 (citations omitted). Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not typically represent a total win for either side. *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Bd. Of Sch. Dirs., Etc*., 616 F.2d 305,315 (7th Cir. 1980)).

In considering whether to give preliminary approval, appropriate considerations include whether: (1) the settlement negotiations occurred at arm's length, (2) there was sufficient discovery, and (3) the proponents of the settlement are experienced in similar litigation. *Gates*, 248 F.R.D. at 439; *In re Linerboard Antitrust Litig*., 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003); *Curiale*, 2008 WL 4899474, at *9.5  The proposed Settlement meets these and related factors.

A.     **The Proposed End Payor Settlement Satisfies a Preliminary Evaluation of Reasonableness.**

The proposed Settlement has no obvious shortcomings and is plainly within the range of possible approval.  It provides for a $30 million payment into an escrow account established for

---

[5] These same cases also provide that where only a small fraction of the End Payor Settlement Class has objected, this is an additional factor warranting preliminary approval. *Gates*, 248 F.R.D. at 439; *Linerboard*, 292 F. Supp. 2d at 638; *Curiale,* 2008 WL 4899474, at *9. While no objections could have been received to date, the deadline for submitting objections is generally established upon preliminary approval, after notice of the End Payor Settlement has been provided, consistent with the schedule that Plaintiffs propose here. Under these circumstances, the appropriate time for considering objections (if any) would be at the final approval stage, after the deadline for submitting objections has passed.

the benefit of the End Payor Class.  Subject to the plan of allocation, after deduction of fees,[6] expenses, and service awards to the End Payor Plaintiffs, the balance in the Settlement Fund ("Net Settlement Fund")[7] will be distributed to End Payor Class members based on their (a) state allocation, (b) status as consumers or TPPs, (c) the volume of their purchases of brand and generic Suboxone during the Class Period, and (d) the amount of claims made within the respective allocation pools. *See* **Exhibit G** (Plan of Allocation).

 End Payor Class members will thus be able to receive substantial relief that would have been difficult if not impossible to otherwise obtain.  Had the 11-State Class gone to trial, an adverse verdict would likely have been the death-knell for the case.  A successful verdict would have achieved efficiency through a class-wide determination that Indivior's conduct was an antitrust violation.  At the same time, it would not have guaranteed any recovery by anyone. A verdict in End Payor Plaintiffs' favor would have permitted members of the 11-State Class to retain separate counsel to file their own individual case.  They could then use the judgment obtained for the Class as *res judicata* for the issue of antitrust violation.  However, they would still be required to prove, on an individual basis, antitrust injury and damages.   The time and expense required to do this could easily have dissuaded 11-State Class members with small claims from engaging in the process. Plus, it would all be for naught in the presence of an adverse verdict.   An appeal of an adverse verdict, or defending an appeal from a successful verdict, would add more time and expense, still with no guarantee of recovery.   In sharp

---

[6] Plaintiffs intend to file a motion for an award of attorneys' fees not to exceed one-third of the End Payor Settlement fund, reimbursement of expenses, and the payment of service awards to the End Payor Plaintiffs 14 days after the Court enters a preliminary approval order.

[7] As defined in the End Payor Settlement Agreement, the Net Settlement Fund is the amount remaining in the End Payor Settlement fund for distribution for approved claims after reduction for payment of taxes, attorneys' fees, any payments to the End Payor Settlement Class representatives and disbursements for such costs and expenses as approved by the Court.

contrast, the proposed Settlement provides a certain and substantial recovery to members of the End Payor Class who submit valid claims.

Further, the End Payor Class faced the risk of this Court granting Defendant's pending motion to dismiss or, alternatively, decertify the 11-State Class. Although Plaintiffs believe that Defendant's motion is meritless, an adverse result on either basis – lack of Article III standing under *Transunion* or decertification for lack of injury at time of trial would, at the very least, have disincentivized Defendant from having any interest in settling on a class-wide basis or for the amount to which the parties to the Settlement have agreed.

Thus, overall, the proposed Settlement represents an excellent result for the End Payor Class. The consideration to be paid by the Defendant, when balanced against the risks and potential benefits of continued litigation, demonstrates that the Settlement falls well within the range of what is fair, reasonable, and adequate, and clearly merits preliminary approval.

The proposed plan of distribution likewise warrants preliminary approval. *Hill*, 2014 U.S. Dist. LEXIS 179702, at *27 (D. Mass. Nov. 26, 2014); *Hochstadt v. Boston Scientific Corp.*, 708 F. Supp. 2d 95, 109 (D. Mass. 2010).  A plan of allocation is fair and reasonable if it has a "reasonable, rational basis."  *Hill*, 2014 U.S. Dist. LEXIS 179702, at *27 (*quoting In re IMAX Secs. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012)). "A reasonable plan of allocation need not necessarily treat all class members equally" and "may allocate funds based on the extent of class members' injuries and consider the relative strength and values of different categories of claims." *Id.* (internal citations and quotations omitted).

The proposed plan of allocation here meets this standard. This Court dismissed the claims for purchases in 35 States and two territories, ultimately certifying a litigation Class for 11 states. In assessing the relative strength of the claims, Class Counsel recognized that the claims in the Illinois Brick-repealer states were likely entitled to more weight and thus a larger distribution

than the states without statutes permitting indirect purchaser antitrust claims. Similarly, Class Counsel requested End Payor Plaintiffs' economist, Dr. Conti, to advise whether TPPs and consumers suffered different percentages of the damages incurred by the End Payor Class as a whole.

To ensure that these differences informed distribution of equitable shares of the Net Settlement Fund, Class Counsel appointed separate counsel ("Allocation Counsel") to advocate the interests of End Payor Class members with purchases in the repealer states and those in non-repealer states. Allocation Counsel were charged with engaging in arm's length negotiations to arrive at a recommendation of the appropriate weight to be given to repealer and non-repealer states and the distribution of funds to those End Payor Class members. Based on their negotiations, Allocation Counsel determined that an equitable allocation of the Net End Payor Settlement Fund would distribute 90% of the Net Settlement Fund to the repealer states and 10% to the non-repealer states. *See* Declaration of Kevin Roddy ("Roddy Decl.") on behalf of the repealer states (Wexler Decl. **Exhibit C**), and Declaration of Lee Albert ("Albert Decl.") on behalf of the non-repealer states. (Wexler Decl. **Exhibit D**). Once allocated in this way, the funds will be distributed on a *pro rata* basis, with 55% to TPPs and 45% to consumers making valid claims.

Appointing Allocation Counsel has long been utilized and approved in the Third Circuit. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), *aff'd,* 391 F.3d 516 (3d Cir. 2004); *Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 at *17 (April 22, 2005 E.D. Pa.). And the plan of allocation ultimately adopted is similar to other court-approved *pro rata* allocation plans in cases brought by consumers and end payors to recover damages arising from delayed generic competition and can be implemented with a high degree of efficiency. *See, e.g.*, *In re Remicade Antitrust Litig.*, No. 17-CV-04326, 2022 WL 3042766 (E.D.

Pa. Aug. 2, 2022); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2020 WL
1922902 (E.D. Pa. Apr. 21, 2020); *In re Warfarin*, 212 F.R.D. 231; *In re Flonase Antitrust Litig.*,
291 F.R.D. 93 (E.D. Pa. 2013). Thus, the proposed distribution plan fairly and appropriately
reimburses End Payor Class members on a *pro rata* weighted basis, based on the strength of their
claims and the extent of their injuries.

> **B.**     **The End Payor Settlement is the Result of Arm's-Length
>             Negotiations.**

Whether a class action settlement arises from arm's length negotiations is often the
central focus of the analysis on a motion for preliminary approval. *Mehling*, 246 F.R.D. at 472;
*Curiale*, 2008 WL 4899474, at *4. The negotiations here were nothing if not arm's length.

This litigation has been hard-fought from the start and settlement negotiations were no
different. The proposed Settlement is the result of non-collusive, good faith efforts between
adversaries to resolve the case before trial and ensuing appeals. *See* Wexler Decl*., passim*. The
Court knows first-hand that this is true. Acting as the mediator, the Court was able to witness the
behaviors of counsel in the negotiation process. The parties' positions were adversarial, and the
assistance of a mediator was both necessary and instrumental in resolving the matter. This factor
thus supports preliminary approval. *See Gates*, 248 F.R.D. at 444; *Greenwich Pharm. Sec. Litig.*,
Civ. A. 92-3071, 1995 WL 251293, at *2 (E.D. Pa. Apr. 26, 1995).

> **C.**     **The Settlement Followed More Than 10 Years of Litigation.**

This litigation was fought hard by both sides for more than 10 years before the Settlement
was ultimately reached. Trial is scheduled for October 30, 2023. The years leading up to the
proposed Settlement were spent actively engaged in document and deposition discovery; the
retention and consultation with experts on class certification, liability, and damages; and the

exchange of expert reports on the same issues.  The parties briefed and argued a variety of pre-trial motions all the way through summary judgment.

Courts have granted preliminary approval of class action settlements occurring at much earlier stages of litigation. *See, e.g., Gates*, 248 F.R.D. at 444 (before discovery on the merits); *Thomas*, 2002 WL 1773035, at *5 (where there was "no reference to any formal discovery"). The advanced stage of this litigation thus furnishes more support for preliminary approval of the Settlement. *See Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 588 (3d Cir. 1999) (finding that post-discovery class action settlements are more likely to reflect the true value of the case and be fair).

### D.   Counsel for the Parties are Experienced in Similar Litigation.

The settlement negotiations were conducted for End Payor Plaintiffs by counsel with extensive experience in litigating lawsuits of this specific type, class actions generally, and other complex cases.  Class Counsel, who strongly recommend this Settlement, know how to pursue generic suppression cases and, after 10 years of litigation, were intimately familiar with the strengths and weaknesses of their case.  The vast experience of Class counsel in litigating similar cases, while not dispositive, suggests the Settlement is fair.  *Fisher Bros. v. Phelps Dodge Indus.*, Inc., 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("[T]he professional judgment of counsel involved in the litigation is entitled to significant weight.").

Courts in other cases have found it appropriate to favorably consider the recommendations of experienced counsel who have negotiated arm's-length settlements.  *See, e.g., Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628 (E.D. Pa. 1994);  *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997).  The Court should do so in this case as well.

### VII.   THE PROPOSED NOTICE PLAN SHOULD BE APPROVED.

End Payor Plaintiffs have proposed a single notice plan for informing End Payor Class members about the Court's certification of a settlement class, the Settlement, and their rights

related to each.  When, as here, notices of (a) class certification and (b) a proposed class settlement are combined, "[t]he Court must direct to the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23 (c)(2)(B).  *see also Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (citing Newberg §§ 8.04, 8.21 (3d ed. 1992)); Manual § 21.31 (2004) (when a judge simultaneously certifies a class action and preliminarily approves a class-wide settlement, notice is commonly combined).[8] The methods for providing notice to End Payor Class members here  constitute the best notice practicable under the circumstances and should be approved.

### A.   The Proposed Manner of Notice Complies with Rule 23

The best notice practicable is notice that can be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). Notice may be provided by "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B).

Under this standard, the best method of notice for TPPs and the consumers for which Plaintiffs have the information or can obtain it "through reasonable effort" is individual notice. *See* MANUAL FOR COMPLEX LITIGATION (4th ed.) § 21.311 at 488; Rule 23(c)(2)(B). Individual notice by U.S. First Class mail has been repeatedly recognized as an appropriate manner of delivering

---

[8] Under Rule 23(e), End Payor Settlement Class members are entitled to reasonable notice of a proposed End Payor Settlement before it is finally approved by the Court, as well as of the final fairness hearing and the opportunity to present their views.  Manual §§ 21.312, 21.633.  "[T]he Rule 23(e) requirement is designed to summarize the litigation and the End Payor Settlement and to apprise End Payor Settlement Class members of the right and opportunity to inspect the complete End Payor Settlement documents, papers, and pleadings filed in the litigation."  *Gates*, 248 F.R.D. at 445 (citations, internal quotation marks omitted).

notice.[9] Courts in cases similar to this one have repeatedly approved individual notice by U.S. First Class mail to classes of end payors in pharmaceutical class actions.[10] End Payor Plaintiffs propose implementing the notice plans promptly after the Court's preliminary approval order.

All TPPs and a large number of consumer Class members will be sent direct notice via U.S. First Class mail.  TPPs are often claimants in similar pharmaceutical antitrust actions. Consequently, their contact information is readily available to A.B. Data.  Indeed, A.B. Data maintains a proprietary database consisting of 42,000 TPPs, which it utilized previously in this case to give mailed notice to TPPs for the 11-State Class. *See* Pang Decl. at ¶ 6, **Exhibit F** to Wexler Decl. Numerous consumers will also receive individual notice, as their names and addresses were obtained when giving notice to the 11-State Class.

While direct notice by mail is the best notice practicable for those End Payor Class members that are reasonably identifiable, it is not the necessary method for those who are not. In such circumstances, publication is the best practicable manner of delivering notice. *See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F. Supp. 3d 269, 274 (E.D.N.Y. 2021) ("where providing consumers with individual notice will offer no significant incremental

---

[9] *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (finding that sending a descriptive notice via first class mail to all class members satisfies due process); *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90-91 (3d Cir. 1985) (first class mail and publication satisfy Rule 23 notice and due process requirements); *Pfeifer v. Wawa, Inc.*, No. 16-cv-00497, 2018 WL 2057466, at *7 (E.D. Pa. May 1, 2018) (ordering notice by first class mail to ensure "the best notice practicable"); *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, 2007 WL 4191749, at *5 (D.N.J. Nov. 21, 2007) ("first-class mail . . . is unquestionably the best notice practicable under the circumstances"); *Parks v. Portnoff Law Assoc.*, 243 F. Supp. 2d 244, 250 (E.D. Pa. 2003) ("notices . . . sent via first class mail to the last known address in defendant's records of the 2,391 potential class members . . . was a reasonable effort as well as the most efficient and effective means for reaching individual members of the class"). *See also* 5 MOORE'S FEDERAL PRACTICE § 23.102[3][a] (2020) ("Courts most often have ordered the class proponent to give notice of the class action by first-class mail to all individual class members who can be identified with reasonable effort").

[10] *Pfeifer v. Wawa, Inc.*, No. 16-cv-00497, 2018 WL 2057466, at *7 (E.D. Pa. May 1, 2018); *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, Civil No. 06-4453 (JEI), 2007 WL 4191749, at *5 (D.N.J. Nov. 21, 2007).

benefit, the added financial and administrative burdens caused by using 22 subpoenas in an attempt to identify the addresses of consumer class members are not justified."); *In re Remeron End-Payor Antitrust Litig.*, No. 02-cv-2007, 2005 WL 2230314, at *15 (D.N.J. Sept. 13, 2005) ("[f]or those whose names and addresses cannot be determined by reasonable efforts, notice by publication suffices under both Rule 23(c)(2) and the Due Process Clause.").   Such a plan is what End Payor Plaintiffs propose and is an appropriate notice plan under Rule 23(e).

As reflected in the Notice Plan, the Settlement Administrator will utilize digital media and earned media to supplement direct notice and to target individual consumer End Payor Class members and any TPP who, for whatever reason, was unaware of the Settlement. *Id.*  Targeted digital banner and newsfeed advertisements will be placed on websites and applications. *See* Wexler Decl. **Exhibit F** (Pang Decl., at ¶9).

The proposed Notice Plan combining direct mail, digital banner ads, social media, and earned media will deliver an estimated minimum reach of 82.8% of End Payor Class members. *Id.* (Pang. Decl. Ex. C, at 6). Notice plans with these attributes have been routinely approved in pharmaceutical antitrust cases such as this.[11]  End Payor Plaintiffs submit that the manner of giving notice they propose in this case should be approved.

### B.        The Form of Notice Complies with Rule 23.

Pursuant to Fed. R. Civ. P. 23(c)(2)(B), "[t]he notice must clearly and concisely state in plain, easily understood language:

> i.        the nature of the action;

---

[11] See, e.g. *In re Zetia (Ezetimbe) Antitrust Litigation*, 18-md-2836, ECF 2151, at 4-8 (E.D. Va. June 6, 2023); *In re Restasis*, 527 F. Supp. 3d at 274-5; *In re Loestrin 24 Fe Antitrust Litig.*, No. 13-md-02472, ECF No. 1427 at 3 (D.R.I. Mar. 23, 2020); *Provigil*, ECF No. 592 and No.615 (E.D. Pa. Aug. 8, 2019 and Apr. 21, 2020); *In re Aggrenox Antitrust Litig.*, No. 14-md-02516, ECF No. 821 at 4 and No. 766 at 7 (D. Conn. Jul. 19, 2018 and Mar. 6, 2018); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521, ECF No. 1016 at 4 (N.D. Cal. May 1, 2018); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, ECF No. 828 at 2 (D. Mass. Dec. 4, 2017); *In re Flonase Antitrust Litigation*, No. 08-3301 (E.D Pa. Jan. 14, 2013); *In re Remeron* 2005 WL 2230314; *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90-91 (3d Cir. 1985) .

ii.    the definition of the class certified;

iii.    the class claims, issues, or defenses;

iv.    that a class member may enter an appearance through an attorney if the member so desires;

v.    that the court will exclude from the class any member who requests exclusion;

vi.    the time and manner for requesting exclusion; and

vii.    the binding effect of a class judgment on members under Rule 23(c)(3).

The proposed Short-Form and Long-Form Notices meet these requirements by providing an easily understood description of the subject matter and claims at issue in the litigation. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 527 (D.N.J. 1997), *aff'd*, 148 F.3d 283, 311 (3d Cir. 1998); *Nichols v. SmithKline Beecham Corp.*, Civ. A. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. Apr. 22, 2005). The Short-Form and Long-Form Notices are attached to the Wexler Decl. at **<u>Exhibit H</u>** and **<u>Exhibit I</u>**, respectively.

The proposed notice materials are based on samples promulgated by the Federal Judicial Center and are like those regularly used in pharmaceutical end payor class actions across the country.  They explain the case in "clear, concise, easily understood language," and fairly apprise End Payor Class members of the Settlement's terms and their options in connection with the proceedings, including the opportunities to opt out or attend and participate in the final fairness hearing.  The materials are also neutral and convey no opinion of the Court about the End Payor Settlement.

Similarly, the claim form End Payor Class members must complete to receive any settlement funds is straight-forward, clearly and succinctly explains the information they must provide, and is not overly burdensome or complicated.  It also includes templates to assist End Payor Class members with correctly compiling the support needed for their claims (electronic versions of which will be available on the website).  The claim form clearly states the last date by which all claims must be postmarked, which will be a proposed 180 days from the date of

entry of the Court's preliminary approval order.  Copies of the proposed claim forms are attached to the Wexler Decl. as **Exhibit J**.

Once the Settlement Administrator has completed processing and calculating the settlement awards for all timely-filed claims, its final recommendations will be submitted to the Court for its approval.  The Net Settlement Fund will be paid pursuant to the plan of allocation and divided *pro rata* among all End Payor Class members whose claims are approved, based on their purchases of brand and generic Suboxone in the various states. *See* **Exhibit G** (Plan of Allocation).

  **C.**  **A.B. Data is Qualified to Serve as End Payor Settlement Administrator**

A.B. Data is an experienced national class action and settlement administrator and has been appointed to the same or similar positions in many consumer and antitrust class actions, including pharmaceutical antitrust cases.  The Court appointed A.B. Data previously in this case to disseminate notice to the 11-State Class, which it did without incident.  The Court also appointed A.B. Data in the *Provigil* matter to both provide notice and administer claims. The Court has thus recognized A.B. Data's skill and experience in successfully administering complex notice and claims programs.[12]  It should appoint A.B. Data as Settlement Administrator in this case.

As Settlement Administrator, A.B. Data will have the authority to contact the claimants as necessary to confirm information provided in the Claim Forms or to seek additional information as required.  Under the supervision of Class Counsel, the Settlement Administrator will ensure that End Payor Class members' claims are handled appropriately, the HIPAA-protected data is maintained in a secure manner, inquiries from End Payor Class members are

---

[12] *See also* *www.abdataclassaction.com*.

responded to in a timely fashion, and the claims are administered fairly and accurately.  *See id. passim*.

**D.    Valley National Bank is Qualified to be the Escrow Agent.**

Plaintiffs also request that the Court approve Valley National Bank as the Escrow Agent for the Settlement Fund, from which any taxes, court-awarded attorneys' fees, expenses, and payments to the End Payor Plaintiffs will be deducted, with the remaining amount constituting the Net Settlement Fund for distribution to the End Payor Class. Valley National Bank is a well-known and highly respected expert in the field of escrow account management.  The Escrow Agent has experience managing similar accounts resulting from class action settlements and was selected by Class Counsel with Defendant's consent.  With the Court's approval, the Escrow Agent will establish the escrow account as a qualified End Payor Settlement fund ("QSF") and will comply with all other requirements for the account identified in ¶ 7of the Settlement Agreement.

**E.    The Proposed Schedule for Final Approval is Adequate and Fair.**

Preliminary approval includes setting the deadlines for providing notice to the End Payor Class, objecting to the Settlement, submitting papers related to final approval and an award of attorneys' fees and costs, submitting claims, and setting the date for the final fairness hearing. That hearing will provide a forum for proponents and opponents (if any) of the Settlement to address its terms, including its fairness, adequacy, and reasonableness, as well as the motion for attorneys' fees and costs.

Plaintiffs propose, and seek the Court's approval of, the following schedule for these events:

|   | Event | Timing |
|---|-------|--------|
| 1 | Opt-out Period | *45 days following mailing and posting of notice* |

| 2 | Notice and claim form to be mailed and posted on www.xxxsettlement.com | _____, 2023 *(the fifth calendar day following entry of an order granting preliminary approval)* |
| 4 | Summary notice to be published | _____, 2023 *(the fifth calendar day following entry of an order granting preliminary approval)* |
| 5 | Deadline for filing motions for final approval and for attorneys' fees and reimbursement of expenses | _____, 2023 *(14 days following entry of an order granting preliminary approval)* |
| 6 | Postmark deadline for requests for exclusion, objections and notices of intent to appear at Fairness Hearing | _____, 2023 *(45 days after entry of an order granting preliminary approval)* |
| 7 | Deadline for responding to any objections | _____, 2023 *(7 days after objection deadline)* |
| 8 | Fairness hearing | *On or before October 30, 2023* |
| 9 | Postmark deadline for filing claims | _____, 202_ *(180 calendar days after order granting preliminary approval)* |

End Payor Plaintiffs propose a period of 45 days from the date of the mailing of the notice to the date by which End Payor Class members must postmark a request to exclude themselves from the class. The proposed notice directs End Payor Class members that wish to exclude themselves from the End Payor Class to submit their exclusion request to A.B. Data and to Co-Lead Counsel.

This proposed 45-day period provides members of the End Payor Class sufficient time to decide whether to opt out. Courts have approved opt-out periods of 45 days (or shorter) in many

analogous cases, including similar generic suppression antitrust class actions.[13]   Indeed, in this very case, the Court approved a 45-day opt-out period for the 11-State Class. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2021 WL 5758896, at *2 (E.D. Pa. Dec. 3, 2021).

## VIII.   CONCLUSION

Plaintiffs respectfully request that the Court grant preliminary approval of their proposed End Payor Settlement with Defendant and grant the additional relief as set forth in their motion and this memorandum.

Dated: August 19, 2023

Respectfully submitted,

Michael Buchman
Motley Rice LLC
777 Third Avenue, 27th Floor
New York, New York 10017
mbuchman@motleyrice.com

/s/ Kenneth A. Wexler
Kenneth A. Wexler
Wexler Boley & Elgersma LLP
311 South Wacker Drive, Suite 5450
Chicago, IL 60606
(312) 346-2222
kaw@wbe-llp.com

Steve D. Shadowen
Hilliard Shadowen LLP
1135 W. 6th Street, Suite 125
Austin, TX 78703
steve@hilliardshadowenlaw.com

Marvin A. Miller
Miller Law LLC
145 South Wells Street, Suite 1800
Chicago, IL 60606
(312) 332-3400
mmiller@millerlawllc.com

*Interim Co-Lead Counsel for the End Payor Class*

Jeffrey L. Kodroff
Spector Roseman & Kodroff, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
jkodroff@srkattorneys.com

*Liaison Counsel for End Payor Class*

---

[13] *See In re Remeron End-Payor Antitrust Litig.*, No. CIV. 02-2007 FSH, 2005 WL 2230314, at *13 (D.N.J. Sept. 13, 2005) (45 days);