**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE SUBOXONE (BUPRENORPHINE HYDROCHLORIDE AND NALOXONE) ANTITRUST LITIGATION | MDL NO. 2445<br>13-MD-2445 |
| THIS DOCUMENT APPLIES TO ALL ACTIONS | |

## <u>MEMORANDUM OPINION</u>

**Goldberg, J.**                                                      **August 30, 2023**

Presently before me in this antitrust, multi-district litigation matter is a Motion for Partial Summary Judgment filed by Plaintiffs—a certified class of direct purchasers of Suboxone—regarding the relevant antitrust market. Plaintiffs ask that I define the relevant market to include only Suboxone and its AB-rated equivalents sold in the United States and its territories. Defendant responds that relevant market is a question of fact, not appropriate for disposition on summary judgment. I agree with Defendant and for the following reasons, will deny the Motion.

## I.     FACTUAL BACKGROUND

The following facts are derived from the evidence submitted by the parties in support of and in opposition to the relevant market summary judgment motion. Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view all facts in the light most favorable to Plaintiffs, the party opposing the Motion.[1]

---

[1]     References to the parties' pleadings will be made as follows: Plaintiffs' Statement of Undisputed Facts ("PSUF"), Defendant's Response ("DR"), Defendant's Statement of Undisputed Facts ("DSUF"), and Plaintiffs' Response ("PR"). To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions. If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits. If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute. I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

A.        **The Antitrust Scheme**

The alleged antitrust scheme at issue is multi-faceted and explained at length in my Opinion

regarding the denial of Defendant's Motion for Summary Judgment on liability in In re Suboxone

(Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation, 622 F. Supp. 3d 22, 35–45 (E.D.

Pa. 2022).  I incorporate these facts by reference here.

B.        **Facts Related to the Relevant Market[2]**

1.        Opioid Use Disorder Treatment During the Relevant Time Period

The following products have been approved for opioid use disorder:

| Product | Manufacturer | Approval Date |
|---------|--------------|---------------|
| Methadone | (numerous) | First approved 1947 |
| Naltrexone tablets | Teva (discontinued)<br>Barr<br>Elite labs<br>SpecGX LLC<br>Accord Healthcare<br>Sun Pharms<br>Chartwell | October 20, 1984<br>May 8, 1998<br>May 26, 1999<br>March 22, 2002<br>August 17, 2011<br>February 24, 2012<br>July 21, 2017 |
| Vivitrol | Alkermes, inc. | April 13, 2006 |
| Subutex Tablets (discontinued) | Indivior/Reckitt | October 8, 2002 |
| Suboxone Tablets (discontinued) | Indivior/Reckitt | October 8, 2002 |
| Generic buprenorphine tablets | Hikma (f/k/a) Roxane<br>Ethypharm<br>Actavis<br>Rubicon<br>Sun Pharm.<br>Rhodes Pharms. | October 8, 2009<br>September 24, 2010<br>February 29, 2015<br>June 10, 2015<br>January 29, 2016<br>March 27, 2017 |
| Suboxone Film | Indivior/Reckitt | August 30, 2010 |
| Generic buprenorphine-naloxone tablets | Amneal<br>Actavis<br>Hikma (f/k/a) Roxane<br>Teva<br>Ethypharm USA Corp.<br>Sun Pharm. | February 22, 2013<br>February 22, 2013<br>June 27, 2014<br>September 8, 2014<br>October 16, 2015<br>August 5, 2016 |

---

[2]        The parties provide extensive and comprehensive "Statements of Undisputed Material Facts" citing to hundreds of pages of documentary evidence and testimony.  I will limit my recitation of these facts to only the most pertinent points relating to the relevant market.  To the extent additional facts are necessary to the analysis, I address them in my legal discussion.

|  | Lannett Co. Inc. | September 19, 2016 |
|  | SpecGX LLC | December 13, 2017 |
|  | Wes Pharma Inc. | July 17, 2020 |
| Zubsolv (tablets) | DJA Global Pharmaceuticals | July 3, 2013 |
| Bunavail (film strips) | BioDelivery Sciences International | June 6, 2014 |
| Probuphine (implantable) | Titan Pharmaceuticals, Inc. | May 26, 2016 |
| Sublocade | Indivior | November 30, 2017 |
| Generic buprenorphine-naloxone film | Dr. Reddy's | June 14, 2018 |
|  | Alvogen | January 24, 2019 |
|  | Sandoz (discontinued) | February 2019 |
|  | Mylan | April 17, 2020 |

(DSUF ¶ 1; PR ¶ 1.)

Methadone was the original medicine for opioid use disorder and was originally approved in 1947. Methadone remains available as a medication treatment option, but due to its high risk of abuse, it is most commonly used in a clinic setting. (Def.'s Ex. 106; Def.'s Ex. 118, Report of Dr. Kwait ("Kwait Report"); Def.'s Ex. 180.)

Vivitrol is a once-monthly injectable naltrexone product, which was approved by the FDA in April 2006. It is indicated "for the prevention of relapse to opioid dependence, following opioid detoxification," meaning patients must be opioid free when they begin their treatment. (Def.'s Ex. 174.)

Naltrexone is an opioid antagonist indicated for "the blockage of the effects of exogenously administered opioids" as part of "an appropriate plan of management for [opioid] addition[]." Naltrexone tablets were first launched in 1980s under the brand name Revia but are now available in generic formulation. (Def.'s Exs. 181, 182.)

Subutex and its subsequent generic equivalents contain one active ingredient, buprenorphine hydrochloride. These types of medications are referred to as "monotherapy" or the "monoproduct." Bunprenorphine-containing products address symptoms of withdrawal and can be taken on a maintenance basis. When dosed appropriately, they do not induce a euphoric effect in patients, thus

allowing patients to eliminate or reduce cravings for opioids.  Buprenorphine products can be taken by patients outside the clinic setting.  (Kwait Report.)

Suboxone, first approved in tablet form on October 8, 2002, is a combination product containing buprenorphine and naloxone that is "indicated for maintenance treatment of opioid dependence."  (Def.'s Ex. 129; (DSUF ¶ 6; PR ¶ 6.)  Suboxone products and their generics are "combination" products, *i.e.* they contain both buprenorphine and naloxone. Buprenorphine and naloxone work in combination to treat opioid dependence, with buprenorphine allowing patients to reduce cravings for opioids, and naloxone deterring the reformulation of the product into an injectable preparation.  (DSUF ¶ 8; PR ¶ 8.)  Since the introduction of the Suboxone tablet in 2002, a number of other "combination" products have been approved by the FDA, including Suboxone film, generic Suboxone tablets, Zubsolv (brand tablet), Bunavail (brand film), and generic Suboxone film.  (Def.'s Ex. 118.)  The primary difference between Zubsolv and the Suboxone tablet is the bioavailability of the active ingredients.  (DSUF ¶ 15; PR ¶ 15; Def.'s Ex. 160.)  The difference between Bunavail and Suboxone film was that Bunavail used buccal administration (inside of the cheek), whereas Suboxone film used sublingual administration (under the tongue).  In 2015, Suboxone film received FDA approval for both buccal and sublingual administration.  (DSUF ¶ 19; PR ¶ 19.)

Recently, two branded buprenorphine-containing products have also been approved—Probuphine and Sublocade.  Probuphine is a buprenorphine implant indicated for the maintenance treatment of opioid dependence in patients who have achieved and sustained prolonged clinical stability on low-to-moderate doses of a "transmuscosal buprenorphine-containing product."  (Def.'s Ex. 177.)  Sublocade is a buprenorphine injection that allows the medicine to release slowly into a patient's body and is "indicated for the treatment of moderate to severe opioid use disorder in patients who have initiated treatment with a transmucosal buprenorphine-containing product."  (Def.'s Ex. 178.)

2.      The Structure of the Opioid Dependence Drug Market

The demand for pharmaceutical drugs is "driven through a supply chain that runs (a) from healthcare providers who select drugs, (b) to pharmacy benefit managers who manage the insurance, (c) to patients who pay some or all of the cost of the prescription, (d) to the pharmacy level and treatment facilities where demand is driven by prescriptions, and (e) ending with wholesalers who seek to fill the demand of pharmacies and other intermediaries." In re Suboxone Antitrust Litig., No. 13-md-2445, 2021 WL 662292, at *12 (E.D. Pa. 2021) (citing Ex. 1, Lamb Rep. ¶ 27). Wholesale acquisition cost ("WAC") is the price that wholesalers pay to obtain pharmaceutical products. The amount that insured patients are responsible for paying for a prescription drug—*i.e.*, the "co-payment"—is typically set by the insurance company. Most patients with commercial insurance pay a fixed co-pay cost for their medications depending on the drug's placement on the insurer's formulary. Patients typically pay nothing for drugs covered on Tier 1 of the formula but may be responsible for a higher co-payment for drugs on Tier 2 of the formulary, which could be offset through use of coupons or discount cards.   Patients with no insurance or with insurance that does not cover a particular drug are responsible for the entire cost.  (DSUF ¶ 39; PR ¶ 39.)

The choice of which medication to prescribe can hinge on insurance coverage, cost, physician preferences, or patient preferences.  (DSUF ¶ 2; PR ¶ 2.)  Indeed, it is common for doctors to prescribe a broad array of buprenorphine medications, including the buprenorphine monotherapy tablets such as Subutex and its generic equivalents.  (Def.'s Ex. 17, Normann Rep. at Exh. E3.)  Demand for treatments of opioid dependence has been growing at high rates over the years and further growth is expected. (DSUF ¶ 4; PR ¶ 4.)

II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the

> movant shows that there is no genuine dispute as to any material fact
> and the movant is entitled to judgment as a matter of law.  The court
> should state on the record the reasons for granting or denying the
> motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue, in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Summary judgment is appropriate if the non-moving party provides merely colorable, conclusory or speculative evidence.  Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  Id. at 252.  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).   Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 241 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

### III.       DISCUSSION

The concept of the "relevant market" bears on proof of an antitrust violation under section 2 of the Sherman Act.  This cause of action has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966).  Monopoly power is "the power to control prices or exclude competition."  United States v. E. I. du Pont de Nemours & Co., 366 U.S. 377, 391 (1961).  The existence of such power ordinarily may be inferred from the predominant share of the market.  Grinnell, 384 U.S. at 571.  Proving the existence of monopoly power through indirect evidence thus requires a definition of the relevant market."  Mylan Pharms. Inc. v. Wartner Chilcott Public Ltd. Co., 838 F.3d 421, 435 (3d Cir. 2016) ("Doryx").  Once a relevant market is determined, the defendant's share in that market can be used as a proxy for market power.  See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).

"The relevant market must be a market for particular products or services, the outer boundaries of which are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  "Interchangeability 'implies that one product is roughly equivalent to another . . . [and] while there might be some degree of preference for one over the other, either would work effectively.'"  Allen-Myland, Inc. v. Int'l Bus. Machs. Corp., 33 F.3d 194, 206 (3d Cir. 1994).  "The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'"  Queen City Pizza, Inc., 124 F.3d at 438 (citing E.I. du Pont de Nemours & Co., 351 U.S. at 395; Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991)).  Therefore, the relevant market definition must focus on the product rather than the distribution level.  PSKS, Inc. v. Leegin Creative Leather Prods., Inc., 615 F.3d 412, 418 (5th Cir. 2010), cert. denied, 562 U.S 1217 (2011).  To exist in the same market,

7

products "need not be identical," only reasonable substitutes.  AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999); United States v. Energy Solutions, Inc., 265 F. Supp. 3d 415, 436 (D. Del. 2017).

"Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers.  More technically, it measures the responsiveness of the demand for one product [X] to changes in the price of a different product [Y]." Doryx, 838 F.3d at 437 (quoting Queen City Pizza, 124 F.3d at 438 n.69).  The United States Supreme Court has defined the relevant cross-elasticity of demand inquiry as whether a price change causes *consumers* to change their consumption of one product in response to a price change in another.  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 469 (1992) ("The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.,* the 'cross-elasticity of demand.'").

Finally, within a broad market, "well-defined submarkets may exist which, in themselves constitute product markets for antitrust purposes." Brown Shoe, 370 U.S. at 325.  To determine the boundaries of such a market, a court must consider "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id.; see also United States v. United States Sugar Corp., 73 F.4th 197, 206 (3d Cir. 2023); United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 51 (D.D.C. 2011) (noting that these "'practical indicia' of market boundaries may be viewed as evidentiary proxies for proof of substitutability and cross-elasticities of supply and demand.").

Ultimately, the definition of the relevant market is typically a question of fact, and the plaintiff bears the burden of adducing enough evidence to permit a reasonable factfinder to adopt the proposed relevant market definition.  Eastman Kodak, 504 U.S. at 469; Queen City Pizza, 124 F.3d at 436 ("[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial

realities faced by consumers."). The United States Court of Appeals for the Third Circuit has recently re-emphasized that cross-elasticity of demand, in particular, is a "highly factual issue" that requires consideration of the special characteristics of the relevant industry that may influence market definition. United States Sugar, 73 F.4th at 206 (quoting Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 723 (3d Cir. 1991)).

Here, Plaintiffs' Motion for Summary Judgment seeks a legal determination regarding the definition of the relevant product market for purposes of assessing Defendant's monopoly power. Plaintiffs hinge their relevant market definition on the singular concept that cross-elasticity of demand must be present between a defendant's product and other products for those other products to be included in the antitrust product market. Plaintiffs contend that, based on the undisputed facts, Suboxone (tablets and film) exhibit cross-elasticity of demand only with Suboxone AB-rated generic equivalents sold in the United States and its territories. Defendant disputes this definition and responds that a genuine issue of material fact exists as to whether the relevant product market also includes reasonable substitutes for Suboxone, including other opioid dependence therapy drugs such as Subutex, Zubsolv, Bunavil, Vivitrol, Probuphine, Sublocade, methadone, and naltrexone. Defendant's alternative relevant market definition rests on an analysis of functional interchangeability, price competition, industry and public recognition, and expert testimony. Defendant also presents evidence to undercut Plaintiffs' cross-elasticity argument, suggesting that Suboxone exhibited cross-elasticity of demand with other opioid dependence therapy.

### A. Functional Interchangeability and Other Practical Indicia

Plaintiffs do not address functional interchangeability and, instead, cabin their argument to cross-elasticity of demand, as discussed below. Defendant, however, does not abandon the functional interchangeability analysis.

Functional interchangeability is one aspect of determining a relevant market. As noted above, a relevant product market is composed of "products that have reasonable interchangeability for the

purposes for which they are produced." U. S. v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956); see also United States v. Energy Solutions, Inc., 265 F. Supp. 3d 415, 436 (D. Del. 2017).  The term "interchangeability" implies that "one product is roughly equivalent to another for the use to which it is put" and "while there might be some degree of preference for . . . one [product] over the other, either would work effectively." Doryx, 838 F.3d at 436 (citations omitted).  Factors for finding reasonable interchangeability include "price, use, and qualities." Queen City Pizza, 124 F.3d at 437.  Products in the same market need not be identical, only reasonable substitutes.  Broadcom Corp. v. Qualcomm Inc., 501 F.3d 298, 307 (3d Cir. 2007) United States v. Anthem, Inc., 236 F. Supp. 3d 171, 194 (D.D.C. Feb. 21, 2017).  Products put to the same end use are reasonably interchangeable even though the method by which they are produced or consumed are not identical.  United States v. Energy Solutions, Inc., 265 F. Supp. 3d 415, 437 (D. Del. 2017) (citing United States v. Cont'l Can Co., 378 U.S. 441, 452 (1964)).

Defendant has pointed to evidence that Suboxone is not the only drug indicated for the treatment of opioid dependence, and thus does not stand alone in the relevant product market.  According to Defendant's undisputed evidence, the FDA has approved Subutex, Zubsolv, Bunavail, Vivitrol, Probuphine, Sublocade, methadone, and naltrexone, all of which are prescribed for opioid dependence therapy.  Indeed, Defendant provides evidence that Zubsolv and Bunavail use the same active ingredients as Suboxone and generic Suboxone and were specifically designed to be interchangeable among patients.  (DSUF ¶¶ 15, 19.)  Bunavail's FDA approval labeling provides guidance for patients switching between Bunavail and Suboxone tablets or film.  (Def.'s Ex. 114.)  At some point, Suboxone, generic Subutex, and Bunavail had virtually identical labeling.  (DSUF ¶¶ 13, 19.)

Defendant also identifies multiple real world examples of switching among the products by insurers, healthcare providers, and patients.  After the 2013 launch of Zubsolv, CVS Caremark, United Healthcare, and Wellcare removed Suboxone film from their formularies.  (DSUF ¶ 60.)  Defendant's

evidence also shows that many clinics or clinic chains, each direct purchasers of Suboxone film, considered methadone and buprenorphine products interchangeable and believed that either would be appropriate for a patient with an opioid addiction.  (DSUF ¶ 34; see also DSUF ¶ 14(a).)  Similarly, State Medicaid agencies, insurers, and PBMs often grouped some combination of buprenorphine, buprenorphine/naloxone tablets, naltrexone, Suboxone film, and Zubsolv as "therapeutic alternatives" or "preferred agents" in the opiate dependence agents class.  (Def.'s Ex. 148 (D.C. Medicaid); Def.'s Ex. 151 (Pennsylvania Medicaid);  Def.'s Ex. 152 (Ohio Medicaid); Def.'s Ex. 155, Highmark Dep., 148–49; Def.'s Ex. 157 (Blue Cross Blue Shield Formulary); Def's Ex. 153 (Informed RX Formulary); Def.'s Ex. 154 (Prime Therapeutics Preferred Drug List).)  See Doryx, 838 F.3d at  435 (considering evidence that health insurers and other managed care providers encouraged the widespread substitution of numerous other oral tracyclines for Doryx).  Finally, Defendant presents a study it commissioned in 2015 and 2016, which showed that, after the entrance of generic buprenorphine-naloxone, Zubsolv, and Bunavail, Suboxone film lost substantial sales, while generic buprenorphine monotherapy, Zubxolv, Vivitrol, and Bunavail began to capture shares of the market.  (Def.'s Exs. 125 at 13, 127 at 29; Normann Rep. ¶¶ 50, 126.)

This evidence, if credited, would allow a reasonable jury to conclude that consumers, health care providers, insurers, and PBMs acknowledged that other opioid dependence treatments were substitutable for Suboxone.  In turn, a jury could find that a high level of functional interchangeability existed between Suboxone and other opioid dependence treatments.

**B.  Cross-Elasticity of Demand**

As noted above, functional interchangeability "is only one aspect of establishing a relevant antitrust market."  Doryx, 838 F.3d at 437.  It is well established that circumstantial evidence of market definition also requires a showing of economic interchangeability—*i.e.*, cross- elasticity of demand— with these therapeutic alternatives.  United States v. Horticultural Supply v. Scotts Co., 367 F. App'x 305, 311 (3d Cir. 2010) (finding that practical indicia evidence of relevant market, without reference

to cross-elasticity of demand, is insufficient to raise a question of fact as to the relevant market); <u>see</u> <u>also</u> <u>In re Solodyn (Minocycline Hyrdrochloride) Antitrust Litig.</u>, No. 14-md-2503, 2018 WL 563144, at *5–6 (D. Mass. Jan. 25, 2018).

Thus, any determination of the relevant market requires an inquiry into cross-elasticity of demand.  Indeed, "[t]he economic tool most commonly referred to in determining what should be included in the market from which one then determines the defendant's market share is cross-elasticity of demand . . . [which] is a measure of the substitutability of products from the point of view of buyers . . . [and] measures the responsiveness of the demand for one product to changes in the price of a different product."  <u>Queen City Pizza</u>, 124 F.3d at 438 n.6 (3d Cir. 1997) (quotations omitted).  The mere presence of some cross-elasticity between products is not sufficient; rather there must be significant cross-elasticity.  <u>FTC  v. Abbvie Inc.</u>, 976 F.3d 327, 373 (3d Cir. 2020).

In considering cross-elasticity of demand, "[s]pecial characteristics of the relevant industry may influence market definition."  <u>Tunis Bros.</u>, 952 F.2d at 723.  "The market for prescription pharmaceuticals is an unusual one, in part because consumers are typically insulated at least to some degree from both cost (which is often largely covered by an insurance plan) and choice (which is at least limited and more likely substantially directed by the prescribing physician), so market features such as cost-sensitivity and elasticity of demand might therefore defy reasonable expectations."  <u>In re</u> <u>Aggrenox Antitrust Litig.</u>, 94 F. Supp. 3d 224, 246 (D. Conn. 2015).    As explained by one legal scholar:

> [I]t is likely that both the patient who actually consumes the drug and the doctor who prescribes it will remain insensitive to (and perhaps, completely oblivious of) prices  and price changes.  The patient will be paying only a fraction of the price of the drug, no matter which drug is prescribed, and the doctor will be paying nothing, as she will not be consuming any of the drugs involved in these transactions.  Furthermore, even patients and physicians who are price sensitive may be unable to express that sensitivity because the patient's insurance forecloses the opportunity to purchase a particular drug, or because copayments are equal for drugs that are not identically priced . . . One problematic outgrowth of patient and physician price insensitivity is

> that, since these are the two entities most likely to be regarded as a "consumer" for antitrust market definition purposes, cross elasticity of demand between two pharmaceutical products is likely to be low regardless of the functional interchangeability of two products.

Anish Vaishnav, "Product Market Definition in Pharmaceutical Antitrust Cases:  Evaluating Cross-Price Elasticity of Demand," 2011 <u>Colum. Bus. L. Rev.</u> 586, 612–14 (2011) (footnotes omitted).

"The practical reality is that the pharmaceutical market is rife with idiosyncrasies.  And while several courts . . . have held that the relevant market was a single-product market [*i.e.*, one that includes only the branded drug and its generic equivalents], market power looks different from one case to the next."  <u>In re Loestrin 24 Fe Antitrust Litig.</u>, 433 F. Supp. 3d 274, 302 (D.R.I. 2019).  At all times, the proper market definition must make a factual inquiry into the "commercial realities" faced by consumers.  <u>Eastman Kodak</u>, 504 U.S. at 482.  Thus, "[c]ourts should 'combine[e] different products or services into 'a single market' when 'that combination reflects commercial realities.'"  <u>Ohio v. Am. Express Co.</u>, 138 S. Ct. 2274, 2285 (2018) (quoting <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 572 (1966)); <u>compare</u> <u>Doryx</u>, 838 F.3d 421, 436 (affirming district court ruling that relevant market consisted of all oral tetracyclines prescribed to treat acne) <u>with</u> <u>In re Nexium (Esomeprazole) Antitrust Litig.</u>, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) (holding the branded drug and its generic to be a plausible relevant market).[3]

In <u>Doryx</u>, <u>supra</u>, the Third Circuit offered guidance on cross-elasticity of demand in the pharmaceutical context.  There, the plaintiff argued that the relevant market consisted of the brand drug

---

[3]     Plaintiffs emphasize that "courts have repeatedly rejected the attempt to change controlling law for the drug industry, finding that cross-elasticity of demand determines the boundaries of the relevant product market for pharmaceutical products, just as for all other products."  (Pls.' Mem. Supp. Summ. J. 9.)  The cases cited by Plaintiffs, however, do not reject consideration of other factors when determining relevant market.  Indeed, in the recent case of <u>United States v. United States Sugar Corporation</u>, 73 F.4th 197, 206 (3d Cir. 2023), the Third Circuit reiterated its previous holding that determination of cross-elasticity of demand is a "highly factual issue" that requires consideration of the "[s]pecial characteristics of the relevant industry [that] may influence market definition."  <u>Id.</u> (citing <u>Tunis Bros</u>, 952 F.2d at 723).

(Doryx) and its generic equivalents, while defendant contended that the market was broader and consisted of all oral tetracyclines prescribed to treat acne.  Doryx, 838 F.3d at 436.  The district court rejected the plaintiff's motion for summary judgment as to the relevant market and determined that the relevant product market was the broader market defined by defendants.  Id. at 434–35.  On appeal, the Third Circuit looked at multiple factors including: (1) high level of product interchangeability between Doryx and other oral tetracyclines prescribed to treat acne, and (2) cross-elasticity of demand.  Id. at 435–46.  The Court found that both factors favored a broader relevant market, noting in particular that the evidence "demonstrated that [d]efendants responded to the market's reaction to their prices with sales promotions in an effort to increase their ability to compete with other tetracyclines."  Id. at 437.  Because the plaintiff carried the burden of proof in defining the market, the Third Circuit affirmed the district court's finding that the relevant market consisted of Doryx and other oral tetracyclines.  Id.

A different result was reached in United Food and Commercial Workers Local 1776 v. Teikoku Pharma. USA, 296 F. Supp. 3d 1142 (N.D. Cal. 2017) ("Lidoderm").  There, the plaintiffs argued that the relevant market included only the drug Lidoderm and its generics, which were lidocaine 5% patches.  Id. at 1166.  Defendants contended that the market should include an array of other pain medications that came in various forms, including nonsteroidal anti-inflammatory drugs, anticonvulsants, muscle relaxers, opioids, and topical anasthetic creams and gels.  Id.  In pressing for this broad market definition, defendants asserted that "cross-elasticity of demand is relevant but not required to determine the relevant product market," particularly given the unique characteristics of the pharmaceutical market and the fact that therapeutic equivalency is a more relevant determinant of the product market.  Id. (emphasis in original).  The court rejected defendants' analysis because it created a "vastly overbroad market that includes a host of different classes and types of drugs that are different from the 'unique' 5% lidocaine patches."  Id. at 1170.  The court noted that "even where products are essentially identical, that alone is insufficient to require their inclusion in the relevant market."  Id. at 1171.  The court found that "based on the undisputed facts and total lack of evidence to show that

Lidoderm's prices were constrained by therapeutically equivalent products," the relevant market, as a matter of law, would be limited to 5% lidocaine patches, Lidoderm, and its generic equivalents. Id. at 1176.

Courts interpreting Lidoderm have done so narrowly, noting that the court's holding was based substantially on the fact that the defendants sought an unnecessarily broad definition of the relevant market and failed to put forth any evidence of cross-elasticity. See In re Intuniv Antitrust Litig., 496 F. Supp. 3d 639, 663 (D. Mass. 2020); In re Solodyn, 2018 WL 563144, at *9.

More akin to the matter before me is the case of In re Intuniv Antitrust Litigation, 496 F. Supp. 3d 639, 663 (D. Mass. 2020). There, the court analyzed the relevant market for Intuniv, a medication used to treat attention deficit hyperactivity disorder ("ADHD"). Id. at 648. The plaintiffs argued that Intuniv had cross-elasticity only with generic Intuniv, while defendant argued that the relevant market included all other non-stimulant ADHD treatments. Id. at 663. Considering the evidence produced by both parties, the court found a dispute of material fact regarding the relevant market. Id. at 664. Specifically, although plaintiffs had put forth evidence to show that Intuniv and other non-stimulant ADHD treatments did not exhibit cross-elasticity, defendants argued that the plaintiffs' evidence only showed the wholesale acquisition cost as opposed to net price after rebates, coupons, and other incentives. Id. at 659–60. Moreover, the court found that although therapeutic interchangeability, on its own, was insufficient to establish the relevant market, there was sufficient evidence that defendant competed with other non-stimulant ADHD treatments. Id. at 665–66 See also Solodyn, 2018 WL 563144, at *7–9 (finding that expert testimony on economic interchangeability, which focused on the effect rebate and promotional programs had on prescriptions, created a genuine issue of material fact as to cross-elasticity); In re HIV Antitrust Litig., No. 19-cv-2573, 2023 WL 3088218, at *15–16 (N.D. Cal. Feb. 17, 2023) (declining to grant summary judgment on relevant market where questions of fact remained as to whether brand HIV drug competed only with its generic equivalents or also with other drugs used to treat HIV).

With this case law in mind, I review the factual record before me.  Plaintiffs have presented multiple forms of evidence in an effort to establish, as a matter of law, that Suboxone exhibits cross-elasticity with only generic forms of Suboxone.

First, Plaintiffs contend that Defendant, through its representatives, made admissions that constitute "undisputed record evidence" of Defendant's ability to repeatedly and significantly increase the price of Suboxone without losing sales to any non-Suboxone product.  Specifically:

- Bradford Asby, Defendant's former Director of Business Analytics was asked whether, from 2008 forward, he ever saw any data suggesting that a small but significant increase in the price of Suboxone tablets or film caused substantial quantities of prescriptions or sales to be shifted away from Suboxone tablets or film and toward some other opioid dependence product.  He stated that he "never saw anything of that nature."  (Pls.' Ex. 2, Dep. of Bradford Ashby ("Ashby Dep.") 165:9–23; 252:9–253:4.)

- Frank Preziosi, Defendant's Rule 30(b)(6) designee, testified that a planned 8.1% price increase in Suboxone tablets would not lead to a loss of sales to other medicine.  (Pls.' Ex. 3, Dep. of Frank Preziosi. ("Preziosi Dep.") 292:7–12.)

- In a 2009 Defendant's slide presentation on its "2010 Managed Markets Strategic Plan," prior to the launch of any competing buprenorphine product, Defendant indicated that "[c]ustomers to date have not shown sensitivity to Suboxone price."  (Pl.'s Ex. 4, at Slide 7.)

Defendant responds that these isolated statements, taken out of context, are not sufficient to meet Plaintiffs' burden of conclusively establishing the relevant market.  For example, Defendant notes that Mr. Ashby did not testify that Defendant "could and did substantially raise the price of brand Suboxone film and tablets without losing sales to other drugs."  Rather, he explained that he was never asked to "measur[e] the effect of a small but significant shift in price," thus explaining why he had not seen any data on this issue.  (Ashby Dep. 253–54.)  Mr. Ashby further testified that he did not have access to data regarding Vivitrol.  (Id. at 250–52.)

Defendant also points out that Mr. Preziosi did not testify that Defendant could raise Suboxone prices without losing sales to other drugs.  Instead, Mr. Preziosi stated that he believed that 8.1% was not an overly aggressive price increase, and that the goal was to stay under 10% to combat expected competition.  (Id. at 290:11–292:6.)

16

Lastly, Defendant notes that the cited slide presentation was written in August 2009, before competing buprenorphine products had launched. The presentation specifically stated that the Suboxone tablet "currently benefits from widespread unrestricted access in a traditionally non-competitive environment," but it recognized that more competition would be coming on the market. (Pls.' Ex. 4, at Slide 7.)

Second, Plaintiffs reference evidence that suggests that Defendant substantially raised Suboxone tablet prices to drive Suboxone share to film, without fear of or actually losing sales to any non-Suboxone manufacturer. In particular, Plaintiffs note the following:

- Between September 2010 and March 2013, Defendant increased Suboxone tablet prices six times, each time by 7–15%, and increasing the Suboxone tablet price by 60% in total. This included two 15% price increases for Suboxone tablets in 2012. (Pls.' Ex. 1, Rep. of Dr. Lamb ("Lamb Rep.") ¶¶ 46, 50, 145.) Despite these price increases, the volumes of Suboxone tablet and film sold continued to increase and were generally unaffected. (Id. ¶¶ 46, 85.)

- Although unit sales of Suboxone tablets fell as Defendant increased tablet prices, Defendant did not lose Suboxone sales to any non-Suboxone product. Rather, the lost tablet sales were shifted to Suboxone film. (Lamb Rep. at fig. 1.)

- Defendant and the generics expected that the wholesaler acquisition cost ("WAC") price of generic buprenorphine naloxone tablets would be lower than the WAC price of branded Suboxone tablets. (PSUF ¶¶ 6–7; DR ¶¶ 6–7.)

- Defendant and the generic Suboxone manufacturers expected that generic tablets would capture substantial market share from brand tablets but not from any non-Suboxone product. (PSUF ¶ 7.)

Defendant responds that such evidence (which Plaintiffs refer to as a "natural experiment") fails to capture the commercial realities of the market. Plaintiffs' pricing evidence involves prices at which Suboxone and competing products were sold to wholesalers, i.e., the wholesale acquisition cost ("WAC"). But the cross-elasticity inquiry focuses on the sale to consumers, which, in turn, must take into consideration net price after rebates, coupons and other incentives. Defendant notes that, although it increased prices on Suboxone between 2009 and 2013 while methadone, buprenorphine, and naltrexone (Vivitrol) were in the market, all of the price increases—and all of Plaintiffs' evidence

related thereto—refer to the WAC, which reflects prices paid by direct purchasers/wholesalers for Suboxone as opposed to prices paid by the actual consumers. Defendant contends that, due to the unique nature of the pharmaceutical market, WAC has almost no bearing on the costs paid by consumers for those same products. (DSUF ¶ 39.) According to Defendant's expert, Dr. Normann, most buprenorphine patients have either commercial insurance or coverage under a Medicaid Program. (Def's Ex. 17, Normann Rep. ¶ 93 n.334.) Those with commercial insurance pay either nothing or fixed co-payment for a drug covered on the insurance company's formulary. (DSUF ¶ 39.) To the extent patients have a co-pay, they are often able to offset some of it through the use of a coupon or discount card. (Id.; see also Def.'s Ex. 118, Expert Report of Dr. Andrew Kwait (noting that a fundamental factor affecting prescribing decision for opioid use therapy is the co-pay cost and that the co-pay card for Suboxone film has had a drastic effect on patients preferences).) As such, to establish the cross-elasticity of demand by reference to Suboxone WAC price increases, Plaintiffs would have to present uncontroverted evidence that the price actually paid by consumers/patients rose in comparison to other products but led to no change in the consumption of competing products. Defendant has convincingly pointed out that Plaintiffs have not done so.

Defendant has also produced evidence that other opioid therapy drugs exhibited cross-elasticity of demand with Suboxone. Defendant asserts that, in response to increasing competition in the opioid dependence therapy market, it engaged in aggressive coupon and rebate programs that decreased the price of Suboxone for both consumers and third-party payors. For buprenorphine products specifically, Defendant's evidence suggests that insurance companies and Medicaid agencies made formulary decisions based, in part, on which manufacturer offered the best prices or rebates. (DSUF ¶¶ 40–41.) Defendant presents further evidence that, to obtain formulary coverage, it offered rebates to managed care organizations ("MCO"s), even though it was increasing the WAC. (DSUF ¶¶ 41–43.) Indeed, data from Magellan—a consultant to more than half the state Medicaid agencies in the country—shows that, between the years 2010 and 2016, brand Suboxone, after rebates, frequently

18

cost less than other opioid addiction treatments, such as Zubsolv, Bunavail, Vivitrol, and generic buprenorphine, even though Defendant made increases in the WAC.[4]  (DSUF ¶ 54.)

Moreover, Defendant's evidence allows the inference that before the launch of generic Suboxone tablets, Defendant considered generic monotherapy as the biggest competitor for Suboxone film.  (DSUF ¶ 13.)  Defendant's March 2010 email reflects Defendant's employees' concerns that a price increase would "accelerat[e] loss of Suboxone to generic Subutex" because "cash patients are at the highest risk of switching to generic Subutex" and are "most sensitive to price."  (Def.'s Ex. 104; see also Def.'s Ex. 139 (Defendant presentation entitled "Actions Taken in 2H 2012 to Limit Mono-product Penetration" including suggestion to issue $0 copay card program).)  As such, Defendant increased the value of its copay coupons to compete with the generic monotherapy, which often drove patient cost down to $0.  (Id. ¶ 57.)  Defendant also presents proof of its understanding that the increases in the price of Suboxone would accelerate losses to other opioid treatment therapy.  This understanding resulted in further increases in the value of its coupons and postponement of planned price increases, all designed to remain competitive with Zubsolv and Bunavail.[5]  (DSUF ¶¶ 47, 59.)  Such evidence could allow a jury to infer that Defendant's ability to raise prices on Suboxone, without any

---

[4]     Plaintiffs contend that rebates and coupons support including additional drugs in the relevant product market only where the existence of such rebates and coupons is accompanied by evidence that an increase in one drug's rebates/coupons in fact caused that drug to gain sales from another drug, that is, cross-elasticity of demand.  Plaintiffs, however, bear the burden of proving relevant market and, to the extent their relevant market analysis fails to consider the impact of rebating and coupons on cross-elasticity of various products, it has not met that burden.

[5]     Plaintiffs contend that sales of Bunavail and Zubsolv were so low in comparison to sales of Suboxone, never exceeding a total of 7% of the combined sales of Zubsolv, Bunavail, and Suboxone, that those products could be included in the relevant market without impact to Plaintiffs' case.  Notably, however, Plaintiffs' expert, Dr. Lamb, did not actually include these products in the proposed relevant market definition.  Plaintiffs' concession that the relevant market may in fact including Bunavail and Zubxolv, despite their expert's contrary  opinion, is an indicator that factual disputes remain as to precisely how the relevant market should be calculated.

corresponding increase in its coupon program, was constrained by competition with other non-Suboxone drugs.[6]

Third, Plaintiffs discuss non-Suboxone opioid addiction products—specifically Subutex, Bunavil, Zubsolv, Vivitrol/naltrexone, and methadone—and argue that these drugs do not exhibit substantial cross-elasticity of demand with Suboxone. Specifically, Plaintiffs present evidence that:

- After Subutex went generic on October 2009, causing buprenorphine prices to fall, the amount of Suboxone sold continued to increase. In fact, Suboxone sales continued to increase even after the introduction of lower-priced generic Subutex. (Pls.' Ex. 1, Lamb Rep. ¶ 54.) Defendant's projections assumed "[n]o loss of Suboxone patients to generic Subutex." (Pls.' Ex. 14 at slide 9.)

- The launches of Zubsolv and Bunavail, which are branded co-formulated buprenorphine hydrochloride and naloxone products indicated for the treatment of opioid dependence, had no impact on Suboxone unit sales, and in fact, Suboxone unit sales continued to increase despite the Bunavil and Zubsolv launches. (Def.'s Ex. 1, Lamb Rep. ¶ 61.) Defendant's own documents show that Zubsolv and Bunavail did not take substantial sales away from Suboxone. Indeed, following their launches Zubsolv's sales peaked at only 6.35% of total buprenorphine/naloxone sales, and Bunavail's sales peaked at only 1.21% of total buprenorphine/naloxone sales, with brand and generic Suboxone accounting for the remainder. (PSUF ¶ 11; DR ¶ 11.)

- Defendant was able to increase Suboxone tablet prices four times by 7–15% each time and film prices twice by 8% each between January and March 2013, without losing sales to methadone, buprenorphine, or naltrexone, which were already in the market at the time of these Suboxone price increases. (Pls.' Ex. 1, Lamb Rep. ¶¶ 46, 64–65.)

---

[6]     Plaintiffs submitted a notice of supplemental authority regarding In re Zetia (Ezetimbe) Antitrust Litig., No. 18-md-2836, 2021 WL 6689718 (E.D. Va. Nov. 1, 2021), approved and adopted in 587 F. Supp. 3d 356 (E.D. Va. 2022), in which the judge found that defendants' expert's definition of a broad competitive market for cholesterol-lowering medications without identification of any other product other than the generic that exhibited significant cross-elasticity of demand with Zetia was insufficient to create a triable issue on relevant market. Id. at *13–17. The judge was unpersuaded by the defendant's evidence (a) of therapeutic substitutability, (b) that the defendant considered other drugs' WAC prices in setting the brand price, (c) defendant's aggressive rebating strategies, and (d) that defendant tracked prescription shares and volume for other cholesterol treatments. Id. at *17–18.

     I do not find Zetia controlling of the issue here. In Zetia, the plaintiffs' expert used a detailed "regression analysis" and constructed an "Almost Ideal Demand System ('AIDS') model to estimate how change in one product's price affects demand for another. Id. at *9–11. Dr. Lamb did not provide any such analysis. In addition, as noted above, Plaintiffs provide only WAC pricing without any consumer pricing data.

However, these price increases "without more, 'cannot establish cross-elasticity of demand.'" BanxCorp. v. Bankrate, Inc., 847 F. App'x 116, 121 (3d Cir. 2021). Such evidence "lacks necessary information about the prices of potentially substitutable products and the demand for such products." Id. To that end, Plaintiffs offer no evidence regarding the prices paid by consumers or third-party payors, and did not take into account that Suboxone tablets and film were often less expensive than other opioid dependence therapy drugs. Indeed, Defendant presents proof that the price of film was generally declining following the launch of Zubsolv in 2012 due to money spent on rebates and coupons. (Normann Rep. at 75.) Moreover, Defendant observes that Plaintiffs cite no evidence regarding the prices of methadone or naltrexone over time. As such, the mere fact that Defendant raised Suboxone prices is irrelevant without knowing whether those increases drove the price higher than other non-Suboxone opioid dependence therapy.

Defendant also points to evidence that Suboxone film actually lost sales to competitors after the entrance of generic Suboxone, Zubsolv, and Bunavil. (DSUF ¶ 58.) Vivitrol, another opioid dependence drug also saw substantial growth. Suboxone film, in the meantime, saw its share of the market go from approximately 70% in 2013 to 24% by the end of 2019. (DSUF ¶ 59.) Various pharmacies and health insurers removed Suboxone film from their formularies and replaced it with competing opioid dependence therapies (not generic Suboxone) on their formularies. (DSUF ¶ 60.)

Finally, Plaintiffs reference "undisputed" expert evidence to establish that the relevant market is brand and generic Suboxone. Plaintiffs' expert economist, Dr. Lamb, opined that the evidence demonstrates a lack of cross-elasticity of demand between Suboxone. (Pl.'s's Ex. 1, Lamb Rep § IV.A.) He noted that Defendant's understanding that it could profitably impose significant price increases in excess of 5% and the fact that it actually did so confirms the limited relevant market. (Id. ¶¶ 41–48.) Dr. Lamb observed that sales of Suboxone were generally unaffected by significantly lower prices for drugs like Subutex, Zubsolv, and Bunavil, and that drugs like methadone and naltrexone were not functional substitutes for Suboxone, meaning that they could not be economic

substitutes. (Lamb Rep. ¶¶ 55, 59, 68, 70.)  Finally, Dr. Lamb applied the FTC and DOJ's Hypothetical

Monopolist Test ("HMT"),[7] and concluded that Defendant maintained an understanding that it could

profitably impose significant Suboxone price increases in excess of five percent, and actually did so.

(Lamb Rep. ¶ 38.)

Plaintiffs then highlight the fact that Defendant's expert, Dr. Normann, did not measure the

cross-elasticity of demand between Suboxone and other drugs used to treat opioid dependence.  (Def.'s

Ex. 16, Dep. of Normann ("Normann Dep.") 190:10–15.)  Rather, according to Plaintiffs, Dr. Normann

suggested that the relevant market may include other opioid dependence treatments that are merely

therapeutically similar to Suboxone, even though something more than therapeutic equivalency is

required to define the relevant antitrust product market.

Defendant concedes that Dr. Normann did not specifically define the product market, as it is

not Defendant's burden to define.  Nonetheless, Dr. Normann did opine that the pricing for brand

Suboxone film was affected by other therapy options to treat opioid addiction.  (Pls.' Ex. 17, Normann

---

[7]     The Hypothetical Monopolist Test ("HMT") begins with a narrow set of products, called the candidate market, and asks whether a hypothetical monopolist selling those products could impose a small but significant non-transitory increase in price ("SSNIP"), which woud be a 5% increase or more, without losing too many sales to make the price increase unprofitable.  If yes, then the market is correctly defined because products outside the candidate market are not effective price constraints.  If not, the candidate market is too narrow and the relevant market includes other products.  Federal Trade Comm'n v. AbbVie, Inc., 329 F. Supp. 98, 128–29 (E.D. Pa. 1998), aff'd in part, rev'd in part 976 F.3d 327 (3d Cir. 2020).

The HMT, however, is typically applied in the merger context.  See 5C Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 530a, at 226 (3d ed. 2007).  While some courts have recognized its application outside the merger context, see In re Intuniv, 496 F. Supp. 3d at 664, at least one court from within this Circuit has opined that the HMT does not provide a useful gauge in the context of the regulatory framework promulgated by the Hatch-Waxman Act.  Under this scheme, generics can be priced considerably lower than brand-name products, meaning that application of the HMT would result in a market limited to a brand-name drug and its AB rated generic "in almost every instance," and would render most brand name pharmaceutical companies as "*per se* monopolists" prior to generic entry.  Abbvie, 329 F. Supp. 3d at 130.  Accordingly, the court in Abbvie rejected use of the HMT in such scenarios.  Id.  Recently, the Third Circuit has emphasized that there is no authority for finding that the HMT governs market definition and held that a court may forego reliance on an HMT analysis in favor of focusing on the "practical indicia" of market definition.  United States Sugar Corp., 73 F.4[th] at 206.

Rep. ¶¶ 121–131.)  Dr. Normann noted that Defendant faced ongoing competition from other opioid dependence therapy options, which required pricing and promotional responses from Defendant.  (Id. ¶ 122.)  Specifically, Dr. Normann indicated that Defendant used commercial rebates and copay coupons to compete against these other treatments, and, as competition increased, Defendant continued to offer more commercial rebates and copay coupons.  (Id. ¶¶ 123–24.)  At the same time, Dr. Normann opined that commercial insurance companies and Medicaid programs considered Suboxone, Bunavail, and Zubsolv to be part of the same drug category on their formularies, and viewed other opioid addiction products as interchangeable with Suboxone.  As such, the plans could incentivize patients to take these other drugs over Suboxone though formulary and PDL placement.  (Id. ¶ 125.)

Dr. Normann also remarked that the unique market for Suboxone products—which are often dispensed through direct purchaser clinics—impacts demand and, in turn, price competition.  Thus, the relevant market could vary depending on the purchaser.  For wholesalers, the demand for brand Suboxone is derived from the downstream demand by patients in conjunction with their doctor, as well as drug coverage by insurance companies and state Medicaid.  (Id. ¶ 128.)  Direct purchaser clinics, however, are healthcare providers that act in the role of both the source of the prescription as well as the filler of that prescription, meaning that they can influence and determine what products they demand.  (Id. ¶ 129.)  PBMs and state Medicaid agencies determine formulary status and tier positioning, many of whom preferred brand Suboxone film due to higher rebates and lower cost.  (Id. ¶ 130.)  Finally, Dr. Normann explained that patient willingness and ability to move between therapy choices based on price could vary by patient, some of which may be more price sensitive, and many of whom were heavily influenced by relative pricing.  (Id. ¶ 131.)  Dr. Normann concluded that robust competition existed between Suboxone and other opioid use disorder treatments, which constrained Suboxone pricing.  (Id. ¶¶ 121–131.)

Ultimately, what remains is a battle between experts on various factual issues.  In such a scenario, the ultimate determination of which expert's opinion is entitled to be credited remains with the jury.  In re Asbestos Prods. Liab. Litig (No. VI), 714 F. Supp. 2d 535, 547 (E.D. Pa. 2010).

## IV.        CONCLUSION

The discussion above reflects only a portion of the parties' extensive evidentiary citations, case references, and footnote challenges to the other party's arguments.  While Plaintiffs offer evidence from which a jury could find in favor of their narrow definition of the relevant market, a party moving for summary judgment on the relevant market bears the burden of demonstrating that a finder of fact "must conclude" that the proposed market includes only products sharing the requisite cross-elasticity of demand.  In re Zetia (Ezetimibe) Antitrust Litig., 587 F. Supp. 3d 356, 362 (E.D. Va. 2022).  Defendant, however, has offered evidence that would allow a reasonable jury to define the relevant market in a much broader fashion.

Separating the wheat from the chaff in the parties' briefing and evidence illuminates that genuine issues of material fact abound as to whether brand Subxone had cross-elasticity of demand only with itself and generic versions, or whether the relevant market must include other opioid use disorder treatments.  Cognizant of the Supreme Court's pronouncement that market definitions are typically determined "after a factual inquiry into the commercial realities faced by consumers," Eastman Kodak, 504 U.S. at 482, I find that the issue of cross-elasticity, particularly in this convoluted pharmaceutical market, is more properly decided by a jury.  I will therefore deny Plaintiffs' Motion for Partial Summary Judgment as to the relevant market.