**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————

| | | |
|---|---|---|
| **IN RE SUBOXONE (BUPRENORPHINE** | : | **MDL NO. 2445** |
| **HYDROCHLORIDE AND NALOXONE)** | : | **13-MD-2445** |
| **ANTITRUST LITIGATION** | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | |
| | : | |
| *End Payor Actions* | : | |
| | : | |

———————————————————

### MEMORANDUM OPINION

**Goldberg, J.**                                                          **December 4, 2023**

Currently before me in this multi-district antitrust case is the End-Payor Plaintiffs' ("EPPs") Motion for Final Approval of the End Payor Settlement. Upon review of the parties' briefing and considering the arguments at the final fairness hearing on October 19, 2023, I will certify a settlement class, grant final approval of the class action settlement, and award attorneys' fees, costs, and incentive payments as requested.

## I.    FACTUAL AND PROCEDURAL HISTORY

Defendant Indivior, Inc. ("Defendant") manufactures Suboxone, a drug commonly used to combat opioid addiction. Suboxone previously came in tablet form, but in 2010, citing safety concerns, Defendant effectuated a change in the administration of this drug, switching from tablet to sublingual film. Various purchasers/consumers of Suboxone claimed that this switch was anticompetitive and solely designed to maintain Defendant's market exclusivity—a scheme known as a "product hop." These claims resulted in multi-district, antitrust litigation before this Court.[1]

---

[1] The alleged antitrust scheme at issue is multi-faceted and explained at length in my Opinion regarding the denial of Defendant's Motion for Summary Judgment on liability in In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation, 622 F. Supp. 3d 22, 35–45 (E.D. Pa. 2022). I incorporate these facts by reference here.

On August 15, 2013, the End Payor Plaintiffs ("EPPs") filed a Consolidated Amended Class Action Complaint setting forth antitrust, consumer protection, and unjust enrichment claims under the laws of forty-eight states, plus Puerto Rico and the District of Columbia.  Following motions to dismiss, I dismissed claims arising under the laws of thirty-seven States and territories and granted the motions as to all Defendant entities[2] other than Defendant Indivior, Inc., formerly known as Reckitt Benckiser, Inc.

Discovery proceeded, and the EPPs filed a motion for class certification of an issues-only class.  On September 27, 2019, I certified a class of EPPs pursuant to Federal Rule of Civil Procedure 23(c)(4) on six distinct issues:

1. Whether Defendant engaged in anticompetitive and deceptive conduct;

2. Whether Defendant willfully maintained monopoly power through such conduct;

3. Whether Defendant had a specific intent to monopolize;

4. Whether Defendant had a dangerous probability of achieving monopoly power;

5. Whether Defendant has offered a non-pretextual pro-competitive justification that could not have been obtained through less restrictive means, and if so;

6. Whether the anticompetitive effects of Defendant's conduct outweigh their proffered procompetitive benefits, if any.

In re Suboxone Antitrust Litig., No. 13-md-2445, 2019 WL 4735520 (E.D. Pa. Sept. 27, 2019).  The United States Court of Appeals for the Third Circuit affirmed this certification on July 28, 2020.  In re Suboxone Antitrust Litig., 967 F.3d 264 (3d Cir. 2020).

---

[2] These other entities included Reckitt Benckiser LLC and Reckitt Benckiser Healthcare (UK) Ltd.

Defendant subsequently filed summary judgment motions as to all claims against it.  I denied those motions in August of 2022, and scheduled trial to commence in September 2023.

In January 2023, upon all counsel's request, I engaged in mediation with the EPPs and Defendant.  Following several months of mediation, the EPPs and Defendant reached a settlement in the amount of $30 million, in exchange for a release of all antitrust, consumer protection, and unjust enrichment claims asserted on behalf of the class of consumers and third-party payors who purchased and/or paid for Suboxone and/or its generic equivalents in forty-eight states, the District of Columbia, and Puerto Rico (the "Settlement").

On August 21, 2023, I entered an order for preliminary approval of the proposed settlement, for preliminary certification of the settlement classes, and for permission to disseminate notice of the proposed settlement to members of the settlement classes ("Preliminary Approval Order"). Upon review of the relevant factors under Federal Rule of Civil Procedure 23, I certified the following class:

> All persons or entities who purchased and/or paid for some or all of the purchase price for Co-Formulated Buprenorphine/Naloxone (Suboxone and/or its AB-rated generic equivalent) in any form, for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming and District of Columbia between December 22, 2011 and the date on which the Court enters the Plaintiffs' proposed Preliminary Approval Order (the "Class Period").[3]

---

[3]     The following persons or entities were excluded from the proposed Classes:  (i) pharmacy benefit managers; (ii) the Defendant and its officers, directors, management, employees, subsidiaries, or affiliates; (iii) all governmental entities (except for government funded employee benefit plans); (iv) all persons or entities who purchased Suboxone or its AB-rate generic equivalents in any form for purposes of resale or directly from Defendant or its affiliates; and (v) the judges in this case and any members of their immediate families.

(ECF No. 935)

Following entry of the Preliminary Approval Order, Lead Counsel for the EPPs ("Class Counsel") worked with Settlement Administrator A.B. Data, Ltd. ("A.B. Data") to implement the approved notice program ("Notice Program").  The Notice Plan included direct mail notice to members of the End Payor Class who could be identified with reasonable effort, augmented by publication in print media and digital media placement.

Thereafter, beginning August 28, 2023, notice was sent by mail to approximately 900,000 addresses and published in targeted digital email.  More than 1,250 emails were sent to third-party payors ("TPPs") and their representatives, and over 291 million digital media impressions were delivered to end-payor class members.  A news release was also disseminated via *PR Newswire*, reaching the desks of over 10,000 newsrooms across the United States.  Following this notice, thirty-seven class members opted out of the class, and no objections to the settlement were filed. [4]  As of the date of the EPPs request for final approval, class members had submitted more than 110,000 claims.  Claim forms are not due until February 17, 2024.

The proposed Plan of Allocation calls for payment of any approved attorneys' fees, litigation costs, settlement administration costs, escrow administration costs, and incentive payments from the settlement funds received.  Following those disbursements, the net settlement funds ("Net Class Settlement Fund") will be used to pay class claims that have been approved and authorized.  The Net Class Settlement Fund will be divided into two State Allocation Pools: (a) 90% will go to States with <u>Illinois Brick</u> repealer statutes, and (b) 10% will go to States without <u>Illinois Brick</u> repealer

---

[4]      According to the Supplemental Declaration of Kenneth Wexler, the Settlement Administrator received an opt-out request by Donegal Mutual Insurance.  Although it was submitted via U.S. mail with a meter date of October 5, 2023, it was postmarked on October 18, 2023, which is after the October 12, 2023. As such, Donegal Mutual Insurance has not been included among the opt-outs. (Supp. Decl. of Kenneth Wexler, ECF No. 985, ¶ 6.)

statutes.  Within each of these State Allocation pools, the funds shall be allocated with 45% going to consumers and 55% going to third party payors.  All funds in each pool will be exhausted, and, to the extent any funds remain after payment of all claims, End Payor Class members may receive more than 100% of their damages.

On October 16, 2023, Class Counsel filed the present Motion for Approval of Proposed Settlement and for Related Relief.  I held a final fairness hearing on October 19, 2023.

## II.    LEGAL STANDARDS

Class actions settlements are distinguished from those in most normal suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); see also In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig. ("G.M. Trucks"), 55 F.3d 768, 785 (3d Cir. 1995).  This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805).  A district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate."  In re Nat'l Football League Players Concussion Injury Litig. ("In re NFL"), 775 F.3d 570, 581 (3d Cir. 2014) (quoting Fed. R. Civ. P. 23(e)(2)).  The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

In order to fulfill this duty, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished." In re Cendant, 264 F.3d 201, 231 (3d Cir. 2001) (quotations omitted).  "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." G.M. Trucks, 55 F.3d at 785 (quotations omitted).

While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Id. at 299 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)).

Where the court has not already certified the class prior to evaluating the settlement, the court must determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and (b), and then separately determine whether the settlement is fair to the class under Rule 23(e). In re NFL, 775 F.3d at 581; In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010).

Under Rule 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorney's fees. The amount of an attorney's fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted).

## III.    CERTIFICATION OF A SETTLEMENT CLASS

Prior to inquiring into the fairness of the Settlement, I must first ensure that the certification requirements set forth in Federal Rule of Civil Procedure 23(a) and (b) have been satisfied. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997); In re NFL, 775 F.3d at 581. The Supreme Court has made clear that "[s]ettlement is relevant to a class certification." Amchem Prods., 521 U.S. at 619. Consequently, a district court "may take the proposed settlement into consideration when

examining the question of certification." In re Prudential Ins. Co., 148 F.3d at 308.  Specifically, the Supreme Court has explained:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions— demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

Amchem, 521 U.S. at 620 (citations omitted).  The court should put particular emphasis on the Rule 23(a)(4) requirement that the representative will fairly and adequately protect the interests of the class.  In re Pet Food Prods., 629 F.3d at 341–42.

I have already engaged in an extensive analysis of the certification requirements when certifying the EPPs as an issues class under Federal Rule of Civil Procedure 23(c)(4).  In re Suboxone, 421 F. Supp. 3d 12, 65–78 (E.D. Pa. 2019).  Thereafter, in granting preliminary approval of the EPP Settlement, I more fully reviewed the requirements under Fed. R. Civ. P. 23(a) and 23(b)(3) to determine that in connection with and solely for purposes of settlement, a settlement class meets all of the requirements and is superior to other available methods for the fair and efficient adjudication of this action.  Moreover, after considering the factors in Rule 23(g)(1)(A), I appointed Interim Co-Lead Counsel, Hilliard & Shadowen LLC, Wexler Boley & Elgersma LLP, Motley Rice LLC, and Miller Law LLC as Co-Lead Counsel for the End Payor Class.  (ECF No. 935.)  I reaffirm those rulings here.

## IV.    FAIRNESS OF THE SETTLEMENT

After determining that a proposed settlement class may properly be certified under Rule 23, the court must evaluate the fairness of a proposed class action settlement under Rule 23(e).  See In

re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) ("'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate.'" (quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998)).   The Third Circuit, in In re Cendant Corp. Litigation, 264 F.3d 201 (3d Cir. 2001), directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." Id. at 232 n.18; see also In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004)

In Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit "identified certain factors which district courts may employ in informing their discretion before granting final approval to the class action settlement." Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 571 (E.D. Pa. 2001) (citing Girsh). "[T]he district court must make findings as to each of the nine Girsh factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)." In re Pet Food Prods., 629 F.3d at 350.   The Girsh factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157.

Subsequently, in <u>In re Prudential Insurance Company America Sales Practice Litigation Agent Actions</u>, 148 F.3d 283 (3d Cir. 1999), the Third Circuit cited a "sea-change in the nature of class actions" and advised that "it may be useful to expand the traditional <u>Girsh</u> factors" when appropriate. <u>Id.</u> at 323. The additional factors for consideration cited by the <u>Prudential</u> Court include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

<u>Id.</u> These <u>Prudential</u> factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." <u>In re Pet Food Prods.</u>, 629 F.3d at 350.

Finally, in <u>In re Baby Products Antitrust Litigation</u>, 708 F.3d 163 (3d Cir. 2013), the Third Circuit added that "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class." <u>Id.</u> at 174. "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." <u>Id.</u>

Ultimately, the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the appellate court gives great deference to the district court's factual findings. <u>Girsh</u>, 521 F.2d at 156. There is an overriding public interest in

settling class action litigation, and it should therefore be encouraged.  See G.M. Trucks, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re Sch. Asbestos Litig., 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years").  As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig., 333 F.R.D. 364, 378 (E.D. Pa. Sept. 24, 2019) (quoting In re Baby Prods., 708 F.3d at 175)).

With these standards in mind, my review of the Settlement here entails several steps.  I will first address whether the Settlement is entitled to a presumption of fairness as described in the Cendant case.  I will then individually address the Girsh, Prudential and Baby Products factors.

### A.    Presumption of Fairness

As set forth above, a proposed settlement is entitled to an initial presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  In re Cendant, 264 F.3d at 232 n.18; see also In re NFL, 821 F.3d at 436.

All of these factors are satisfied here.  First, it is undisputed that the settlement negotiations occurred at arm's length.  The parties engaged in settlement negotiations through approximately six months of mediation.  During all of these mediation sessions, in which I was personally involved, the parties maintained adversarial positions requiring intensive advocacy and negotiation.

Second, the parties engaged in sufficient discovery, which took place over the course of approximately ten years and involved the review and analysis of thousands documents and

deposition transcript pages.  Experts were engaged and provided comprehensive reports, and the parties had the opportunity to test their legal theories via numerous motions.

Third, as noted above, Class Counsel, who are the proponents of the Settlement, are highly experienced in similar class litigation.  As I found in my Opinion certifying the EPP issues class, Class Counsel has extensive experience handling complex class action litigation, particularly in the antitrust context.  In re Suboxone, 421 F. Supp. 3d 12, 68 (E.D. Pa. 2019).

Finally, as will be discussed in more detail below, the response to the Class Settlement has been overwhelmingly favorable.  Nearly 110,000 Settlement Class Members have filed claims to participate in the Settlement, only thirty-seven Class Members have sought exclusion from the Class, and no one has filed an objection.

In light of these factors, I find that the proposed Settlement is entitled to a presumption of fairness.  While this presumption does not obviate the need for scrupulous analysis under the Girsh, Prudential, and Baby Product factors, it does skew the analysis in favor of approving the Settlement.

**B.    Application of the *Girsh* Factors**

1.    Complexity, Expense, and Likely Duration of the Litigation (Factor 1)

"The first factor 'captures the probable costs, in both time and money, of continued litigation.'"  In re Warfarin, 391 F.3d 535–36 (quoting In re Cendant, 264 F.3d at 233)); see also In re NFL, 821 F.3d at 437.

This suit involves complicated antitrust issues in the realm of pharmaceutical manufacturing. "An antitrust class action is arguably the most complex action to prosecute . . ."  In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quotations omitted); see also In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive.").  Continued prosecution of the claims would have required litigation of Defendant's then-pending motion to dismiss for lack of standing and/or

decertification of the class.  Even if the EPPs were successful, there would have been complicated pretrial proceedings, multiple motions *in limine*, fact witness testimony, and costly expert witness testimony.  The class certified for trial included only eleven represented states and was limited to a liability issues class, meaning that even if the EPPs won on liability, they would have had to individually pursue any further claim for damages.  Such litigation would have entailed new counsel, new expert litigation, and new trials.  Ultimately, the settlement eliminated these risks and provided immediate and guaranteed recovery for a class including forty-eight states and two territories.  Because such private resolution of the conflict "reduces expenses and avoids delay," this factor weighs heavily in favor of approving the Settlement.  McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015).

### 2. Reaction of the Potential Class Members to the Settlements (Factor 2)

The second Girsh factor—the reaction of the classes to the settlement—"attempts to gauge whether members of the class support the settlement."  In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 254 (D. Del. 2002) (quoting In re Prudential, 148 F.3d at 318).

Here, in response to widespread notice, only thirty-seven potential class members have opted out.  The ten TPP opt-outs are entirely made up of those who previously opted out of the Class to engage in state court litigation.  At the time of the final fairness hearing, the claims administrator had received no objections, and, during the hearing itself, there were no objectors.  Finally, even though the due date for claim forms is not until February 17, 2004, 110,000 claim forms have already been submitted.  Accordingly, this factor favors approval of the Settlement.

### 3. Stage of Proceedings and Amount of Discovery Completed (Factor 3)

Through the "lens" of the third Girsh factor—the stage of the proceedings and the amount of discovery competed—courts can determine whether counsel had an "adequate appreciation of the merits of the case before negotiating."  In re Prudential, 148 F.3d at 319 (quoting G.M. Trucks, 55

F.3d at 813).  "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair."  Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999) (citing Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, ten years of active litigation transpired during which extensive discovery was exchanged, depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued.  Only after the grant of class certification, the issuance of rulings on Daubert motions, and the denial of Defendant's motions for summary judgment did the parties reach the settlement.  Given this record, I find that the parties had a well-developed appreciation of the merits of the case prior to negotiation.

4.    Risks of Establishing Liability & Damages (Factors 4 and 5)

The fourth and fifth Girsh factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  In re Warfarin, 391 F.3d at 537.

As I have repeatedly noted, over the ten-year litigation period, a favorable outcome was far from guaranteed to the EPPs.  The EPPs put forth novel theories of antitrust liability.  If the EPPs had gone to trial on liability and won, they still would have had to file and prove individual cases on impact and damages.  Thus, a successful trial for the eleven-state class would not have yielded an immediate or guaranteed recovery in every follow-up trial.  "The dispute over damages would likely have resulted in an expensive battle of the experts and there was no way to anticipate a jury's response to intricate economic data."  McDonough, 80 F. Supp. 3d at 644.  Ultimately, the EPPs faced the risk of a lower or zero recovery had they pursued trial over settlement.

By the same token, I note that while the EPPs' likelihood of prevailing was far from certain, "there is no indication this case was brought in bad faith simply to generate attorneys' fees, or that the case [was] too weak to succeed under most circumstances."  Reibstein v. Rite Aid Corp., 761 F.

Supp. 2d 241, 253 (E.D. Pa. 2011).  Indeed, the EPPs successfully thwarted Defendant's extensive

motion for summary judgment.  Ultimately, the Settlement provided the certainty of a $30 million

immediate recovery without subjecting the EPPs to the rigors of a difficult trial.  As such, I find

these factors weigh in favor of the Settlement.

> 5.    Likelihood of Obtaining and Keeping Class Certification Through Trial
>        (Factor 6)

The sixth Girsh factor "measures the likelihood of obtaining and keeping a class certification

if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification

have a great impact on the range of recovery one can expect to reap from the class action."  In re

Warfarin, 391 F.3d at 537 (internal quotations & citation omitted).  Class certification is tenuous, as

a "district court retains the authority to decertify or modify a class at any time during the litigation

if it proves to be unmanageable."  Id. (citation omitted).

Here, the EPPs were certified only as an issues class under Fed. R. Civ. P. 23(c)(4).  Just

prior to the settlement, Defendant had moved to decertify the class on grounds of lack of standing

under TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021).  While Defendant's chances of

prevailing on this motion remain unknown, the EPPs had to negotiate the settlement with the specter

of this motion looming.  Had Defendant succeeded in having the class de-certified, the EPPs would

have been unable to pursue relief on any class basis.  The settlement here guarantees some recovery

to all potential class members, both named and unnamed.  As such, this factor weighs in favor of

approving the settlement.

> 6.    Ability of Defendants to Withstand a Greater Judgment (Factor 7)

The ability of the Defendants to withstand a greater judgment generally only comes into play

when "a settlement in a given case is less than would ordinarily be awarded but the defendant's

financial circumstances do not permit a greater settlement."  Reibstein, 761 F. Supp. 2d at 254.  The

Third Circuit has noted that simply because a defendant "could afford to pay more does not mean that it is obligated to pay any more than what the [class members] are entitled to under the theories of liability that existed at the time the settlement was reached." In re Warfarin, 391 F.3d at 538.

Here, although the EPPs did not know precisely what Defendant's financial situation was, it was nonetheless a factor for consideration in the settlement negotiations. Defendant already had a $600 million judgment against it by the Department of Justice and faced other litigation both in the state courts, and in federal court by forty-two States' Attorneys General and a class of direct purchasers. Settlement by the EPPs provided a greater guarantee that they would be able to collect on their judgment.

> 7.   Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and to a Possible Recovery in Light of All Attendant Risks of Litigation (Factors 8 & 9)

"The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." In re Warfarin, 391 F.3d at 538 (citations omitted). In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." In re Prudential, 148 F.3d at 322 (quoting G.M. Trucks, 55 F.3d at 806 (further quotations omitted)). In conducting this evaluation, it is recognized "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation." In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at *11 (E.D. Pa. Jan. 4, 2001). "The fact that a proposed settlement may only amount to a fraction of the potential recovery

does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.  The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh." In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citations omitted) (internal quotations marks omitted), aff'd, 264 F.3d 201 (3d Cir. 2001).

The settlement here is reasonable in light of the best possible recovery.  The EPPs had only calculated their recovery in terms of overcharges, not actual damages, and their overcharge amount did not take into account the impact that rebates would have.  Their overcharge figures for an eleven-state class ranged from approximately $230 million to almost $300 million.  The total EPP settlement of $30 million is approximately ten percent of the best possible recovery situation.  Courts have approved settlements in and around this range.  See In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (citing in part In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement in the appropriate amount of 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); Erie Forge and Steel, Inc. v. Cyprus Minerals Co., No. 94-cv-404, 1994 WL 485803 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); Fox v. Integra Financial Corp., No. 90-dv-1504 (W.D. Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); In re Four Seasons Sec. Litig., 58 F.R.D. 19, 36–37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million)).

The settlement becomes even more reasonable when considered against the attendant risks of litigation.  The settlement was achieved after ten years of litigation.  Class certification was granted to an eleven-state class on liability issues only.  As such, the best-case recovery scenario could not have been obtained through a singular trial.  And Defendant had its own competing

economic experts who would have challenged the EPPs' damages calculation at every angle, potentially lowering the recoverable damages. "After considering the present-day-value of money, the likelihood that the class would recover less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness." <u>Jackson v. Wells Fargo Bank, N.A.</u>, 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); <u>see also</u> <u>In re NFL</u>, 821 F.3d 410, 440 (3d Cir. 2016) (holding that, in considering the eighth and ninth <u>Girsh</u> factors, "we must take seriously the litigation risks inherent in pressing forward with the case" including the possibility that litigation could leave class members with "no recovery at all").

Taking all of this into consideration, I find that the eighth and ninth <u>Girsh</u> factors weigh in favor of approval of the Settlement.

8.    <u>Summary of the *Girsh* Factors</u>

In sum, all of the <u>Girsh</u> factors favor approval of the EPP Settlement. Although the <u>Girsh</u> factors are simply a guide, I find that, under these considerations, the Settlement is fair and reasonable.

**C.    <u>The *Prudential* Factors</u>**

The <u>Prudential</u> factors involve multiple additional considerations, including: (1) "the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages"; (2) "the existence and probable outcome of claims by other classes and subclasses"; (3) "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants"; (4) "whether class or subclass members are accorded the right to opt out of the settlement"; (5) "whether

any provisions for attorneys' fees are reasonable"; and (6) "whether the procedure for processing individual claims under the settlement is fair and reasonable." In re Prudential, 148 F.3d at 323. Only the Prudential factors relevant to the litigation in question need be addressed. Id. 323–24; In re Cigna-American Specialty Health Admin. Fee Litig., No. 16-cv-3967, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019).

The first factor—maturity of the underlying substantive issues—substantially mirrors Girsh factor three, the stage of the proceedings. Under this factor, the advanced development of the record weighs in favor of approval. See Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken."). As oft-repeated, the Settlement here came on the heels of ten years of active litigation during which extensive discovery was exchanged, expert reports were obtained and exchanged, and vigorous motion practice was pursued. Class Counsel had the benefit of assessing the strength and weaknesses of the case based on this discovery and the Defendants' motions. Moreover, the Settlement resulted from extensive negotiations in which I acted as the mediator. Accordingly, I find that the Settlement was premised on a significantly mature record.

Factors two and three look at the outcomes of claims by other classes and other claimants. The DOJ had already obtained a $600 million judgment against Defendant for similar conduct, $60 million of which was distributed to consumers, many of whom may be members of the End Payor Class. Defendant also faced antitrust claims from multiple other claimants and classes including the States' Attorneys General, the Direct Purchaser Class, and a group of opt-out End Payors pursuing state court litigation in Virginia and Kentucky. The Settlement here permits class members from forty-eight States to potentially recover the full amount of overcharge damages they suffered

as a result of the alleged anticompetitive conduct. Thus, there do not appear to be any disparities in the success of the settlements obtained by the various claimants.

Factor four considers whether class or subclass members are accorded the right to opt out of the settlement. The Notice Program pursued after preliminary approval of the settlement specifically advised potential class members of their right to opt out of the settlement. Only thirty-seven end payors did so. The release of claims against Defendants does not apply to those plaintiffs who opt out.

Pursuant to the fifth factor—the reasonableness of attorneys' fees—the Notice Program specifically advised potential Class Members that:

> If the Court approves the Settlement, Co-Lead Counsel will ask the Court for an award of attorneys' fees of one-third (1/3) from the Settlement Fund (plus a proportionate share of the interest on any portion of the funds deposited in escrow pursuant to Court Order), and reimbursement of litigation expenses incurred in the case . . .Co-Lead Counsel may also request additional attorneys' fees and reimbursement of expenses in connection with the administration and preservation of the Settlement Fund. If the Court grants Co-Lead Counsel's requests, these amounts would be deducted from the Settlement Fund. You will not have to pay these fees, expenses, and costs out of your own pocket. The administrative expenses for the Settlement will also be paid out of the Settlement Fund . . . You can tell the Court you do not agree with Co-Lead Counsel's request for attorneys' fees and expenses . . . for the End Payor Plaintiffs, by filing an objection . . .

(ECF No. 930-9, p. 11.) While the reasonableness of these requested fees is discussed in more detail below, I find—for purposes of approving the fairness of the Settlement—that the notice to the Class Members about the requested fees was reasonable.

Under the fifth factor—the procedure for processing individual claims under the settlement—I find that the process is both fair and reasonable. End Payor Class members must complete a form (available on an electronic template), provide information about their purchases of brand or generic Suboxone, and "if possible" provide documentation of at least one purchase of

brand or generic Suboxone.   The form can be submitted online or returned by mail and postmarked by February 17, 2024, giving class members six months to comply with the requirements.  Once the Settlement Administrator completes the processing and calculation of the settlement awards for all timely-filed claims, final recommendations will be submitted to the Court for approval.  The Net Settlement Fund will be paid pursuant to the plan of allocation and divided *pro rata* among all End Payor Class members whose claims are approved, based on their purchases of brand and generic Suboxone in the various state.

Overall, the Prudential factors raise no concerns regarding the fairness of the Settlement. The Settlement was reached at mature stage of the litigation, and the Settlement's terms appropriately set forth how to file a claim, how the monies will be distributed, how to opt out of the Settlement, and what the potential attorneys' fees and costs awards could be.  Ultimately, the Settlement is consistent with those obtained by the other claimants in the related actions.  As such, I find that the Prudential factors favor approval of the Settlement.

### D.    *Baby Products* Direct Benefit Factor

The final factor I must consider in my analysis of the Settlement's fairness is "the degree of direct benefit provided to the class."  In re Baby Products Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013).  As noted above, "[i]n making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards."  Id.; see also In re Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 329 (3d Cir. 2019).

Here, the Plan of Allocation provides that:

- The Net Settlement Fund means the Settlement Fund Amount ($30 million) less Court-approved attorneys' fees, reimbursement of costs and expenses, service awards, and fees

and costs associated with issuing notice and claims administration in accordance with the Settlement.

- The Net Settlement Fund shall have two "State Allocation Pools":  (a) the "Repealer State Allocation Pool," and (b) the "Non-Repealer State Allocation Pool."

- The Net Settlement Fund shall be divided among the State Allocation Pools as follows: (a) ninety percent (90%) of the Net Settlement Fund to the Repealer State Allocation Pool, and (b) ten percent (10%) of the net Settlement Fund to the Non-Repealer State Allocation Pool.

- Within each Pool, the amounts available for distribution to eligible claimants shall be allocated 45% to consumers ("Consumer Pool") and 55% to Third Party Payors ("TPP Pool").  Claimants shall be paid only out of the State Allocation Pool for which they are eligible.

- All funds in each State Allocation must be exhausted if possible, subject to the following: (a) to the extent that any money available for the Consumer Pool within a State Allocation Pool remains undistributed, such funds shall be used to pay valid claims of TPPs within that State Allocation Pool, and vice versa; and (b) to the extent that any money available for distribution within a State Allocation Pool, such funds shall be distributed to End Payor Class members previously submitting claims to and receiving payment from the State Allocation Pool, whether or not that results in such End Payor Class members receiving more than 100% of their damages.

- Eligible Claimants in the Repealer State Allocation Pool consist of consumers and TPPs in the End Payor class with purchases or payments made in or, or residing in, the following States:  Alaska, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, an Wisconsin.

- Eligible Claimants in the Non-Repealer State Allocation Pool consist of consumers and TPPs in the End Payor Class with purchases or payments made in, or residing in, the following States:  Arkansas, Colorado, Connecticut, Delaware, Georgia, Idaho, Kentucky, Louisiana, Montana, New Jersey, Oklahoma, Texas, Washington, and Wyoming.

(Plan of Allocation, ECF No. 930-7.)

As discussed above, Class Members will be entitled to recover up to 100% of their purchase price if sufficient funds are available.  Ultimately, this Settlement prioritizes the maximum number of potential Class Members receiving a direct benefit from the litigation.  In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig., 333 F.R.D. 364, 385 (E.D. Pa. 2019) (approving class

settlement where, "[d]espite a weak case, Class Counsel continued to prioritize obtaining a direct benefit for potential Class Members and ultimately achieved a Settlement with the potential to directly benefit an estimated 3.5 million consumers").

       **E.**    **Conclusion as to Fairness of the Settlement**

In light of the foregoing, I find that the Settlement is fair, reasonable, and adequate.  Lending the Settlement the requisite presumption of fairness, I note that all of the <u>Girsh</u> factors, all of the <u>Prudential</u> factors, and the <u>Baby Products</u> direct benefit consideration weigh in favor of approval.  Accordingly, I will grant final approval to Settlement.

## V.    APPROVAL OF THE PLAN OF ALLOCATION

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself.  <u>McDonough v. Toys R Us, Inc.</u>, 80 F. Supp. 3d 626, 648 (E.D. Pa. 2015).  "Therefore, the proposed plan needs to be fair, reasonable and adequate."  <u>Id.</u> (citing <u>In re Baby Prods.</u>, 708 F.3d at 174).  "A district court 's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'"  <u>Sullivan v. DB Investments, Inc.</u>, 667 F.3d 273, 326 (3d Cir. 2011) (quoting <u>Walsh v. Great Atl. & Pac. Tea Co., Inc.</u>, 726 F.2d 956, 964 (3d Cir. 1983)).

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  <u>In re Ikon Office Solutions, Inc., Secs. Litig.</u>, 194 F.R.D. 166, 184 (E.D. Pa. 2000).  Repeatedly, courts have approved of similar plans of allocation.  <u>See, e.g.</u>, <u>In re Flonase Antitrust Litig.</u>, 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where, in antitrust action against brand name drug manufacturer, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying purchases of the brand name drug); <u>Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company)</u>, 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007)

(approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); In re Remeron Direct Purchaser Antitrust Litig., No. 03-cv-0085, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses . . . in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade.  Such a method of allocating the Net Settlement Fund is inherently reasonable."); see also In re Corel Corp. Inc. Secs. Litig., 293 F. Supp. 2d 484, 493 (E.D. Pa. Jan. 4, 2001) (noting that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.").

Here, the proposed Plan of Allocation is fair, reasonable, and adequate as it provides a straightforward method for determining each Class Member's pro rata share of the Net Settlement Fund and then reimburses Class Members based on the type and extent of their injuries.  As set forth in more detail above, the process for submission of claims is simple as End Payor Class members need only complete a form with information about their purchases of brand or generic Suboxone, and "if possible" provide documentation of at least one purchase of brand or generic Suboxone.  The settlement funds from Defendant will be subject to deductions for approved attorneys' fees, administrative costs, litigation costs, and incentive payments.  Ninety percent of the net amount shall be given to the "Repealer State Allocation Pool" and ten percent will go into the "Non-Repealer State Allocation Pool."  From each of those pools, 45% will be paid out to consumers, while 55% will be paid out to third party payors.  The amounts will be allocated on a *pro rata* basis and all Class Members will receive a proportionate award based on the amounts they paid for brand and generic Suboxone during the class period.  All of the net settlement amounts will be reimbursed to Class Members.

I will therefore approve the proposed Plan of Allocation.

## VI.   MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND INCENTIVE AWARDS

The final portion of my review of the Settlement requires consideration of the EPPs' Motion for (1) an award of attorneys' fees, (2) reimbursement of litigation expenses, and (3) incentive awards for the class representatives.

### A.   Attorneys' Fees

The EPPs seek an award of attorneys' fees in the amount of $10 million plus accrued interest—approximately one-third of the Class Settlement Fund—on behalf of Class Counsel.

Under Federal Rule of Civil Procedure 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorneys' fees. The amount of an attorneys' fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted).   "'[A] private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.'"   In re Cendant, 404 F.3d at 187 (quoting G.M. Trucks, 55 F.3d 768, 820 n.39).

In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method.  The percentage-of-recovery method is generally favored in common fund cases, such as the one here, because it allows courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for its failure."   In re Prudential, 148 F.3d at 333 (internal quotations omitted); see also In re Rite Aid Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (finding that the "percentage of the fund" method is the proper method for calculating attorneys'

24

fees in common fund class actions in this Circuit.); <u>Kirsch v. Delta Dental of New Jersey</u>, 534 F.

App'x 113, 115 (3d Cir. 2013) ("The percentage of recovery method is generally favored in common

fund cases . . .") (quotations omitted).

In <u>Gunter v. Ridgewood Energy Corp.</u>, 223 F.3d 190 (3d Cir. 1990), the Third Circuit

directed that, when analyzing a fee award in a common fund case, a district court must consider

several factors, including:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of
> the class to the settlement terms and/or fees requested by counsel; (3)
> the skill and efficiency of the attorneys involved; (4) the complexity
> and duration of the litigation; (5) the risk of nonpayment; (6) the
> amount of time devoted to the case by plaintiffs' counsel; and (7) the
> awards in similar cases.

<u>Id.</u> at 195 n. 1.  This list was not intended to be exhaustive.  <u>Id.</u>

In <u>In re Prudential</u>, the Third Circuit identified three other factors that may be relevant and

important to consider: (1) the value of benefits accruing to class members attributable to the efforts

of class counsel as opposed to the efforts of other groups, such as government agencies conducting

investigations, (2) the percentage fee that would have been negotiated had the case been subject to

a private contingent fee agreement at the time counsel was retained, and (3) any "innovative" terms

of settlement.  148 F.3d at 336–40.

Ultimately,  in  reviewing  an attorneys' fees award in  a class action settlement,  a  district

court should consider the <u>Gunter</u> factors, the <u>Prudential</u> factors, and any other factors that are useful

and relevant with respect to the particular facts of the case.  The fee award reasonableness factors

"need not be applied in a formulaic way" because each case is different, "and in certain cases, one

factor may outweigh the rest."  <u>In re Rite Aid</u>, 396 F.3d at 301 (quoting <u>Gunter</u>, 223 F.3d at 195

n.1).  In cases involving extremely large settlement awards, district courts may give some of these

factors less weight in evaluating a fee award.  <u>See In re Cendant Corp. Litig.</u>, 264 F.3d 201, 283–84

(3d Cir. 2001); In re Prudential, 148 F.3d at 339.  What remains important is that, in all cases, the district court "engage in robust assessments of the fee award reasonableness factors," In re Rite Aid, 396 F.3d at 302, recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements."  In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001) (internal quotations omitted); see also In re AT&T Corp., 455 F.3d 160, 165–66 (3d Cir. 2006).

Once all of the Gunter and Prudential factors have been considered, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method.  In re Prudential, 148 F.3d at 333.  More specifically, the district court should apply the percentage-of-recovery method and then do "an abridged lodestar analysis"—multiplying the number of hours reasonably worked on a case by a reasonable billing rate—and compare it against the percentage-of-recovery method.  In re Rite Aid, 396 F.3d at 305–06.  In doing so, the court can ensure that the percentage-of-recovery method does not yield too high or low of an award. Id. at 306.

With these standards in mind, I consider each of the Gunter and Prudential factors and then cross-check the percentage-of-recovery amount against a lodestar analysis to provide an overall assessment of the reasonableness of the requested attorneys' fees.

      1.     Gunter/Prudential Factors

          a.     *Size of the Fund Created & Number of Persons Benefitted*

The Settlement Agreement establishes a total recovery of $30,000,000, from which administrative expenses, attorneys' fees, and costs must be paid.  See Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (noting that "size of the fund" should include attorneys' fees, and administration expenses); Lake Forest Partners, L.P. v. Sprint Commc'ns Co. L.P., No. 12-cv-00999, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013)  (the size of the fund

should include the "separate payment of attorney's fees and expenses, and the expenses of administration") (citing Boeing Co. v. Van Gemert, 444 U.S. 472, 479 (1980)).  Notice has been disseminated to thousands of potential Class Members through the Notice Program as described above, and nearly 110,000 Class Members have filed claims as of the date of the final fairness hearing.

Class Counsels' requested fees in this case represent 33 1/3 % of the total recovery—a percentage which is well within the range of reasonable fees, on a percentage basis, in the Third Circuit.  See, e.g., Esslinger v. HSBC Bank Nevada, No. 10-cv-3213, 2012 WL 5866074, at *12 (thirty percent fee award reasonable considering size of the fund); In re Processed Egg Prods. Antitrust Litig., No. 08–md-2002, 2012 WL 5467530, at *6 (E.D. Pa. Nov. 9, 2012) (approving a thirty percent (30%) fee award for $25,000,000.00 settlement); In re Flonase Antitrust Litig., 291 F.R.D. 93, 104 (E.D. Pa. 2013) (citing cases and remarking that "[a] one-third fee award is standard in complex antitrust cases of this kind" and "is consistent with awards in other complex antitrust actions involving the pharmaceutical industry") (quotations omitted).  Accordingly, this factor weighs in favor of finding the fee request reasonable.

### b.   Presence or Absence of Substantial Objections

The Notice Program specifically advised potential Class Members that Class Counsel would request an award of attorneys' fees of up to one-third of the total amount of the Settlement funds, plus costs, all of which would be paid from the Settlement funds.  Despite this widespread notice, no class member filed an objection.  Moreover, I note that 110,000 individuals have submitted claims, thus tacitly indicating their approval for the Settlement and requested attorneys' fees.

### c.   Skill and Efficiency of Attorneys' Involved

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation."  Gunter, 223

F.3d at 198 (quotations omitted).  "The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."  Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000) (quotations omitted).

As repeatedly discussed above, both in regard to class certification and with respect to the fairness of the Settlement, Class Counsel are skilled and effective class action litigators that have obtained a highly favorable settlement in an extremely complex case despite the fact that an end-payor litigation class was only certified on certain issues pertaining to litigation and not on damages. I need not reiterate those same considerations again here.  This factor therefore supports a 33 1/3% attorney fee award.

### d.     Complexity and Duration of the Litigation

"[C]omplex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the class by class counsel" are factors which "increase the complexity of class litigation."  In re Cendant Corp. PRIDES, 243 F.3d at 741.  All of those factors favor the requested fee award here.

The legal issues involved here were complex, implicating a novel theory of a product hop antitrust scheme.   Various groups of plaintiffs proceeded against Defendant.   Discovery was extensive and far-reaching, involving certification, fact, and expert discovery.   The case was hard-fought on both sides, with multiple, highly-contested motions, including motions to dismiss, discovery motions, certification motions, Daubert motions, and motions for summary judgment. Class Counsel spent more than 26,000 hours on the litigation.  Finally, after more than ten years of litigation, and many months of intensive mediation, the case reached a settlement.

In short, the litigation has been more than sufficiently lengthy and complex to justify the requested attorneys' fees.

e.      *Risk of Nonpayment*

The risk of nonpayment in this matter was not negligible.  Class Counsel began this litigation in 2013 on a contingent fee basis.  See In re Flonase, 291 F.R.D. at 104 ("[A]s a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial.  Throughout this lengthy litigation, Class Counsel have not received any payment.  This factor supports approval of the requested fee.").  Over the next ten years, Class Counsel devoted extensive amounts of time and resources to litigating this case, all while pursuing complex legal theories which brought with them no guarantee of recovery at trial.  Even in the event of recovery, the EPPs faced the substantial likelihood of challenge on appeal.  The risk of nonpayment was then significantly heightened by the fact that the EPP Class was not certified for damages.  Given Class Counsels' diligent pursuit of this case for more than a decade with significant risk and no immediate financial reward in sight, I find that this factor weighs in favor of the requested fee award.

f.      *Amount of Time Devoted to the Case by Counsel*

According to the Declaration submitted in support of Class Counsels' Motion for Attorneys' Fees, Class Counsel has spent 26,000 hours prosecuting of this case, all without any guarantee of payment.  (Wexler Decl. ¶ 24.)  Such expenditure of time at such great risk warrants the requested 33 1/3 % fee award.  See In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000) (granting a 30% fee request because "[c]ounsel expended more than 45,000 hours on this case and paid out expenses of more than $3 million with no guarantee of recovery" and the case presented "the legal obstacles of establishing scienter, damages, causation, and the like."); Cullen, 197 F.R.D. at 149–50 (finding that counsel's expenditure of 3,899.84 hours on litigation represented a "substantial commitment to this litigation" that warranted a counsel fee of 33 1/3 % of the settlement fund); Wallace v. Powell, 288 F.R.D. 347, 375 (M.D. Pa. 2012) (finding that counsel's

expenditure of 34,900.48 hours on prosecuting the matter reflected a "substantial commitment to this litigation" and "the complexity of Plaintiffs' claims").

> g.    *Awards in Similar Cases*

"While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund." Stevens v. SEI Invs. Co., No. 18-cv-4205, 2020 WL 996418, at *12 (E.D. Pa. Feb. 26, 2020) (citing G.M. Trucks, 55 F.3d at 822). Courts have consistently approved such awards. See, e.g., Myers v. Jani-King of Philadelphia, Inc., No. 09-cv-1738, 2019 WL 4034736, at *11 (E.D. Pa. Aug. 26, 2019) (citing cases and noting that "the requested fee of one-third (1/3) of the settlement amount is reasonable in comparison to awards in other cases."); In re Fasteners Antitrust Litig., No. 08-md-1912, 2014 WL 296954, at *7 (E.D. Pa. Jan. 27, 2014) ("Co-Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions) (citing cases); Stagi v. Nat'l R.R. Passenger Corp., 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) (noting that this District's fee awards generally range between nineteen and forty-five percent of the common fund); In re Merck & Co., Inc. Vytorin Erisa Litig., No. 08-cv-285, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) ("review of 289 settlements demonstrates "average attorney's fee percentage [of] 31.71% with a median value that turns out to be one-third") (quoting In re Remeron Direct Purchaser Antitrust Litig., No. 03-cv-0085, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); Nichols v. SmithKline Beecham Corp., No. 00-cv-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005) (approving 30% fee of the $65 million settlement in pharmaceutical antitrust class action); In re Linerboard Antitrust Litig., No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (approving 30% fee of a $202 million settlement in an antitrust class action).

Given the magnitude of this case, the efforts of Class Counsel, the risks borne, and the positive outcome, I find that the requested fee of 33 1/3 % recovery remains consistent with the awarded fee in other, similar cases.

> h.    *Value of Benefits Accruing to Class Members Attributable to the Efforts of Class Counsel as Opposed to the Efforts of Other Groups, Such as Government Agencies*

A significant factor to consider is whether Class Counsel was aided by a government investigation.  In re AT&T Corp., 455 F.3d 160, 173 (3d Cir. 2005).  "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underline the concept of the common fund, and would create an incentive for plaintiffs[s] attorneys to 'minimize the costs of failure . . . by free riding on the monitoring efforts of others.'"  In re Prudential, 148 F.3d at 337 (further quotations omitted).

Here, the EPPs filed suit almost approximately three years before the States' Attorneys General and five years before the federal government filed civil and criminal cases against Defendant.  Prior to either of these suits, the EPPs had already engaged in their own investigation and developed their own antitrust theories regarding Defendant's actions.  Class Counsel were subsequently able to coordinate discovery and the exchange of information with the Direct Purchaser class and the States' Attorneys General.

Moreover, as noted by the EPPs, the involvement of the federal government and its subsequent settlements with Defendant put the financial viability of Defendant, and thus the ability of the End Payor Class to recover anything, in question.  Nonetheless, Class Counsel pushed forwarded and litigated Daubert and summary judgment motions.  Any benefit gained from government agency involvement paled in comparison to the efforts of Class Counsel.

> *i.*      *The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Agreement at the Time Counsel Was Retained*

"In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts.  That is, we must consider 'the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained.'" In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008) (quoting In re AT & T Corp., 455 F.3d 160, 165(3d Cir. 2006)).  While not an easy calculation, it is an important exercise because "the goal of the fee setting process [is] to 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.'" In re Linerboard Antitrust Litig. ("Linerboard II"), 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004) (quoting In re Continental Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992)).  "[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.  In re Ikon Office Solutions, 194 F.R.D. at 194 (E.D. Pa. 2000); see also In re Remeron Direct Purchaser Antitrust Litig., No. 03-cv-0085, 2005 WL 3008808, at *16 (D.N.J. 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation.")

The requested fees here fall squarely within that range, as Class Counsel seeks an award of 33 1/3% of the Settlement Fund.  Therefore, this factor supports the requested fees.

> *j.*      *Innovative Terms of Settlement*

In certain cases, a district court may find that "class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.'" In re Prudential, 148 F.3d at 339 (quotations omitted).  Such a finding may be warranted where a settlement involved "innovative" or unique terms.  Id. (describing the findings of the lower court regarding plaintiffs' counsels' work on the settlement, including "the availability of full compensatory relief, the

extensive and comprehensive outreach, and the multi-tiered review process designed to ensure fair scoring of claims," among other characteristics).

Nothing in the Settlement here is particularly remarkable or innovative. Accordingly, there is no indication that this factor should bear on an attorney fee award.

> k.   Overall Review of the <u>Gunter</u> and <u>Prudential</u> Factors

All of the <u>Gunter</u> and <u>Prudential</u> factors—except one that weighs neither for nor against approval—supports the award of an attorneys' fees in the amount of 33 1/3 % of the Settlement. Taking them as a whole, I find that the scale is heavily tipped in favor of the requested attorneys' fee award.

> 2.   <u>Cross-Check Against Class Counsels' Lodestar</u>

The Third Circuit has suggested that it is "sensible" for district courts to cross check the percentage fee award against the "lodestar" method. <u>In re Rite Aid</u>, 396 F.3d at 305. The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. <u>Id.</u> The court must then use a multiplier, which is a device that "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." <u>Id.</u> at 305–06. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." <u>Id.</u> at 306. Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case." <u>In re Prudential</u>, 148 F.3d at 340–41.

Here, as noted above, Class Counsel spent approximately 26,000 working on this case on behalf of the class, which hours included preparing the initial Complaint and the Consolidated

Amended Class Action Complaint, conducting legal research, engaging in extensive discovery, briefing multiple motions or responses to motions for summary judgment, pursuing class certification, engaging and working with experts, preparing for trial, and pursuing settlement negotiations and settlement document drafting.  In addition, Class Counsel will undoubtedly need to spend additional hours in order to monitor and administer the Settlement and final closing of this case.

Rates for counsel appear to be well within the reasonable range for Class Counsels' experience and for the region.  The current hourly rates charged by class counsel take into account position, experience, level, and location, with the highest rate at somewhere between $900 and $1000 per hour for co-lead counsel Ken Wexler.  Courts have considered similar rates reasonable in the past.  Fulton-Green v. Accolade, Inc., No. 18-cv-274, 2019 WL 4677954, at *12 (E.D. Pa. Sept. 23, 2019) (approving class counsel's rates that ranged from $202 to $975 per hour); In re Viropharma Inc., Sec. Litig., No. 12-cv-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys."); In re Avandia Mktg., Sales Practices and Prods. Liab. Litig., No. 07-md-1871, 2012 WL 6923367, at * 10 (E.D. Pa. Oct. 19, 2012) (concluding a top hourly rate of $595 was "particularly reasonable in comparison" to the hourly rates of top Philadelphia firms).

According to counsel, taking the lodestar yields a number of $13,447,884.69.  Where there has been a class settlement, this lodestar "is usually multiplied by a factor to reflect the degree of success, the risk of non-payment the attorneys faced and perhaps the delay in payment that they encountered."  Brown v. Esmor Corr. Servs., No. 98-cv-1282, 2005 WL 1917869, at *13 (D.N.J. Aug. 10, 2005); see also In re Prudential, 148 F.3d 283, 340 (3d Cir. 1998) ("Multipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially

beneficial litigation, or may reward counsel for an extraordinary result."). The Third Circuit has recognized that lodestar multipliers from one to four "are frequently awarded" in class cases. In re Prudential, 148 F.3d at 341 (citing 3 Herbert Newberg & Albert Conte, Newberg on Class Actions § 14.03 at 14-5 (3d ed. 1992)).

Here, no such multiplier is necessary as the lodestar amount is even higher than the $10,000,000 percentage-of-recovery amount sought here. In other words, Class Counsel is requesting less than their total lodestar, making it within the accepted range in the Third Circuit.

### 3.  Conclusion as to Attorneys' Fees

Having thoroughly considered all of the Gunter and Prudential factors and having cross-checked the requested fee against the lodestar amount, I find nothing that would warrant denying or reducing the fee requested by Class Counsel. Indeed, by all measures, the requested fee is fair, reasonable, and commensurate with the skill of the attorneys, the amount of work they expended on this complicated litigation, and the results they achieved. Accordingly, I will grant attorneys' fees in the amount of $10,000,000 plus accrued interest.

### B.  **Reasonable Litigation Expenses**

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001). The court must consider whether the expenses were adequately documented and reasonably and appropriately incurred in the prosecution of the case. Demmick v. Cellco P'ship, No. 06-cv-2163, 2015 WL 13646311, at *4 (D.N.J. Apr. 30, 2015).

According to the Declarations submitted by Class Counsel, the EPPs have incurred $3,942.771.87 for expenses advanced to prosecute the litigation since 2013. Of these expenses, $2,519,904.62 includes, among other things, commercial copies, data extraction, internal

reproduction, court fees, court reporters/transcripts, computer research, telephone/fax/email, postage/delivery, professional fees (expert, investigator, accountant, etc.), witness/service fees, travel, and data hosting.  Class Counsel has broken down the fees both by category and by which law firm incurred them. Finding that these expenses were appropriately incurred in the prosecution of the class action, I award Class Counsel the requested fees in the amount of $2,519,904.62.

In addition, Class Counsel has filed an Amendment to their Motion for Litigation Expenses setting forth the anticipated costs of notice and claims administration relating to the End Payor Settlement.  That Amendment reflects the following additional costs: (a) a mathematical error understating out-of-pocket expenses by $66.13; (b) expenses from economist Greylock McKinnon Associates for Rena Conti's role in the settlement allocation process in the amount of $18,745.07; (c) additional expenses of $1,404,056.05 from the Settlement Administrator for additional expenses through the conclusion of the settlement administration and the payment of claims.  These additional sums total $1,404,056.05.

Having fully reviewed the documentation submitted by Class Counsel in support of both their original Motion and their Amended Motion, I find that the requested expenses were adequately substantiated and reasonably and appropriately incurred in the prosecution of the case.  Accordingly, I will award reasonable and necessary expenses in the total amount of $3,942.771.87.

### C.     Class Representative Incentive Awards

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 665 (E.D. Pa. 2015) (quotations omitted).  Generally, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quotation omitted); see also First State Orthopaedics

v. Concentra, Inc., 534 F. Supp. 2d 500, 524–25 (E.D. Pa. 2007) (citing Nichols v. SmithKline Beecham Corp., No. 00-cv-6222, 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005); Godshall v. Franklin Mint Co., No. 01-cv-5639, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004)).   Factors to be considered when deciding to give incentive awards include "the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class." McGee v. Ann's Choice, Inc., No. 12-cv-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014) (citing In re Plastic Tableware Antitrust Litig., No. 94-cv-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995)).

Here, Class Counsel requests incentive awards in the amount of $15,000 for each of the seven End Payor representatives for their efforts to date.   According to Class Counsel, each of these representatives assisted greatly in the prosecution of this case by communicating with counsel throughout the litigation, reviewing and approving the filing of the complaints and key motions, providing voluminous paper and electronic responses to numerous requests for documents and data, providing information for the experts, answering interrogatories, having an employee sit for deposition, agreeing to participate in trial, and conferring with counsel during the settlement negotiation process.

As noted by the EPPs, these requested incentive awards fall in line with those that have been approved in other cases.   See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-cv-1797, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (approving $100,000 incentive award for four class representatives, and $50,000 incentive awards for two other class representatives); In re Domestic Drywall Antitrust Litig., No. 13-md-2437, 2018 WL 3439454, at *20 (E.D. July 17, 2018)

(approving incentive awards to the four named Plaintiffs in the amount of $50,000); <u>Marchbanks Truck Serv. v. Comdata Network, Inc.</u>, No. 07-cv-1078, 2014 WL 12738907, at *3–4 (E.D. Pa. July 14, 2014) (awarding incentives in the amount of $150,000 to one class representative, $75,000 each to two others, and $15,000 to the fourth).

For these reasons, I will grant the requested incentive awards of $15,000 to each of the End Payor Plaintiffs, including:  A.F. of L. – A.C.G. Building Trades Welfare Plan, Construction & General Laborers' Local 190 Welfare Fund, I.B.E.W. 292 Health Care Plan, Michigan Regional Council of Carpenters Employee Benefits Fund, Painters District Council No. 30 Health and Welfare Fund, Teamsters Health Services and Insurance Plan Local 404, and United Food & Commercial Workers Health and Welfare Fund of Northeastern Pennsylvania—for a total of $105,000 in incentive payments.

## VII.    CONCLUSION

In light of the foregoing, I will approve the End Payor Class Settlement and Plan of Allocation.  In addition, I will (a) award End-Payor Class Counsel for the Settlement Classes attorneys' fees in the amount of $10,000,000, plus accumulated interest on the Class Settlement Fund; (b) reimburse Class Counsel $3,942.771.87 in litigation costs and expenses; and (c) award each of the End Payor Plaintiffs $15,000 (for a total of $105,000) to be paid from the Class Settlement Fund.

An appropriate Order follows.