**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE SUBOXONE (BUPRENORPHINE** | : | **MDL NO. 2445** |
| **HYDROCHLORIDE AND NALOXONE)** | : | **13-MD-2445** |
| **ANTITRUST LITIGATION** | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | |
| | : | |
| *Direct Purchaser Actions* | : | |
| | : | |

## MEMORANDUM OPINION

**Goldberg, J.**                                                  **February 27, 2024**

Currently before me in this multi-district antitrust case is the Direct Purchaser Plaintiffs' ("DPPs") Motion for Final Approval of the Settlement.  Upon review of the parties' briefing and considering the arguments at the final fairness hearing on February 27, 2024, I will certify a settlement class, grant final approval of the class action settlement, and award attorneys' fees, costs, and incentive payments as set forth in the accompanying Order.

## I.      FACTUAL AND PROCEDURAL HISTORY

Defendant Indivior, Inc. ("Defendant") manufactures Suboxone, a drug commonly used to combat opioid addiction.  Suboxone previously came in tablet form, but in 2010, citing safety concerns, Defendant effectuated a change in the administration of this drug, switching from tablet to sublingual film.  Various purchasers/consumers of Suboxone claimed that this switch was anticompetitive and solely designed to maintain Defendant's market exclusivity—a scheme known as a "product hop." These claims resulted in multi-district, antitrust litigation before this Court.[1]

---

[1]      The alleged antitrust scheme at issue is multi-faceted and explained at length in my Opinion regarding the denial of Defendant's Motion for Summary Judgment on liability in In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation, 622 F. Supp. 3d 22, 35–45 (E.D. Pa. 2022). I incorporate these facts by reference here.

Class Counsel for the DPPs ("Class Counsel") originally began investigating this case in August 2012.[2]  On December 12, 2012, certain Class Counsel firms, representing named Plaintiff Burlington Drug Company ("BDC"), filed the first antitrust lawsuit on behalf of a putative class of direct purchasers challenging Defendant's conduct with respect to its Suboxone product.  See Burlington Drug Co., Inc. v. Reckitt Benckiser Group plc, et al. Civ. A. No. 12-2828 (D. Vt.).  That suit was quickly followed by other, similar direct purchaser complaints on behalf of named Plaintiffs Rochester Drug Cooperative ("RDC") and Meijer, Inc and Meijer Distribution, Inc. (collectively, "Meijer").  On June 6, 2013, following referral of all of these cases to the United States Judicial Panel on Multidistrict Litigation, the cases were centralized in the United States District Court for the Eastern District of Pennsylvania. Notably, at the time these actions were instituted, no governmental entities were involved.

On August 15, 2013, Class Counsel filed a Consolidated Amended Complaint alleging that Defendant engaged in various acts and practices as a part of an overall scheme to coerce a switch of the Suboxone market from Suboxone tablets to Suboxone film and to delay the market entry of less-expensive versions of Suboxone tablets, in violation of Section 2 of the Sherman Act.

Defendant filed a motion to dismiss the DPPs' claims in September 2013.  While a portion of the motion was granted, most of that motion was denied.  Thereafter, the parties began discovery and the DPPs again amended their Complaint.  Full discovery commenced in March 2015, and proceeded for several years, during which numerous discovery disputes were litigated and resolved.  Class Counsel obtained approximately 6.7 million pages in discovery, deposed thirty-three fact witnesses, and defended multiple other depositions.  The parties also exchanged fifteen expert reports (not including rebuttal reports) on multiple issues pertinent to the antitrust claims and damages posed by the operative

---

[2]      Class Counsel includes attorneys from nine firms including Gerwin Gerstein & Fisher LLP, Faruqi & Faruqi LLP, Hagens Berman Sobol & Shapiro LLP, Berger Montague PC, Odom & Des Roches, LLC, Smith Segura Raphael & Leger LLP, Taus Cebulash & Landau LLP, the Radice Law Firm PC, and Sperling & Slater LLC (hereinafter, "Class Counsel").

Complaint, and the DPPs took seven depositions of Defendant's experts and defended eight depositions of their own experts.

On September 18, 2018, Class Counsel moved for class certification of the DPP class.  Defendant opposed this motion and also moved, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to exclude the DPPs' class certification expert.  Following extensive briefing and oral argument, I issued a Memorandum Opinion, dated September 27, 2019, granting the motion for class certification and denying Indivior's Daubert motion.  Defendant appealed this decision to the United States Court of Appeals for the Third Circuit, thus staying the case pending appeal.  On July 28, 2020, the Third Circuit issued a unanimous, precedential opinion affirming the class certification.  See In re Suboxone, 967 F.3d 264 (3d Cir. 2020).

While the appeal was pending, the parties briefed "Phase I" Daubert motions—i.e., motions to exclude non-economic expert opinions that would not be impacted by the Third Circuit's pending decision.  On November 23, 2020, I issued an extensive Opinion regarding the Phase I Daubert motions.  Subsequent to the Third Circuit's affirmance of class certification, I then considered the "Phase II" Daubert motions—i.e., motions to exclude economic experts.  I ruled on those Phase II motions on February 19, 2021.  Additionally, I rejected Defendant's two-time effort to disqualify named Plaintiff RDC as a class representative.

In March 2021, the parties filed extensive motions for summary judgment, including two separate motions by Defendant and a partial motion for summary judgment by the DPPs.  Ultimately, on August 22, 2022, I denied both of Defendant's motions in their entirety.  I reserved ruling on the DPPs' motion for summary judgment as to the relevant market, but ultimately denied it on August 30, 2023.

The parties also had ongoing disputes regarding the deposition of nine witnesses, who had previously invoked the Fifth Amendment in May 2018 while the Department of Justice ("DOJ") was engaged in a criminal investigation of Defendant.  After the closure of the DOJ's criminal charges

against Defendant, the DPPs sought, in December 2022, to subpoena and depose these witnesses. Several of the witnesses continued to invoke the Fifth Amendment, and the DPPs moved for an adverse inference as to their testimony.  That motion was ultimately mooted by the settlement of the case.

On December 16, 2022, following a conference with the parties, I set a trial date of September 18, 2023.  That date was later pushed to October 30, 2023, as a result of the settlement by the End-Payor Class.  The DPPs and Defendant began active trial preparation and filed forty-two motions *in limine*, as well as numerous motions relating to the other issues arising during pre-trial period.

In January 2023, upon all counsel's request, I engaged in mediation with the DPPs and Defendant.  Following several months of mediation, the DPPs and Defendant reached a settlement in the amount of $385 million, in exchange for a release of all antitrust, consumer protection, and unjust enrichment claims asserted on behalf of the certified class (the "Settlement").

On October 30, 2023, I entered an order for preliminary approval of the proposed Settlement, for preliminary certification of the settlement classes, for approval of an escrow agent and proposed escrow agreement, for appointment of a claims administrator, for permission to disseminate notice of the proposed settlement to members of the Class, and for a schedule up through the Fairness Hearing ("Preliminary Approval Order").

Following entry of the Preliminary Approval Order, Defendant deposited the settlement fund into the approved interest-bearing escrow account, and Co-Lead Counsel posted all relevant documents on their websites, including notice to the class, which was mailed by the claims administrator on November 20, 2023.  Pursuant to the Preliminary Approval Order, members of the DPP Class had until January 12, 2024 to object to either the Settlement and/or Class Counsel's request for attorneys' fees, reimbursement of expenses and service awards to the Class representatives.  As of the date of the filing of the Motion for Final Approval on February 2, 2024, no objections were filed, and several class members have submitted letters to the Court in affirmative support of the Settlement and/or Class Counsel's Revised Fee Submission.

I held a Final Fairness Hearing on February 27, 2024.

**II.    LEGAL STANDARDS**

Class actions settlements are distinguished from those in most normal suits because Federal Rule of Civil Procedure 23(e) mandates that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e); see also In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig. ("G.M. Trucks"), 55 F.3d 768, 785 (3d Cir. 1995).  This rule "imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re Prudential Ins. Co. Am. Sales Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting G.M. Trucks, 55 F.3d at 805).  A district court may approve a settlement agreement only "after a hearing and on finding that it is fair, reasonable, and adequate." In re Nat'l Football League Players Concussion Injury Litig. ("In re NFL"), 775 F.3d 570, 581 (3d Cir. 2014) (quoting Fed. R. Civ. P. 23(e)(2)).  The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008).

In order to fulfill this duty, the court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims would be extinguished." In re Cendant, 264 F.3d 201, 231 (3d Cir. 2001) (quotations omitted).  "The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." G.M. Trucks, 55 F.3d at 785 (quotations omitted).  While the court is to employ a vigorous analysis in fulfilling its fiduciary duty to protect the rights of absent class members, it must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." In re Prudential, 148 F.3d at 317 (quoting G.M. Trucks, 55 F.3d at 806).  "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Id. at 299 (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)).

Where the court has not already certified the class prior to evaluating the settlement, the court must determine whether the proposed settlement class satisfies the requirements of Rule 23(a) and (b), and then separately determine whether the settlement is fair to the class under Rule 23(e). In re NFL, 775 F.3d at 581; In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010).

Under Rule 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorney's fees. The amount of an attorney's fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted).

## III.    CERTIFICATION OF A SETTLEMENT CLASS

Prior to inquiring into the fairness of the Settlement, I must first ensure that the certification requirements set forth in Federal Rule of Civil Procedure 23(a) and (b) have been satisfied. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619 (1997); In re NFL, 775 F.3d at 581. The Supreme Court has made clear that "[s]ettlement is relevant to a class certification." Amchem Prods., 521 U.S. at 619. Consequently, a district court "may take the proposed settlement into consideration when examining the question of certification." In re Prudential Ins. Co., 148 F.3d at 308.

I already engaged in an extensive analysis of the certification requirements when certifying the DPPs as a litigation class under Federal Rule of Civil Procedure 23(b). In re Suboxone, 421 F. Supp. 3d 12, 45-65 (E.D. Pa. 2019). I need not re-engaged in that analysis for purposes of certifying a settlement class.

## IV.    FAIRNESS OF THE SETTLEMENT

After determining that a proposed settlement class may properly be certified under Rule 23, the court must evaluate the fairness of a proposed class action settlement under Rule 23(e). See In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) ("'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a

determination that the proposed settlement is fair, reasonable and adequate.'" (quoting <u>In re Prudential</u> <u>Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 316 (3d Cir. 1998)).   The Third Circuit, in <u>In re Cendant Corp. Litigation</u>, 264 F.3d 201 (3d Cir. 2001), directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  <u>Id.</u> at 232 n.18; <u>see also</u> <u>In re</u> <u>Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 535 (3d Cir. 2004)

In <u>Girsh v. Jepson</u>, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit "identified certain factors which district courts may employ in informing their discretion before granting final approval to the class action settlement."  <u>Schwartz v. Dallas Cowboys Football Club, Ltd.</u>, 157 F. Supp. 2d 561, 571 (E.D. Pa. 2001) (citing <u>Girsh</u>).   "[T]he district court must make findings as to each of the nine <u>Girsh</u> factors in order to approve a settlement as fair, reasonable, and adequate, as required by Rule 23(e)."  <u>In re Pet Food Prods.</u>, 629 F.3d at 350.  The <u>Girsh</u> factors include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

<u>Girsh</u>, 521 F.2d at 157.

Subsequently, in <u>In re Prudential Insurance Company America Sales Practice Litigation Agent</u> <u>Actions</u>, 148 F.3d 283 (3d Cir. 1999), the Third Circuit cited a "sea-change in the nature of class actions" and advised that "it may be useful to expand the traditional <u>Girsh</u> factors" when appropriate.  <u>Id.</u> at 323. The additional factors for consideration cited by the <u>Prudential</u> Court include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other

> factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Id.  These Prudential factors are "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." In re Pet Food Prods., 629 F.3d at 350.

Finally, in In re Baby Products Antitrust Litigation, 708 F.3d 163 (3d Cir. 2013), the Third Circuit added that "one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class." Id. at 174.  "In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.

Ultimately, the "decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court," and the appellate court gives great deference to the district court's factual findings.  Girsh, 521 F.2d at 156.   There is an overriding public interest in settling class action litigation, and it should therefore be encouraged.  See G.M. Trucks, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); In re Sch. Asbestos Litig., 921 F.2d 1330, 1333 (3d Cir. 1990) (noting that the court encourages settlement of complex litigation "that otherwise could linger for years").  As a result, "when evaluating a settlement, a court should be 'hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." In re Comcast Corp. Set-Top Cable TV Box Antitrust Litig., 333 F.R.D. 364, 378 (E.D. Pa. Sept. 24, 2019) (quoting In re Baby Prods., 708 F.3d at 175)).

With these standards in mind, my review of the Settlement here entails several steps.  I will first address whether the Settlement is entitled to a presumption of fairness as described in the <u>Cendant</u> case.  I will then individually address the <u>Girsh</u>, <u>Prudential</u> and <u>Baby Products</u> factors.

### A.   <u>Presumption of Fairness</u>

As set forth above, a proposed settlement is entitled to an initial presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  <u>In re Cendant</u>, 264 F.3d at 232 n.18; <u>see also</u> <u>In re NFL</u>, 821 F.3d at 436.

All of these factors are satisfied here.  First, it is undisputed that the settlement negotiations occurred at arm's length.  The parties began settlement negotiations in January 2023, and then engaged in intensive mediation starting in August 2023.  During numerous mediation sessions, in which I was personally involved, the parties maintained adversarial positions requiring intensive advocacy and negotiation.

Second, as detailed above, the parties engaged in sufficient discovery, which took place over the course of approximately ten years and involved the review and analysis of thousands of documents and deposition transcript pages.  The parties exchanged a total of fifteen expert reports and had the opportunity to test their legal theories via numerous motions.

Third, Class Counsel, who are the proponents of the Settlement, are highly experienced in similar class litigation.  As I found in my Opinion certifying the DPP Class, Class Counsel has extensive experience handling complex class action litigation, particularly in the antitrust context.  <u>In re Suboxone</u>, 421 F. Supp. 3d 12, 50 (E.D. Pa. 2019).

Finally, as will be discussed in more detail below, the response to the Class Settlement has been overwhelmingly favorable.  No class member has filed an objection.

In light of these factors, I find that the proposed Settlement is entitled to a presumption of fairness.  While this presumption does not obviate the need for scrupulous analysis under the <u>Girsh</u>, <u>Prudential</u>, and <u>Baby Product</u> factors, it does skew the analysis in favor of approving the Settlement.

    **B.**    **Application of the *Girsh* Factors**

        1.    <u>Complexity, Expense, and Likely Duration of the Litigation (Factor 1)</u>

"The first factor 'captures the probable costs, in both time and money, of continued litigation.'" <u>In re Warfarin</u>, 391 F.3d 535–36 (quoting <u>In re Cendant</u>, 264 F.3d at 233)); <u>see also</u> <u>In re NFL</u>, 821 F.3d at 437.

This suit involves complicated antitrust issues in the realm of pharmaceutical manufacturing. "An antitrust class action is arguably the most complex action to prosecute . . ."  <u>In re Linerboard Antitrust Litig.</u>, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quotations omitted); <u>see also</u> <u>In re Flonase Antitrust Litig.</u>, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive.").  Continued prosecution of the claims would have required complicated pretrial proceedings, litigation of multiple motions *in limine*, weeks of fact witness testimony, and costly expert witnesses, all without guarantee of any recovery.  Ultimately, the settlement eliminated these risks and provided immediate and guaranteed recovery.  Because such private resolution of the conflict "reduces expenses and avoids delay," this factor weighs heavily in favor of approving the Settlement.  <u>McDonough v. Toys R Us, Inc.</u>, 80 F. Supp. 3d 626, 640 (E.D. Pa. 2015).

        2.    <u>Reaction of the Potential Class Members to the Settlements (Factor 2)</u>

The second <u>Girsh</u> factor—the reaction of the classes to the settlement—"attempts to gauge whether members of the class support the settlement."  <u>In re Warfarin Sodium Antitrust Litig.</u>, 212 F.R.D. 231, 254 (D. Del. 2002) (quoting <u>In re Prudential</u>, 148 F.3d at 318).

Here, in response to widespread notice, no objections have been received, and during the hearing itself, there were no objectors.  Indeed, in connection with the DPPs' Motion for Final Approval, eight

class members wrote letters in affirmative support of the settlement and attorneys' fees.  (ECF No. 996-2, Decl. of Bruce Gerstein at Exs. 2–9.)  Accordingly, this factor favors approval of the Settlement.

### 3.    Stage of Proceedings and Amount of Discovery Completed (Factor 3)

Through the "lens" of the third Girsh factor—the stage of the proceedings and the amount of discovery competed—courts can determine whether counsel had an "adequate appreciation of the merits of the case before negotiating."  In re Prudential, 148 F.3d at 319 (quoting G.M. Trucks, 55 F.3d at 813).  "[P]ost discovery settlements are more likely to reflect the true value of the claim and be fair."  Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999) (citing Bell Atl. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, ten years of active litigation transpired during which extensive discovery was exchanged, depositions were taken, expert reports were obtained and exchanged, and vigorous motion practice was pursued.  The parties reached a settlement only after the grant of class certification, the issuance of rulings on Daubert motions, the denial of Defendant's motions for summary judgment, and extensive pretrial preparation.  Given this record, I find that the parties had a well-developed appreciation of the merits of the case prior to negotiation.

### 4.    Risks of Establishing Liability & Damages (Factors 4 and 5)

The fourth and fifth Girsh factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  In re Warfarin, 391 F.3d at 537.

Given Defendant's numerous defenses both as to liability and damages, a favorable outcome was not guaranteed to the DPPs.  At the time of the Settlement, trial was merely three and a half weeks away, with numerous legal motions remaining to be decided, many of which could have significantly undermined the DPPs' case.

By the same token, I note "there is no indication this case was brought in bad faith simply to generate attorneys' fees, or that the case [was] too weak to succeed under most circumstances."

Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 253 (E.D. Pa. 2011). Indeed, the DPPs successfully thwarted Defendant's extensive motion for summary judgment. Ultimately, the Settlement provided the certainty of a $385 million immediate recovery without subjecting the DPPs to the rigors of a difficult trial. As such, I find these factors weigh in favor of the Settlement.

     5.    Likelihood of Obtaining and Keeping Class Certification Through Trial
           (Factor 6)

The sixth Girsh factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial" in light of the fact that "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." In re Warfarin, 391 F.3d at 537 (internal quotations & citation omitted). Class certification is tenuous, as a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." Id. (citation omitted).

Here, the DPPs were certified as a class, and that decision was unanimously affirmed by the Third Circuit. See In re Suboxone, 967 F.3d 264 (3d Cir. 2020). There was no reason to believe that this case would not sustain its class certification through trial. As such, this factor does not weigh either for or against the Settlement.

     6.    Ability of Defendants to Withstand a Greater Judgment (Factor 7)

The ability of the Defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." Reibstein, 761 F. Supp. 2d at 254. The Third Circuit has noted that simply because a defendant "could afford to pay more does not mean that it is obligated to pay any more than what the [class members] are entitled to under the theories of liability that existed at the time the settlement was reached." In re Warfarin, 391 F.3d at 538.

Here, although the DPPs did not know precisely what Defendant's financial situation was, it was nonetheless a factor for consideration in the settlement negotiations. Defendant already had a $600

million judgment against it by the Department of Justice and had recently reached settlements of $102.5 million with forty-two States' Attorneys General and $30 million with a class of end payors.  In addition, Defendant was facing other litigation in the state courts.  The DPPs negotiated a settlement that provided for immediate financial recovery, which eliminated the risk that they would not be able to collect on a judgment following a trial.

> 7.    Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and to a Possible Recovery in Light of All Attendant Risks of Litigation (Factors 8 & 9)

"The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case.  The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."   In re Warfarin, 391 F.3d at 538 (citations omitted).   In order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."  In re Prudential, 148 F.3d at 322 (quoting G.M. Trucks, 55 F.3d at 806 (further quotations omitted)).  In conducting this evaluation, courts recognize "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation."  In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at *11 (E.D. Pa. Jan. 4, 2001).  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.  The percentage recovery, rather must represent a material percentage recovery to plaintiff in light of all the risks considered under Girsh."  In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citations omitted) (internal quotations marks omitted), aff'd, 264 F.3d 201 (3d Cir. 2001).

The settlement here is reasonable in light of the best possible recovery.  The DPPs' expert, Dr. Russell L. Lamb, estimated the DPPs damages in two scenarios:  (1) if the DPPs proved that Defendant had delayed the entry of generics, the damages were $3,157,444,422, and (2) if the DPPs lost on their generic delay theory, the damages were $2,643,264,162.  The total DPP settlement of $385 million is approximately twelve to fourteen percent of these potential recovery situations.  Courts have approved settlements in and around this range.  See In re Linerboard Antitrust Litigation, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (citing in part In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 325 (N.D. Ga. 1993) (approving a settlement in the appropriate amount of 12.7 to 15.3 percent of the estimated $2 billion minimum possible trebled recovery); Erie Forge and Steel, Inc. v. Cyprus Minerals Co., No. 94-cv-404, 1994 WL 485803 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); Fox v. Integra Financial Corp., No. 90-cv-1504 (W.D. Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); In re Four Seasons Sec. Litig., 58 F.R.D. 19, 36–37 (W.D. Okla. 1972) ($8 million settlement approved although claims exceeded $100 million)).

The settlement becomes even more favorable when considered against the attendant risks of litigation.  The settlement was achieved after ten years of litigation.  Defendant had competing economic experts who would have challenged the DPPs' damages calculations on multiple potentially viable theories. "After considering the present-day-value of money, the likelihood that the class would recover less than its maximum actual damages, all of the attendant risks of litigation, and the interests in resolution, such a recovery is well within the range of reasonableness."  Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); see also In re NFL, 821 F.3d 410, 440 (3d Cir. 2016) (holding that, in considering the eighth and ninth Girsh factors, "we must take seriously the litigation risks inherent in pressing forward with the case" including the possibility that litigation could leave class members with "no recovery at all").

Taking all of this into consideration, I find that the eighth and ninth <u>Girsh</u> factors weigh in favor of approval of the Settlement.

        8.      <u>Summary of the *Girsh* Factors</u>

In sum, all of the <u>Girsh</u> factors favor approval of the DPP Settlement.  Although the <u>Girsh</u> factors are simply a guide, I find that, under these considerations, the Settlement is fair and reasonable.

## C.     **The *Prudential* Factors**

The <u>Prudential</u> factors involve multiple additional considerations, including: (1) "the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages"; (2) "the existence and probable outcome of claims by other classes and subclasses"; (3) "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants"; (4) "whether class or subclass members are accorded the right to opt out of the settlement"; (5) "whether any provisions for attorneys' fees are reasonable"; and (6) "whether the procedure for processing individual claims under the settlement is fair and reasonable."  <u>In re Prudential</u>, 148 F.3d at 323.  Only the <u>Prudential</u> factors relevant to the litigation in question need be addressed.  <u>Id.</u> 323–24; <u>In re Cigna-American Specialty Health Admin. Fee Litig.</u>, No. 16-cv-3967, 2019 WL 4082946, at *3 (E.D. Pa. Aug. 29, 2019).

The first factor—maturity of the underlying substantive issues—substantially mirrors <u>Girsh</u> factor three, the stage of the proceedings.  Under this factor, the advanced development of the record weighs in favor of approval.  <u>See</u> <u>Chakejian v. Equifax Info. Servs., LLC</u>, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding settlement reasonable where underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of case, and mediation efforts undertaken.").  As oft-repeated, the Settlement here came on the heels of ten years of active litigation during which extensive discovery was exchanged, expert reports were obtained, and vigorous motion practice was

pursued.  Class Counsel had the benefit of assessing the strength and weaknesses of the case based on this discovery and the Defendants' motions.  Moreover, the Settlement resulted from extensive negotiations in which I acted as the mediator.  Accordingly, I find that the Settlement was premised on a significantly mature record.

Factors two and three look at the outcomes of claims by other classes and other claimants.  The DOJ had already obtained a $600 million judgment against Defendant based on similar conduct and accompanied by the threat of criminal liability.  As part of the consolidated litigation before me, a group of forty-two States' Attorneys General obtained a settlement of $102.5 million and the End Payor Class obtained a settlement of $30 million, leaving the DPPs the sole remaining group.  The Settlement here involves an immediate payout of $385 million, more than three times that of the States and more than ten times that of the EPPs.  Thus, there do not appear to be any disparities in the success of the settlements obtained by the various claimants.

Factor four considers whether class or subclass members are accorded the right to opt out of the settlement.  After the initial certification of the class, class members were provided an opt-out period.  Although a second opt-out period was not provided following the Settlement, I find that that class members still retained the right to object to the Settlement and did not do so.

Pursuant to the fifth factor—the reasonableness of attorneys' fees—the Notice Program specifically advised potential Class Members that:

> If the Court gives Final Approval to the settlement, then the Court will be asked to approve reasonable fees and expenses for the lawyers wo worked on the case and for reimbursement of the litigation expenses they have advanced on behalf of the Class.  Class Counsel intend to seek attorneys' fees of up to 33 1/3 % of the Settlement Fund plus court-approved expenses and service awards, including a proportionate share of any accrued interest.  If the Court grants Class Counsel's requests, fees and expenses would be deducted from the Settlement Fund.  Class Members will not have to pay any attorneys' fees or expenses out of their own pockets.
>
> Any application by Class Counsel for an award of attorneys' fees, reimbursement of expenses and service awards to Class Representatives

> will be filed with the Court and made available for download and/or viewing . . .

(ECF No. 996-10, p. 8–9.)  While the reasonableness of these requested fees is discussed in more detail below, I find—for purposes of approving the fairness of the Settlement—that the notice to the Class Members about the requested fees was reasonable.

Under the fifth factor—the procedure for processing individual claims under the settlement—I find that the process is both fair and reasonable.  The Claims Administrator will provide a separate, individualized claim form (the "Claim Form") for each class member.   The Claim Form will expressly set forth the Class member's (a) purchases of Suboxone Tablets during the period of June 1, 2012 through March 14, 2013, and (b) purchases of Suboxone Film during the period of September 1, 2012 through July 31, 2015, all calculated based on sales data produced by Defendant during discovery.  The Claim Form will also request that the Class member verify the accuracy of the information contained therein and will provide instructions for challenging any figures or computations.  If a Class member disputes the information, it may submit its own purchase data pursuant to certain procedures.  If it agrees that the information is accurate, it can sign and return the Claim Form.   Once the Settlement Administrator completes the processing and calculation of the settlement awards for all timely-filed claims, final recommendations will be submitted to the Court for approval.  The Net Settlement Fund will be paid pursuant to the plan of allocation and divided according among all the Direct Purchaser Class members whose claims are approved, based on their purchases. (ECF No. 982-4.)

Overall, the Prudential factors raise no concerns regarding the fairness of the Settlement.  The Settlement was reached at mature stage of the litigation, and the Settlement's terms appropriately set forth how to file a claim, how the monies will be distributed, how to object to the Settlement, and what the potential attorneys' fees and costs awards could be.  Ultimately, the Settlement is consistent with those obtained by the other claimants in the related actions.  As such, I find that the Prudential factors favor approval of the Settlement.

**D.**     ***Baby Products* Direct Benefit Factor**

The final factor I must consider in my analysis of the Settlement's fairness is "the degree of direct benefit provided to the class." In re Baby Products Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013). As noted above, "[i]n making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards." Id.; see also In re Google Inc. Cookie Placement Consumer Privacy Litig., 934 F.3d 316, 329 (3d Cir. 2019).

Here, the number of individual awards is not relevant where, as here, "each class member who submit[s] a valid claim is eligible to receive an individual award." Ward v. Flagship Credit Acceptance LLC, 17-cv-2069, 2020 WL 7599389, at *22 (E.D. Pa. Feb. 13, 2020). As to the size of the individual awards compared to claimants' damages, the Settlement represents a compromise but still awards each class member a substantial direct benefit that is immediate and guaranteed. Finally, as set forth above, the claims process used to determine individual words is directly based on each Class member's purchases from Defendant.

**E.     Conclusion as to Fairness of the Settlement**

In light of the foregoing, I find that the Settlement is fair, reasonable, and adequate. Lending the Settlement the requisite presumption of fairness, I note that all the Girsh factors, the Prudential factors, and the Baby Products direct benefit consideration weigh in favor of approval. Accordingly, I will grant final approval to Settlement.

**V.     APPROVAL OF THE PLAN OF ALLOCATION**

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself. McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 648 (E.D. Pa. 2015). "Therefore, the proposed plan needs to be fair, reasonable and adequate." Id. (citing In re Baby Prods., 708 F.3d at 174). "A district court's 'principal obligation' in approving a plan of allocation

'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'" Sullivan v. DB Investments, Inc., 667 F.3d 273, 326 (3d Cir. 2011) (quoting Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983)).

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000).  Repeatedly, courts have approved of similar plans of allocation.  See, e.g., In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 752 (E.D. Pa. 2013) (approving plan of allocation as fair, reasonable, and adequate where, in antitrust action against brand name drug manufacturer, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying purchases of the brand name drug); Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company), 513 F. Supp. 2d 322, 335 (E.D. Pa. 2007) (approving as reasonable a distribution plan that allocated settlement funds to class members based upon their *pro rata* share of the class's total transparent tape purchases during the damage period, net of invoice adjustments and rebates paid as of the date of the settlement); In re Remeron Direct Purchaser Antitrust Litig., No. 03-cv-0085, 2005 WL 3008808, at *11 (D.N.J. Nov. 9, 2005) ("Plaintiffs propose to allocate the Settlement funds, net of Court approved attorneys' fees, incentive award, and expenses . . . in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged conduct in restraint of trade.  Such a method of allocating the Net Settlement Fund is inherently reasonable."); see also In re Corel Corp. Inc. Secs. Litig., 293 F. Supp. 2d 484, 493 (E.D. Pa. Jan. 4, 2001) (noting that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable.").

Here, the proposed Plan of Allocation is fair, reasonable, and adequate as it provides a straightforward method for determining each Class Member's *pro rata* share of the Net Settlement Fund based upon purchases of branded Suboxone Tablets and Film.  As set forth in more detail above, Direct Purchaser Class members need only complete a form with information about their purchases of

Suboxone Tablets and Film for specific periods of time.  Based upon Dr. Lamb's damages calculations, the Allocation Plan allocates 4.78% of the Net Settlement Fund to the Class's purchases of Suboxone Tablets and 95.22% of the Net Settlement Fund to the Class's purchases of Suboxone Film.  (ECF No. 982-4 at 5–6.)

To calculate the *pro rata* share for each claimant, the Claims Administrator, working with Dr. Lamb, will take (a) each Claimant's weighted combined total net purchases of Suboxone Tablets from Defendant from January 1, 2012 through March 13, 2013, and Suboxone Film from Defendant from September 1, 2012 through July 31, 2015; (b) remove any purchases for which the rights to damages in this litigation have been assigned by agreement; and divide it by (c) the weighted combined total purchases by all Claimants who timely submit valid, accepted Claim Forms of Suboxone Tablets from Defendant from January 1, 2012 through March 14, 2013 and Suboxone Film  from Defendant from September 1, 2012 through July 31, 2015.  Using data produced in discovery, Dr. Lamb has already performed a preliminary computation of the percentage shares of the Net Settlement Fund due to each Class member.  Should any Class member fail to submit a claim or should any Claimant document and submit an alternative amount of purchases that is approved by the Claims Administrator, the Claimant's shares will be recalculated accordingly.  (Id. at 7.)

Upon Court approval of the final report and declaration of the Claims Administrator, the Claims Administrator shall issue, a check or wire payable to each Claimant who has submitted a complete and valid Claim Form, including to each Claimant that filed a late but approved claim.  Subject to further Court order, any monies that remain unclaimed form the Net Settlement Fund after the initial distribution shall be distributed to Claimants in an additional distribution on the basis of the same calculations of the Claimants' *pro rata* weighted combined total of Suboxone Tablets and Suboxone Film Purchases.  To the extent residual funds cannot be feasibly paid out, Plaintiffs' Counsel shall seek *cy pres* distributions, although that scenario is unlikely.  (Id. at 11.)

As no Class Member has objected to the proposed Plan of Allocation, and as the Plan seeks to distribute the entire amount of the Net Settlement Fund to Class Members, I will approve. It.

## VI. MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND INCENTIVE AWARDS

The final portion of my review of the Settlement requires consideration of the DPPs' Motion for (1) an award of attorneys' fees, (2) reimbursement of litigation expenses, and (3) incentive awards for the class representatives.

### A.    Attorneys' Fees

The DPPs seek an award of attorneys' fees in the amount of $120,645,687.56 plus accrued interest—approximately thirty-two percent of the Class Settlement Fund minus reimbursed expenses and service awards to class representatives—on behalf of Class Counsel.

Under Federal Rule of Civil Procedure 23(h), at the conclusion of a successful class action, class counsel may apply to a court for an award of attorneys' fees. The amount of an attorneys' fee award "is within the district court's discretion so long as it employs correct standards and procedures and makes finding of fact not clearly erroneous[.]" Sullivan v. DB Invs., Inc., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (internal quotation marks omitted). "'[A] private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.'" In re Cendant, 404 F.3d at 187 (quoting G.M. Trucks, 55 F.3d 768, 820 n.39).

In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method is generally favored in common fund cases, such as the one here, because it allows courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for its failure." In re Prudential, 148 F.3d at 333 (internal quotations omitted); see also In re Rite Aid Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (finding that the "percentage of the fund" method is the proper method for calculating attorneys' fees in common fund

class actions in this Circuit.); <u>Kirsch v. Delta Dental of New Jersey</u>, 534 F. App'x 113, 115 (3d Cir. 2013) ("The percentage of recovery method is generally favored in common fund cases . . .") (quotations omitted).

In <u>Gunter v. Ridgewood Energy Corp.</u>, 223 F.3d 190 (3d Cir. 1990), the Third Circuit directed that, when analyzing a fee award in a common fund case, a district court must consider several factors, including:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

<u>Id.</u> at 195 n. 1. This list was not intended to be exhaustive. <u>Id.</u>

In <u>In re Prudential</u>, the Third Circuit identified three other factors that may be relevant and important to consider: (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained, and (3) any "innovative" terms of settlement. 148 F.3d at 336–40.

Ultimately, in reviewing an attorneys' fees award in a class action settlement, a district court should consider the <u>Gunter</u> factors, the <u>Prudential</u> factors, and any other factors that are useful and relevant with respect to the particular facts of the case. The fee award reasonableness factors "need not be applied in a formulaic way" because each case is different, "and in certain cases, one factor may outweigh the rest." <u>In re Rite Aid</u>, 396 F.3d at 301 (quoting <u>Gunter</u>, 223 F.3d at 195 n.1). In cases involving extremely large settlement awards, district courts may give some of these factors less weight in evaluating a fee award. <u>See</u> <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 283–84 (3d Cir. 2001); <u>In re Prudential</u>, 148 F.3d at 339. What remains important is that, in all cases, the district court "engage in

robust assessments of the fee award reasonableness factors," <u>In re Rite Aid</u>, 396 F.3d at 302, recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements."  <u>In re Cendant Corp. PRIDES Litig.</u>, 243 F.3d 722, 730 (3d Cir. 2001) (internal quotations omitted); <u>see also</u> <u>In re AT&T Corp.</u>, 455 F.3d 160, 165–66 (3d Cir. 2006).

Once all of the <u>Gunter</u> and <u>Prudential</u> factors have been considered, the Third Circuit has suggested that it is "sensible" for district courts to "cross-check" the percentage fee award against the "lodestar" method.  <u>In re Prudential</u>, 148 F.3d at 333.  More specifically, the district court should apply the percentage-of-recovery method and then do "an abridged lodestar analysis"—multiplying the number of hours reasonably worked on a case by a reasonable billing rate—and compare it against the percentage-of-recovery method.  <u>In re Rite Aid</u>, 396 F.3d at 305–06.  In doing so, the court can ensure that the percentage-of-recovery method does not yield too high or low of an award.  <u>Id.</u> at 306.

With these standards in mind, I consider each of the <u>Gunter</u> and <u>Prudential</u> factors and then cross-check the percentage-of-recovery amount against a lodestar analysis to provide an overall assessment of the reasonableness of the requested attorneys' fees.

       1.    <u>Gunter/Prudential Factors</u>

          *a.*    *Size of the Fund Created & Number of Persons Benefitted*

The Settlement Agreement establishes a total recovery of $385 million, from which administrative expenses, attorneys' fees, and costs must be paid.  <u>See</u> <u>Jackson v. Wells Fargo Bank, N.A.</u>, 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (noting that "size of the fund" should include attorneys' fees, and administration expenses); <u>Lake Forest Partners, L.P. v. Sprint Commc'ns Co. L.P.</u>, No. 12-cv-00999, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013)  (the size of the fund should include the "separate payment of attorney's fees and expenses, and the expenses of administration") (citing <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 479 (1980)).

Class Counsels' requested fees in this case represent thirty-two percent[3] of the total recovery—a percentage which is well within the range of reasonable fees, on a percentage basis, in the Third Circuit.  See, e.g., Esslinger v. HSBC Bank Nevada, No. 10-cv-3213, 2012 WL 5866074, at *12 (thirty percent fee award reasonable considering size of the fund); In re Processed Egg Prods. Antitrust Litig., No. 08–md-2002, 2012 WL 5467530, at *6 (E.D. Pa. Nov. 9, 2012) (approving a thirty percent fee award for $25,000,000.00 settlement); In re Flonase Antitrust Litig., 291 F.R.D. 93, 104 (E.D. Pa. 2013) (citing cases and remarking that "[a] one-third fee award is standard in complex antitrust cases of this kind" and "is consistent with awards in other complex antitrust actions involving the pharmaceutical industry") (quotations omitted).  Accordingly, this factor weighs in favor of finding the fee request reasonable.

> b.    *Presence or Absence of Substantial Objections*

The Notice, mailed on November 20, 2023, specifically advised Class Members that Class Counsel would request an award of attorneys' fees of up to one-third of the total amount of the Settlement funds, plus costs, all of which would be paid from the Settlement funds.  Despite this Notice, no class member filed an objection prior to the deadline of January 12, 2024.

> c.    *Skill and Efficiency of Attorneys' Involved*

The Third Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." Gunter, 223 F.3d at 198 (quotations omitted).  "The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000) (quotations omitted).

As repeatedly discussed above, both in regard to class certification and with respect to the fairness of the Settlement, Class Counsel are skilled and effective class action litigators that have

---

[3]  Class Counsel's initial Motion for Attorneys' Fees sought 33 1/3 % of the Net Settlement Fund.  By way of a supplemental submission, Class Counsel lowered their request to 32% of the Net Settlement Fund.

obtained a highly favorable settlement in an extremely complex case litigated over the course of ten years.  I need not reiterate those same considerations again here.  This factor therefore supports a thirty-two percent attorney fee award.

> d.      *Complexity and Duration of the Litigation*

"[C]omplex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the class by class counsel" are factors which "increase the complexity of class litigation."  In re Cendant Corp. PRIDES, 243 F.3d at 741.  All of those factors favor the requested fee award here.

The legal issues involved here were complex, implicating a novel theory of a product hop antitrust scheme.  Various groups of plaintiffs proceeded against Defendant.  Discovery was extensive and far-reaching, involving certification, fact, and expert discovery.  The case was hard-fought on both sides, with multiple, highly-contested motions, including motions to dismiss, discovery motions, certification motions, Daubert motions, and motions for summary judgment.  Finally, after more than ten years of litigation, and many months of intensive mediation, the case reached a settlement.

In short, the litigation has been more than sufficiently lengthy and complex to justify the requested attorneys' fees.

> e.      *Risk of Nonpayment*

The risk of nonpayment in this matter was not negligible.  Class Counsel began this litigation in 2013 on a contingent fee basis with no up front retainer fees or allowance of expenses.  See In re Flonase, 291 F.R.D. at 104 ("[A]s a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial.  Throughout this lengthy litigation, Class Counsel have not received any payment.  This factor supports approval of the requested fee.").  Over the next ten years, Class Counsel devoted extensive amounts of time and resources to litigating this case, all while pursuing complex legal theories which brought with them no guarantee of recovery at trial.  Even in the event of recovery, the DPPs faced the substantial likelihood of challenge on appeal and a potential bankruptcy filing by Defendant.

Given Class Counsels' diligent pursuit of this case for more than a decade with significant risk and no immediate financial reward in sight, I find that this factor weighs in favor of the requested fee award.

<em>f.      Amount of Time Devoted to the Case by Counsel</em>

According to the Declarations submitted in support of the Motion for Attorneys' Fees, Class Counsel has spent approximately 112,000 hours prosecuting of this case and advanced approximately $7.5 million, all without any guarantee of payment.  (Gerstein Decl., ECF No. 992-2, ¶ 83.)  Such expenditure of time at such great risk warrants the requested thirty-two percent fee award.  See In re Ikon Office Solutions, Inc., Secs. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000) (granting a thirty fee request because "[c]ounsel expended more than 45,000 hours on this case and paid out expenses of more than $3 million with no guarantee of recovery" and the case presented "the legal obstacles of establishing scienter, damages, causation, and the like."); Cullen, 197 F.R.D. at 149–50 (finding that counsel's expenditure of 3,899.84 hours on litigation represented a "substantial commitment to this litigation" that warranted a counsel fee of thirty-three and a third percent of the settlement fund); Wallace v. Powell, 288 F.R.D. 347, 375 (M.D. Pa. 2012) (finding that counsel's expenditure of 34,900.48 hours on prosecuting the matter reflected a "substantial commitment to this litigation" and "the complexity of Plaintiffs' claims").

<em>g.      Awards in Similar Cases</em>

"While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has noted that reasonable fee awards in percentage-of-recovery cases generally range from nineteen to forty-five percent of the common fund."  Stevens v. SEI Invs. Co., No. 18-cv-4205, 2020 WL 996418, at *12 (E.D. Pa. Feb. 26, 2020) (citing G.M. Trucks, 55 F.3d at 822).  Courts have consistently approved such awards.  See, e.g., Myers v. Jani-King of Philadelphia, Inc., No. 09-cv-1738, 2019 WL 4034736, at *11 (E.D. Pa. Aug. 26, 2019) (citing cases and noting that "the requested fee of one-third (1/3) of the settlement amount is reasonable in comparison to awards in other cases."); In re Fasteners Antitrust Litig., No. 08-md-1912, 2014 WL 296954, at *7 (E.D. Pa. Jan. 27, 2014) ("Co-Lead

Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions) (citing cases); <u>Stagi v. Nat'l R.R. Passenger Corp.</u>, 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) (noting that this District's fee awards generally range between nineteen and forty-five percent of the common fund); <u>In re Merck & Co., Inc. Vytorin Erisa Litig.</u>, No. 08-cv-285, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) ("review of 289 settlements demonstrates "average attorney's fee percentage [of] 31.71% with a median value that turns out to be one-third") (<u>quoting</u> <u>In re Remeron Direct Purchaser Antitrust Litig.</u>, No. 03-cv-0085, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); <u>Nichols v. SmithKline Beecham Corp.</u>, No. 00-cv-6222. 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005) (approving thirty percent fee of the $65 million settlement in pharmaceutical antitrust class action); <u>In re Linerboard Antitrust Litig.</u>, No. MDL 1261, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) (approving thirty percent fee of a $202 million settlement in an antitrust class action).

Given the magnitude of this case, the efforts of Class Counsel, the risks borne, and the positive outcome, I find that the requested fee of thirty-two percent recovery remains consistent with the awarded fees in other, similar cases.

> h.   *Value of Benefits Accruing to Class Members Attributable to the Efforts of Class Counsel as Opposed to the Efforts of Other Groups, Such as Government Agencies*

A significant factor to consider is whether Class Counsel was aided by a government investigation.  <u>In re AT&T Corp.</u>, 455 F.3d 160, 173 (3d Cir. 2005).  "Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underline the concept of the common fund, and would create an incentive for plaintiffs[s] attorneys to 'minimize the costs of failure . . . by free riding on the monitoring efforts of others.'"  <u>In re Prudential</u>, 148 F.3d at 337 (further quotations omitted).

Here, the DPPs filed suit in December 2012, which significantly preceded the FDA's referral of Defendant's conduct to the Federal Trade Commission, subsequent FTC investigation, and criminal prosecutions by the Department of Justice.   Prior to these governmental suits, the DPPs had already

engaged in their own investigation and developed their own antitrust theories regarding Defendant's actions.  Class Counsel were subsequently able to coordinate discovery and the exchange of information with the End Payor Class and the States' Attorneys General.

Moreover, the involvement of the federal government and its subsequent settlements with Defendant put the financial viability of Defendant, and thus the ability of the Direct Purchaser Class to recover anything, in question.  Nonetheless, Class Counsel pushed forwarded and litigated <u>Daubert</u> and summary judgment motions.   Any benefit gained from government agency involvement paled in comparison to the efforts of Class Counsel.

       *i.*        *The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Agreement at the Time Counsel Was Retained*

"In making a common benefit award, we must try to ascertain what the market would pay for the attorneys' efforts.  That is, we must consider 'the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained.'"  <u>In re Diet Drugs Prods. Liab. Litig.</u>, 553 F. Supp. 2d 442, 482 (E.D. Pa. 2008) (quoting <u>In re AT & T Corp.</u>, 455 F.3d 160, 165(3d Cir. 2006)).   While not an easy calculation, it is an important exercise because "the goal of the fee setting process [is] to 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.'"  <u>In re Linerboard Antitrust Litig. ("Linerboard II")</u>, 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004) (quoting <u>In re Continental Ill. Sec. Litig.</u>, 962 F.2d 566, 568 (7th Cir. 1992)).  "[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.  <u>In re Ikon Office Solutions</u>, 194 F.R.D. at 194 (E.D. Pa. 2000); <u>see also</u> <u>In re Remeron Direct Purchaser Antitrust Litig.</u>, No. 03-cv-0085, 2005 WL 3008808, at *16 (D.N.J. 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class commercial litigation.")

The requested fees here fall squarely within that range, as Class Counsel seeks an award of thirty-two percent of the Settlement Fund.  Therefore, this factor supports the requested fees.

j.      *Innovative Terms of Settlement*

In certain cases, a district court may find that "class counsels' representation and the results achieved [by the settlement agreement] were 'nothing short of remarkable.'" <u>In re Prudential</u>, 148 F.3d at 339 (quotations omitted).  Such a finding may be warranted where a settlement involved "innovative" or unique terms.  <u>Id.</u> (describing the findings of the lower court regarding plaintiffs' counsels' work on the settlement, including "the availability of full compensatory relief, the extensive and comprehensive outreach, and the multi-tiered review process designed to ensure fair scoring of claims," among other characteristics).

Nothing in the Settlement here is particularly remarkable or innovative.  Accordingly, there is no indication that this factor should bear on an attorney fee award.

k.      *Overall Review of the <u>Gunter</u> and <u>Prudential</u> Factors*

All of the <u>Gunter</u> and <u>Prudential</u> factors—except one that weighs neither for nor against approval—supports the award of an attorneys' fees in the amount of thirty-two percent of the Settlement.  Taking them as a whole, I find that the scale is heavily tipped in favor of the requested attorneys' fee award.

2.      <u>Cross-Check Against Class Counsels' Lodestar</u>

The Third Circuit has suggested that it is "sensible" for district courts to cross check the percentage fee award against the "lodestar" method.  <u>In re Rite Aid</u>, 396 F.3d at 305.  The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys.  <u>Id.</u>  The court must then use a multiplier, which is a device that "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."  <u>Id.</u> at 305–06.  "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the

percentage-of-recovery method, with an eye toward reducing the award." Id. at 306.  Even when used as a cross-check, courts should "explain how the application of a multiplier is justified by the facts of a particular case."  In re Prudential, 148 F.3d at 340–41.

Here, as noted above, Class Counsel spent approximately 112,000 working on this case, which hours included preparing the initial Complaint and the Consolidated Amended Class Action Complaint, conducting legal research, engaging in extensive discovery, briefing multiple motions or responses to motions for summary judgment, pursuing class certification, engaging and working with experts, preparing for trial, and pursuing settlement negotiations and settlement document drafting.  In addition, Class Counsel will undoubtedly need to spend additional hours in order to monitor and administer the Settlement and final closing of this case.

Rates for counsel appear to be well within the reasonable range for Class Counsels' experience and for the region.  The current hourly rates charged by class counsel take into account position, experience, level, and location, with the highest rate at somewhere between $1550 per hour for co-lead counsel Bruce Gerstein and progressively working downward.  Courts have considered similar rates reasonable in the past.  Fulton-Green v. Accolade, Inc., No. 18-cv-274, 2019 WL 4677954, at *12 (E.D. Pa. Sept. 23, 2019) (approving class counsel's rates that ranged from $202 to $975 per hour); In re Viropharma Inc., Sec. Litig., No. 12-cv-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys.")a.

According to counsel, taking the lodestar yields a number of $80,094,400.22.  Where there has been a class settlement, this lodestar "is usually multiplied by a factor to reflect the degree of success, the risk of non-payment the attorneys faced and perhaps the delay in payment that they encountered."  Brown v. Esmor Corr. Servs., No. 98-cv-1282, 2005 WL 1917869, at *13 (D.N.J. Aug. 10, 2005); see also In re Prudential, 148 F.3d 283, 340 (3d Cir. 1998) ("Multipliers may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially

beneficial litigation, or may reward counsel for an extraordinary result."). The Third Circuit has recognized that lodestar multipliers from one to four "are frequently awarded" in class cases. In re Prudential, 148 F.3d at 341 (citing 3 Herbert Newberg & Albert Conte, Newberg on Class Actions § 14.03 at 14-5 (3d ed. 1992)).

Here, Class Counsel's requested fees equate to a lodestar multiplier of 1.5, which is well within the accepted range in the Third Circuit.

> 3.    Conclusion as to Attorneys' Fees

Having thoroughly considered all of the Gunter and Prudential factors and having cross-checked the requested fee against the lodestar amount, I find nothing that would warrant denying or reducing the fee requested by Class Counsel. Indeed, by all measures, the requested fee is fair, reasonable, and commensurate with the skill of the attorneys, the amount of work they expended on this complicated litigation, and the results they achieved. Accordingly, I will grant attorneys' fees in the amount of $120,645,687.56 plus accrued interest.

**B.    Reasonable Litigation Expenses**

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001). The court must consider whether the expenses were adequately documented and reasonably and appropriately incurred in the prosecution of the case. Demmick v. Cellco P'ship, No. 06-cv-2163, 2015 WL 13646311, at *4 (D.N.J. Apr. 30, 2015).

According to the Declarations submitted by Class Counsel, the EPPs have incurred $7,532,226.36 for expenses advanced to prosecute the litigation since December 2012. These expenses included local counsel fees, deposition and hearing vendors, document databases and review platforms, process servers/subpoena costs, experts, data, mediation, trial support, and costs of notice of class certification. (Gerstein Decl., ECF No. 992-2, ¶¶ 83–84.) Class Counsel has broken down the fees both

by category and by which law firm incurred them. Finding that these expenses were appropriately incurred in the prosecution of the class action, I award Class Counsel the requested costs in the amount of $7,532,226.36.

  **C.**  **Class Representative Incentive Awards**

  Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 665 (E.D. Pa. 2015) (quotations omitted).  Generally, "[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (quotation omitted); see also First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 524–25 (E.D. Pa. 2007) (citing Nichols v. SmithKline Beecham Corp., No. 00-cv-6222, 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005); Godshall v. Franklin Mint Co., No. 01-cv-5639, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004)).  Factors to be considered when deciding to give incentive awards include "the risk to the plaintiff in commencing litigation, both financially and otherwise; the notoriety and/or personal difficulties encountered by the representative plaintiff; the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial; the duration of the litigation; and the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class." McGee v. Ann's Choice, Inc., No. 12-cv-2664, 2014 WL 2514582, at *3 (E.D. Pa. June 4, 2014) (citing In re Plastic Tableware Antitrust Litig., No. 94-cv-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995)).

  Here, Class Counsel requests incentive awards in the amount of $100,000 for each of the three DPP representatives for their efforts to date.  According to Class Counsel, each of these representatives—Burlington Drug Company ("BDC"), Rochester Drug Co-Operative ("RDC"), and Meijer, inc. and Meijer Distribution, Inc. ("Meijer")— assisted greatly in the prosecution of this case by filing suit on behalf of the DPP Class and undertaking all responsibilities involved in being a named

plaintiff, including monitoring the progress of the case and responding to discovery requests.  According to Class Counsel, each class representative executed broad document searches and collections that required time end effort by their employees.  Each of the class representatives was also deposed, and they continued to expend time and effort over more than a decade.

As noted by the DPPs, these requested incentive awards fall in line with those that have been approved in other cases.  See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-cv-1797, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (approving $100,000 incentive award for four class representatives, and $50,000 incentive awards for two other class representatives); In re Domestic Drywall Antitrust Litig., No. 13-md-2437, 2018 WL 3439454, at *20 (E.D. July 17, 2018) (approving incentive awards to the four named Plaintiffs in the amount of $50,000); Marchbanks Truck Serv. v. Comdata Network, Inc., No. 07-cv-1078, 2014 WL 12738907, at *3–4 (E.D. Pa. July 14, 2014) (awarding incentives in the amount of $150,000 to one class representative, $75,000 each to two others, and $15,000 to the fourth); In re Opana ER Antitrust Litig., No. 14-cv-10150, ECF No. 1085 (N.D. Ill. Nov. 3, 2022) at ¶ 16 (awarding $150,000 each to two class representatives).

For these reasons, I will grant the requested incentive awards of $100,000 to each of the Direct Purchaser Plaintiffs, including BDC, RDC, and Meijer, for a total of $300,000 in incentive payments.

## VII.   CONCLUSION

In light of the foregoing, I will approve the Direct Purchaser Class Settlement and Plan of Allocation.  In addition, I will: (a) award Direct Purchaser Class Counsel attorneys' fees in the amount of $120,645,687.56, plus accumulated interest; (b) reimburse Class Counsel $7,532,226.36 in litigation costs and expenses; and (c) award each of the Direct Purchaser Plaintiffs $100,000 (for a total of $300,000) to be paid from the Class Settlement Fund.

An appropriate Order follows.